NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 24-1376

UNITED STATES COURT OF APPEALS

FOR THE DISTRICT OF COLUMBIA CIRCUIT

AMERICAN WATER WORKS ASSOCIATION,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents*.

On Petition for Review of Final Agency Action of the

United States Environmental Protection Agency

**PAGE PROOF BRIEF FOR RESPONDENTS**

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

Of Counsel:                                           BRADLEY CRAIGMYLE
                                                      *Deputy Assistant Attorney General*

LESLIE DARMAN                                         SARAH IZFAR
KATIE SPIDALIERI                                      *Senior Attorney*
                                                      Environment and Natural Resources Division
U.S. Environmental Protection Agency                  U.S. Department of Justice
                                                      150 M Street, N.E.
                                                      Washington, D.C. 20002
                                                      (202) 532-3050
                                                      sarah.izfar@usdoj.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

In addition to the parties and amici listed in the Initial Opening Brief of Petitioner, the Chamber of Commerce has appeared as amicus for Petitioner.

### B.    Ruling Under Review

The agency action under review is a final rule entitled "National Primary Drinking Water Regulations for Lead and Copper: Improvements (LCRI)," 89 Fed. Reg. 86418 (Oct. 30, 2024).

### C.    Related Cases

All related cases are identified in the Initial Opening Brief of Petitioner.

/s/ *Sarah Izfar*

SARAH IZFAR

Counsel for Respondents

i

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
    CASES ........................................................................................... i

TABLE OF AUTHORITIES ................................................................ v

GLOSSARY ........................................................................................ x

INTRODUCTION ............................................................................... 1

STATEMENT OF THE ISSUES ........................................................ 2

PERTINENT STATUTES AND REGULATIONS ............................. 3

STATEMENT OF THE CASE ............................................................ 3

I.     Background ............................................................................. 3

     A.     Statutory background ............................................ 3

          1.     Establishment and review of national primary
               drinking water regulations ......................... 4

          2.     Establishing each treatment technique ....... 6

          3.     Health risk reduction and cost analysis ...... 7

     B.     Regulatory and factual background ...................... 7

          1.     Lead contamination ..................................... 7

          2.     EPA's earlier attempts to regulate lead and the
               1991 Lead and Copper Rule ....................... 8

          3.     Subsequent revisions to the 1991 Rule ...... 10

          4.     The Lead and Copper Rule Revisions ("2021
               Rule") ......................................................... 12

(Page 3 of Total)

      5.    EPA's reconsideration of the 2021 Rule.................................13

      6.    The Rule ...........................................................................14

  C.  Procedural history.....................................................................17

STANDARD OF REVIEW .................................................................17

SUMMARY OF ARGUMENT ............................................................18

ARGUMENT ......................................................................................20

I.    The best interpretation of "control" in the definition of "public water system" is that it includes lines that the system can access to conduct full replacement of lead service lines. ..........................20

  A.  SDWA authorizes EPA to regulate public water systems. .................21

  B.  The best interpretation of the statute is that service lines are under the "control" of public water system operators if systems have access to fully replace the lines. .................23

  C.  Equating control with ownership is not the best interpretation. ........................................................................25

  D.  In every lead rule, EPA has consistently required lead service line replacement of some customer-owned service lines, and the Rule does not expand EPA's authority...........................................................................28

II.    EPA reasonably required public water systems to conduct full lead service line replacement of lines under their control within 10 years. .....................................................................................33

  A.  EPA reasonably determined that mandatory full lead service line replacement prevents adverse health effects....................34

  B.  EPA reasonably found that full lead service line replacement within 10 years is feasible. ..............................36

1.      EPA reasonably identified the fastest feasible rate
        for lead service line replacement. ..............................................36

2.      Lead service line replacement is technically
        possible within the Rule's timeframe. ......................................41

3.      Lead service line replacement is affordable within
        the Rule's timeframe. ................................................................44

4.      Petitioner's remaining scattershot infeasibility
        claims fail. .................................................................................47

III.    EPA's health risk reduction and cost analysis (Economic
        Analysis) is reasonable. ..................................................................51

IV.     Petitioner's requested remedy is inappropriate. .............................55

CONCLUSION ...........................................................................................57

CERTIFICATE OF COMPLIANCE .........................................................58

iv

# TABLE OF AUTHORITIES[*]

## CASES

*Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) ....................................................................... 55, 56

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.,*
    724 F.3d 243 (D.C. Cir. 2013) ...............................................................................17

*\*Am. Water Works Ass'n v. EPA (AWWA),*
    40 F.3d 1266 (D.C. Cir. 1994) .................................................................. 8, 9, 28

*Bass v. Ledbetter,*
    363 S.E.2d 760 (Ga. 1988) ....................................................................................27

*Biden v. Texas,*
    597 U.S. 785 (2022) .......................................................................................... 21, 22

*BP P.L.C. v. Mayor & City Council of Balt.,*
    593 U.S. 230, 141 S.Ct. 1532 (2021) ..................................................................23

*\*City of Portland v. EPA,*
    507 F.3d 706 (D.C. Cir. 2007) ....................................................... 7, 17, 33, 45, 52

*City of Waukesha v. EPA,*
    320 F.3d 228 (D.C. Cir. 2003) ..............................................................................34

*Env't Def. Fund, Inc. v. Costle,*
    578 F.2d 337 (D.C. Cir. 1978) ................................................................................3

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ................................................................................................29

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) .......................................................................................... 18, 34

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) .......................................................................................... 18, 27

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

v

*Lucero v. Holland*,
  902 F.3d 979 (9th Cir. 2018) ..............................................................26

*Mass. Lobstermen's Ass'n v. Ross*,
  349 F. Supp. 3d 48 (D.D.C. 2018) .....................................................27

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
  413 U.S. 405 (1973).............................................................................25

*Oakland Water Res. Comm'r v. Mich. DEQ*,
  No. 18-000259-MZ (2019) ..................................................................27

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
  605 U.S. 168 (2025)...................................................................... 17, 18

*Sw. Airlines Co. v. Saxon*,
  596 U.S. 450 (2022).............................................................................23

*West Virginia v. EPA*,
  597 U.S. 697 (2022).............................................................................30

**STATUTES**

5 U.S.C. § 706.................................................................................................52

5 U.S.C. § 706(2) ...........................................................................................17

42 U.S.C. §§ 300f *et seq.* ...............................................................................3

42 U.S.C. § 300f(1)............................................................................. 4, 21, 30

42 U.S.C. § 300f(1)(C)(ii)............................................................................5, 6

*42 U.S.C. § 300f(4)(A) .................................................... 2, 4, 21, 24

42 U.S.C. § 300f(5)....................................................................................4, 22

42 U.S.C. § 300g ........................................................................................4, 21

42 U.S.C. § 300g-1(a)(3) .................................................................................5

42 U.S.C. § 300g-1(b)(1)(A)...........................................................................4

42 U.S.C. § 300g-1(b)(1)(B)...........................................................................4

vi

42 U.S.C. § 300g-1(b)(2)(A)................................................................8

42 U.S.C. § 300g-1(b)(3) ....................................................................3

42 U.S.C. § 300g-1(b)(3)(A) ...............................................................5

42 U.S.C. § 300g-1(b)(3)(B) ...............................................................5

*42 U.S.C. § 300g-1(b)(3)(C)............................................ 5, 20, 47, 51, 52

*42 U.S.C. § 300g-1(b)(3)(C)(i) ................................................... 7, 45

42 U.S.C. § 300g-1(b)(3)(C)(i)(III) ...................................................55

42 U.S.C. § 300g-1(b)(3)(C)(ii) .................................................... 7, 45

42 U.S.C. § 300g-1(b)(4)(A) ...............................................................5

*42 U.S.C. § 300g-1(b)(4)(C)...................................... 7, 17, 51, 52

*42 U.S.C. § 300g-1(b)(4)(D)....................... 6, 19, 33, 44, 47, 52

42 U.S.C. § 300g-1(b)(4)(E)(ii) .........................................................44

*42 U.S.C. § 300g-1(b)(7) ...................................... 1, 2, 3, 13

*42 U.S.C. § 300g-1(b)(7)(A)................................ 5, 6, 18, 33, 52

42 U.S.C. § 300g-1(b)(9) .....................................................................5

42 U.S.C. § 300g-1(b)(15) .................................................................44

42 U.S.C. § 300g-1(e) ........................................................................11

42 U.S.C. § 300g-4(d) ..........................................................................6

42 U.S.C. § 300g-5..............................................................................41

42 U.S.C. § 300g-6..............................................................................31

42 U.S.C. § 300g-6(a)(2) ...................................................................22

42 U.S.C. § 300j-5 ..............................................................................11

Pub. L. No. 93-523, 88 Stat. 1661 (1974)................................................23

(Page 8 of Total)

## CODE OF FEDERAL REGULATIONS

40 C.F.R. § 141.2 ...................................................................8

40 C.F.R. § 141.84 (1991) ....................................................9

40 C.F.R. § 141.84(d) (2000)..............................................10

40 C.F.R. § 141.84(d)(1) (2024) .........................................15

*40 C.F.R. § 141.84(d)(2)............................... 15, 23, 24, 28, 31

40 C.F.R. § 141.84(d)(2)(i)..................................................15

40 C.F.R. § 141.84(d)(3) ....................................................15

40 C.F.R. § 141.84(g)(7) (2021) .........................................31

## FEDERAL REGISTER

40 Fed. Reg. 59566 (Dec. 24, 1975)......................................8

48 Fed. Reg. 45502 (Oct. 5, 1983).........................................8

56 Fed. Reg. 26460 (June 7, 1991).....................................8, 9

61 Fed. Reg. 16348 (Apr. 12, 1996)......................................9

63 Fed. Reg. 41940 (Aug. 5, 1998)........................................4

65 Fed. Reg. 1950 (Jan. 12, 2000) ...................................9, 10

71 Fed. Reg. 40828 (July 18, 2006).....................................10

72 Fed. Reg. 57782 (Oct. 10, 2007).....................................10

84 Fed. Reg. 61741 (Nov. 13, 2019) ...................................11

85 Fed. Reg. 54235 (Sep. 1, 2020) .....................................32

86 Fed. Reg. 4198 (Jan. 15, 2021) .................... 12, 13, 31, 49

86 Fed. Reg. 14003 (Mar. 12, 2021).....................................13

(Page 9 of Total)

86 Fed. Reg. 71574 (Dec. 17, 2021) ................................................................ 13, 14

88 Fed. Reg. 84878 (Dec. 6, 2023) ................................................. 14, 17, 36, 51

89 Fed. Reg. 86418 (Oct. 30, 2024) ...................................................................1

**LEGISLATIVE HISTORY**

H.R. Rep. No. 93-1185 (1974), U.S.C.C.A.N. 6454 .................................................4

(Page 10 of Total)

# GLOSSARY

| | |
|---|---|
| 1991 Rule | Maximum Contaminant Level Goals and National Primary Drinking Water Regulations for Lead and Copper, 56 Fed. Reg. 26460 (June 7, 1991), as amended 65 Fed. Reg. 1950 (Jan. 12, 2000). |
| 2021 Rule | National Primary Drinking Water Regulations: Lead and Copper Rule Revisions, 86 Fed. Reg. 4198 (Jan. 15, 2021) |
| EPA | U.S. Environmental Protection Agency |
| Economic Analysis | Health risk reduction and cost analysis, as required by 42 U.S.C. § 300g-1(b)(3)(C) |
| μg/L | Micrograms per liter |
| Proposed Rule | National Primary Drinking Water Regulations for Lead and Copper: Improvements (LCRI), 88 Fed. Reg. 84878 (Dec. 6, 2023) |
| Rule | National Primary Drinking Water Regulations for Lead and Copper: Improvements (LCRI), 89 Fed. Reg. 86418 (Oct. 30, 2024) |
| RTC | Response to Comments |
| SDWA | Safe Drinking Water Act |
| TSD | Technical Support Document |

x

**INTRODUCTION**

After decades of implementing a drinking water regulation that repeatedly failed to protect many Americans from lead contamination, in some cases with catastrophic results, the U.S. Environmental Protection Agency ("EPA") took decisive action to safeguard the nation's drinking water with the Rule. 89 Fed. Reg. 86418 (Oct. 30, 2024). Two core findings animate the Rule. First, there is no safe level of lead in drinking water. Lead poses serious health hazards to everyone, particularly to young children, and damage can be long-lasting. Second, EPA's decades-long effort to safeguard the public, by relying primarily on regulations that minimize lead exposure through targeted tap monitoring and corrosion control treatments, has failed to prevent system-wide lead contamination and widespread adverse health effects.

Unlike most drinking water contamination that water systems address by treating incoming source water, lead contamination primarily results when lead leaches from pipes after leaving the water treatment plant. After intensive stakeholder involvement, EPA concluded that the only way to comply with the Safe Drinking Water Act's ("SDWA's") mandate to prevent anticipated adverse health effects "to the extent feasible" is to require replacement of lead service lines. 42 U.S.C. § 300g-1(b)(7). Where present, these lines are the most significant source of lead in drinking water. The Rule therefore requires water

1

systems to fully replace all lead service lines under their control, regardless of tap monitoring results.

Petitioner does not dispute the significant health benefits of the Rule but primarily challenges this requirement.  Its challenge fails on multiple grounds.  EPA's statutory interpretation is the best and most natural reading and is consistent with its longstanding position.  EPA supported its feasibility analysis with a voluminous record that includes the best available data and empirical examples of successful lead service line replacement programs.  And finally, EPA reasonably completed its cost-benefit economic analysis, concluding that under every metric analyzed, the estimated benefits from the Rule far outweigh the estimated costs.  The Court should uphold the Rule as lawful and reasonable.

## STATEMENT OF THE ISSUES

SDWA mandates that a treatment technique in a drinking water regulation must prevent "known or anticipated adverse effects on the health of persons to the extent feasible."  42 U.S.C. § 300g-1(b)(7).  EPA accomplished this by requiring public water systems to fully replace lead service lines under their "control."  *Id.* § 300f(4)(A).  The case presents three issues:

1.    Whether EPA may require public water systems to fully replace lead service lines if the system has access to conduct a replacement because a) the definition of "public water system" includes lines under the "control" of the

2

operator of the system and b) such lines include those that the system has access to replace.

2.     Whether EPA reasonably required most water systems to fully replace lead service lines under their control within 10 years of the compliance deadline based on its conclusion that doing so would prevent adverse health effects to the extent feasible, as required by 42 U.S.C. § 300g-1(b)(7).

3.     Whether EPA's health risk reduction and cost analysis, which concluded that the benefits of the Rule outweighed the costs, reasonably complied with 42 U.S.C. § 300g-1(b)(3).

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations not included in the Petitioner's Brief are set forth in the Supplemental Addendum separately filed with this brief.

## STATEMENT OF THE CASE

### I.    Background

#### A.    Statutory background

In 1974, Congress passed SDWA, 42 U.S.C. §§ 300f *et seq*., in response to "accumulating evidence that our drinking water contains unsafe levels of a large variety of contaminants." *Envt'l Def. Fund, Inc. v. Costle*, 578 F.2d 337, 339 (D.C. Cir. 1978). Congress intended to ensure "that water supply systems serving

the public meet minimum national standards for protection of public health."  H.R. Rep. No. 93-1185, at 1 (1974), reprinted in 1974 U.S.C.C.A.N. 6454.

To achieve this purpose, Congress charged EPA with identifying contaminants in "public water systems" through a multi-step process.  42 U.S.C. § 300g-1(b)(1)(A)(B).  "Public water system" means "a system for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen service connections or regularly serves at least twenty-five individuals." [1]  *Id*. § 300f(4)(A).  The term includes "any collection, treatment, storage, and distribution facilities under control of the operator of such system and used primarily in connection with such system."[2]  *Id.*

## 1.    Establishment and review of national primary drinking water regulations

SDWA authorizes EPA to issue standards for drinking water served by "public water systems."  42 U.S.C. §§ 300g (coverage); 300f(1) (definition of

---

[1] The term "public" thus does not refer to the ownership of the system.

[2] Throughout this brief and the Rule, EPA uses "public water system" and "operator" interchangeably.  EPA also uses "public water system" to refer to both the system of pipes and conveyances *and* the entity that supplies water.  *See* 63 Fed. Reg. 41940, 41941 (Aug. 5, 1998).  While "supplier of water" is defined as "any person who owns or operates a public water system," 42 U.S.C. § 300f(5), the term "operator" is not defined by SDWA or EPA.  Generally, the operator is the entity that operates the system, which may or may not be the owner.  Response to Comments ("RTC") at 9-260, JA__, EPA-HQ-OW-2022-901-2645.

4

primary drinking water regulation). These standards—entitled "National Primary Drinking Water Regulations"—are accompanied by "maximum contaminant level goal[s]" which are set for each contaminant at the level at which there are no known or anticipated adverse human health effects with an adequate margin of safety. *Id*. § 300g-1(a)(3), (b)(4)(A).

A drinking water regulation consists of either a "maximum contaminant level" or, relevant here, "each treatment technique known to the Administrator which leads to a reduction in the level of [lead] sufficient to satisfy the requirements of section 300g-1[.]" *Id*. § 300f(1)(C)(ii). Treatment techniques "prevent known or anticipated adverse effects on the health of persons to the extent feasible." *Id*. § 300g-1(b)(7)(A).

EPA shall, "not less often than every 6 years, review and revise, as appropriate, each national primary drinking water regulation promulgated under this subchapter." *Id*. § 300g-1(b)(9). When doing so, EPA considers the best available, peer-reviewed science; provides public information on public health effects that is comprehensive, informative, and understandable; and completes an analysis of the health risk reduction benefits and costs. *Id*. § 300g-1(b)(3)(A)(C). Further, "each revision shall maintain, or provide for greater, protection of the health of persons." *Id*. § 300g-1(b)(9).

### 2. Establishing each treatment technique

SDWA authorizes EPA to "promulgate a national primary drinking water regulation that requires the use of a treatment technique in lieu of establishing a maximum contaminant level, if the Administrator makes a finding that it is not economically or technologically feasible to ascertain the level of the contaminant." 42 U.S.C. § 300g-1(b)(7)(A). A "treatment technique" is any process that leads to a reduction of the level of a contaminant in tap water that reaches the consumer. *Id*. §§ 300f(1)(C)(ii), 300g-4(d). A treatment technique rule may contain multiple treatment techniques. *Id.* §§ 300f(1)(C)(ii), 300g-1(b)(7)(A). When developing such a rule, EPA "shall identify those treatment techniques which, in the Administrator's judgment, would prevent known or anticipated adverse effects on the health of persons *to the extent feasible*." *Id.* § 300g-1(b)(7)(A) (emphasis added). Therefore, EPA identifies the most protective treatment techniques that are feasible. *Id*.; *see also* Rule at 86434, JA__.

SDWA defines "feasible" as "feasible with the use of the best technology, treatment techniques and other means which the Administrator finds, after examination for efficacy under field conditions and not solely under laboratory conditions, are available (taking cost into consideration)." 42 U.S.C. § 300g-1(b)(4)(D). This Court has interpreted feasibility in simpler terms as technically

possible and affordable.  *See City of Portland v. EPA*, 507 F.3d 706, 712 (D.C. Cir. 2007); *see also* Rule at 86433, JA__.

### 3. Health risk reduction and cost analysis

When proposing a drinking water regulation, SDWA requires EPA to prepare a health risk reduction and cost analysis ("Economic Analysis").  42 U.S.C. § 300g-1(b)(3)(C)(i).  EPA must analyze at least seven elements related to the anticipated effects of the proposed regulation.  *Id*.  EPA uses this analysis to determine "whether the benefits of the [treatment technique] justify, or do not justify, the costs."  *Id.* § 300g-1(b)(4)(C); *see also id.* § 300g-1(b)(3)(C)(ii).

### B. Regulatory and factual background

### 1. Lead contamination

Lead exposure can cause serious acute and chronic health impacts, including to the brain and nervous system, with infants and children particularly susceptible to brain damage that can persist into adulthood.  Rule at 86429, JA__.  Lead can also damage the cardiovascular system and kidneys.  *Id*.  Lead exposure has been associated with cancer.  *Id*.

EPA estimates that drinking water can make up 20 percent or more of a person's total exposure to lead.  *Id*.  Lead typically does not enter drinking water from source water but through the corrosion of lead service lines that connect a water main to a home or building, and through corrosion from leaded pipes,

7

fittings, and other fixtures inside a home or building.  *Id*.[3]  Where present, lead

service lines are the most significant source of lead in drinking water.  *Id*.

> **2.    EPA's earlier attempts to regulate lead and the 1991 Lead and Copper Rule**

EPA has regulated lead in drinking water for decades.  EPA first issued

interim drinking water regulations for lead, establishing a maximum contaminant

level of 50 µg/L.  *See* 40 Fed. Reg. 59566, 59570 (Dec. 24, 1975), JA__.  In 1986,

Congress amended SDWA and established a list of contaminants, including lead,

that EPA must regulate.  42 U.S.C. § 300g-1(b)(2)(A) (citing 48 Fed. Reg. 45502

(Oct. 5, 1983)).  EPA then promulgated the 1991 Rule, in which it concluded that

there is no known safe level of lead in drinking water and established a maximum

contaminant level goal of 0 µg/L.  56 Fed. Reg. 26460, 26170–71 (June 7, 1991),

JA__ – __ ("1991 Rule").  Due to the nature of lead contamination, EPA determined

that setting a maximum contaminant level was not feasible and established a

treatment technique rule.  *Id*. at 26477, JA__.[4]  EPA required water systems to

implement four treatment techniques: source water treatment, corrosion control

---

[3] The Rule generally defines "service line" as a portion of pipe that connects the water main to the building inlet.  40 C.F.R. § 141.2.

[4] The D.C. Circuit upheld EPA's decision to promulgate a treatment technique rule.  *See Am. Water Works Ass'n v. EPA (AWWA)*, 40 F.3d 1266, 1270–71 (D.C. Cir. 1994).

treatment, public education, and where necessary, lead service line replacement. *Id*. at 26478, JA__.

The 1991 Rule required lead service line replacement only if triggered when a system's lead monitoring results exceeded an "action level" of 15 µg/L even after that system had implemented corrosion control treatment. *Id*. at 26482, JA__; *see also* 40 C.F.R. § 141.84 (1991). Once lead service line replacement was triggered, water systems were required to replace those lines at an annual rate of at least 7% until lead levels declined (or test out of replacement). 56 Fed. Reg. at 26507, JA__.

At first, the 1991 Rule required water systems to replace the full service line based on a "rebuttable" presumption that systems controlled the entire line. *Id*. at 26552–53, JA__–__ ("A water system shall replace the entire service line (up to the building inlet)"). Petitioner in this action challenged the presumption, and this Court declined to reach the merits, remanding on procedural grounds for defective notice. *AWWA*, 40 F.3d at 1275.

On remand, EPA proposed a requirement to "replace that portion of the lead service line which the system owns as well as that portion of the line which the system has the legal authority to replace in order to protect the quality of the water delivered to the user." 61 Fed. Reg. 16348, 16365 (Apr. 12, 1996), JA__. In 2000, EPA finalized its proposal. 65 Fed. Reg. 1950, 2005 (Jan. 12, 2000), JA__. EPA

9

required water systems to "replace that portion of the lead service line that it owns" and "[i]n cases where the system does not own the entire lead service line," the system was required to notify the owner of the line and "offer to replace the owner's portion of the line." *Id*. (citing 40 C.F.R. § 141.84(d) (2000)). EPA explained that using ownership to determine the system's responsibility for lead service line replacement would eliminate potential legal confusion and delays in implementing the rule. *Id*. at 1963, JA__; Rule at 86449, JA__.

### 3.    Subsequent revisions to the 1991 Rule

Beginning in 2000, the District of Columbia discovered widespread lead contamination in drinking water caused by service lines containing lead. Rule at 86430, JA__. This prompted EPA to review the 1991 Rule (as revised in 2000) to determine "whether elevated drinking water lead levels were a national problem" and to identify actions to improve rule implementation. *Id*.; *see also* 71 Fed. Reg. 40828, 40830 (July 18, 2006), JA__ (2006 review). EPA embarked on a two-step revision process, first promulgating a rule focused on short-term revisions. 72 Fed. Reg. 57782 (Oct. 10, 2007). Then, EPA turned to long-term revisions, which would require additional data collection, research, and stakeholder involvement. Rule at 86430, JA__.

10

As part of this process, in 2011, EPA consulted with the Scientific Advisory Board, a statutorily-created board of independent scientists,[5] regarding the impacts of partially replacing lead service lines, as opposed to fully replacing them. *Id*. at 86431, JA__. The Board concluded that partial replacements do not reliably reduce lead levels and could, in the short term, actually elevate levels. *Id*. Also in 2011, the National Drinking Water Advisory Council, established pursuant to 42 U.S.C. § 300j-5, provided EPA with recommendations for revising the 1991 Rule. Rule at 86431, JA__. In 2014, the Council initiated extensive stakeholder deliberations to further develop its recommendations. *Id*.; *see also* 84 Fed. Reg. 61741 (Nov. 13, 2019).

As this process was concluding, Flint, Michigan faced a lead contamination crisis. Pieper, "Flint Water Crisis Caused By Interrupted Corrosion Control: Investigating 'Ground Zero' Home" at 2008, *Environmental Science and Technology*, EPA-HQ-OW-2022-0801-0250, JA__. Beginning in 2014, the Flint, Michigan water system switched its drinking water source to the Flint River, and distributed water without corrosion control treatment, causing a breakdown in the protective coating in the distribution system that reduces the risk of lead leaching into the water. *Id*. Monitoring by the water system did not identify elevated lead

---

[5] 42 U.S.C. § 300g-1(e) requires EPA to consult with this Board before proposing a drinking water regulation.

levels and did not trigger further actions under the 1991 Rule. *Id.* at 2011–12, JA\_\_–\_\_. Flint demonstrated the limitations of corrosion control treatment and its susceptibility to error. RTC at 5-173–5-174, JA\_\_–\_\_.

EPA released a white paper summarizing the Council's recommendations and lessons learned from both the D.C. and Flint lead crises. Rule at 86431, JA\_\_. EPA noted significant shortcomings with the 1991 Rule, including a reactive approach that requires actions *after* a system identifies a threat to public health. *Id.* The Council recommended a proactive approach to permanently eliminate the largest source of lead in drinking water—lead service lines—by requiring full replacement as quickly as feasible. *Id.*

### 4.    The Lead and Copper Rule Revisions ("2021 Rule")

Prompted by EPA's review of the 1991 Rule, and the 2011 findings that partial replacements were ineffective, EPA promulgated the 2021 Rule. 86 Fed. Reg. 4198, 4200 (Jan. 15, 2021), JA\_\_.

Like the 1991 Rule, the 2021 Rule was a treatment technique rule that relied on the same four treatment techniques. *Id.* at 4201, JA\_\_. Further, EPA did not generally require lead service line replacement unless tap monitoring showed elevated levels of lead. Rule at 86431, JA\_\_. The 2021 Rule required water systems to conduct full lead service line replacement regardless of ownership if the customer consented to the replacement of their portion of the line and agreed to

12

pay.[6] *See* Rule at 86423 (comparison chart), JA__.   In contrast to the 1991 Rule, partial replacements would not count toward meeting the 2021 Rule's replacement requirements.  86 Fed. Reg. at 4201, JA__.

### 5.    EPA's reconsideration of the 2021 Rule

 Several groups challenged the 2021 Rule.  *See Newburgh Clean Water Project v. EPA*, Case No. 21-1019 (D.C. Cir.).  Petitioners (Intervenor-Defendants here) argued that the 2021 Rule did not meet the statutory standard to prevent known or anticipated adverse health effects to the extent feasible.  *See id*., ECF No. 1958365 (citing 42 U.S.C. § 300g-1(b)(7)).  Petitioner here intervened in defense of the 2021 Rule.  *Id*., ECF No. 1934258.

Shortly thereafter, EPA began a year-long reconsideration of the 2021 Rule. 86 Fed. Reg. 14003 (Mar. 12, 2021).[7]  EPA received written comments and held public listening sessions, roundtables in different geographic regions, and meetings with different stakeholders.  86 Fed. Reg. 71574, 71576 (Dec. 17, 2021), JA__.

---

[6] Lead service line replacement in the 2021 Rule and the 2024 Rule refer to the replacement of lead service lines *and* certain galvanized iron and steel lines downstream of lead service lines because those lines can adsorb lead particles. Rule at 86447, JA__.  For simplicity, the Agency refers to all such pipes requiring replacement as lead service lines.

[7] EPA ultimately moved to remand the 2021 Rule, and this Court placed the case in abeyance.  *See Newburgh*, Case No. 21-1019, ECF No. 1984197.

13

EPA conferred with local governments, community and environmental groups, and local public water utilities. *Id.*

In December 2021, EPA announced the outcome of its reconsideration and its intention to conduct a new rulemaking. *Id.* at 71574, JA__. EPA estimated that the 2021 Rule would result in replacements of only approximately five percent of lead service lines over a 35-year period. *Id*. at 71578, JA__. EPA stressed the urgency of fully replacing all lead service lines as quickly as possible because leaving millions of lead service lines (between 6.3 and 9.3 million) in the ground would place additional generations of Americans at risk. *Id*.

In 2023, EPA proposed the Rule challenged here, and a year later it took final action by issuing the Rule. *See* 88 Fed. Reg. 84878 (Dec. 6, 2023) ("Proposed Rule"), JA __; Rule at 86418, JA__. The Rule superseded the 2021 Rule and reinstated the 1991 Rule for three years, giving systems a reprieve from the 2021 Rule's compliance deadlines to focus on complying with this Rule by its 2027 compliance deadline. Rule at 86558–59, JA__–__.

### 6.     The Rule

In the Rule, EPA affirmed its proposal that requiring lead service line replacement based on tap monitoring and lead levels alone is insufficient to protect public health. Rule at 86419, JA__. Rather, "a mandatory, systemwide service line replacement program irrespective of tap monitoring results is essential," at the

14

fastest rate feasible, to meet SDWA's statutory requirement to promulgate a regulation that "prevent[s] known or anticipated adverse effects on the health of persons to the extent feasible."  Rule at 86447, JA__.

As a result, the Rule requires *mandatory* replacement, meaning regardless of tap monitoring results, and *full* replacement, meaning the entire service line, of lead service lines under the control of water systems.  Rule at 86447, JA__; *see also* 40 C.F.R. § 141.84(d)(1) (2024).  The Rule defines "control" as situations "[w]here a water system has access (e.g., legal access, physical access) to conduct full service line replacement."  40 C.F.R. § 141.84(d)(2).  Where water systems lack access, the Rule does not require replacement, but systems must document the reasons they lack access, including "any specific laws, regulations, and/or water tariff agreements that affect the water system's ability to gain access to conduct full replacement."  *Id*.  When legal access depends upon a property owner's consent, the Rule also requires water systems to make a "reasonable effort" to obtain access, similar to the 2021 Rule.  Rule at 86445, JA__; *see also* 40 C.F.R. § 141.84(d)(3).  Like the 2021 Rule, the Rule does not require water systems to replace lines if the owner refuses.  Rule at 86490, JA__.  But the Rule does not use ownership as the metric for determining control or access and "does not establish the criteria for determining whether a system has access to conduct full service line replacement."  40 C.F.R. § 141.84(d)(2)(i).  In other words, the Rule defers to the

water system and to traditional matters of state and local law to determine whether a system has access to conduct full lead service line replacement.

Relatedly, the Rule also eliminates language concerning payment responsibility. The 1991 and 2021 Rules both required water systems to offer to replace the customer's portion of a service line but expressly stated that systems were not required to pay for replacements they do not own. Rule at 86453, JA__. The Rule, however, considered the allocation of costs a matter of state and local law, outside of EPA's authority under SDWA, and declined to address the allocation of costs at all. *Id*. at 86453–54, 86447–48, JA__–__, __–__.

Because the number and proportion of lead service lines vary significantly among systems, EPA faced difficulty identifying a single deadline to represent the fastest feasible replacement rate applicable to all systems. *Id.* at 86446, JA__. Ultimately, the Rule establishes a 10-year deadline from the Rule's 2027 compliance date for water systems to replace all lead service lines under their control. *Id*. States must set a shorter deadline on a case-by-case basis if feasible, and eligible systems may seek extensions (e.g., if the system has a high proportion of lead service lines). *Id*.; *see also id*. at 86464, JA__.

EPA concluded that lead service line replacement within this timeframe is feasible because it is both technically possible and affordable. *Id.* at 86453, 86460, 86467–88, JA__, __, __–__. EPA thoroughly explained and documented its

16

feasibility analysis in the record, including in a Technical Support Document ("TSD"), EPA-HQ-OW-2022-0801-2646, and Response to Comments, EPA-HQ-OW-2022-901-2645.

EPA proposed and reaffirmed, after completing an exhaustive Economic Analysis, that the benefits of the Rule justify the costs.  42 U.S.C. § 300g-1(b)(4)(C); 88 Fed. Reg. at 85034–35, JA__–__; Rule at 86594, JA__; *see generally* Econ. Analysis, EPA-HQ-OW-2022-0801-2649.

## C.    Procedural history

On December 13, 2024, Petitioner brought this action.  ECF No. 2089691. Environmental and community groups intervened.  ECF Nos. 2090841, 2131030. After evaluating whether to reconsider the Rule following the change in presidential administrations, EPA moved to lift the case from abeyance and set a briefing schedule, which the Court granted.  ECF Nos. 2128527, 2132323.

## STANDARD OF REVIEW

The Administrative Procedure Act's deferential standard of review applies. 5 U.S.C. § 706(2); *see also City of Portland,* 507 F.3d at 713.  "[T]he arbitrary and capricious standard is 'highly deferential' and 'presumes agency action to be valid[.]'" *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin*., 724 F.3d 243, 245 (D.C. Cir. 2013).  "Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable

17

and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025); *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

In deciding questions of statutory interpretation, "[c]ourts must exercise their independent judgment," but "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). Ultimately, to resolve the meaning of disputed statutory language, a court shall adopt the interpretation that, "after applying all relevant interpretive tools, [it] concludes is best." *Id*. at 400.

## SUMMARY OF ARGUMENT

SDWA authorizes EPA to regulate public water systems, and the Rule falls squarely within the bounds of EPA's authority. The definition of "public water system" is best understood as including service lines that operators may access to replace, regardless of ownership. These accessible lines are under the operator's "control" and thus are part of the "public water" system. Petitioner's counterinterpretation, that "control" equates to ownership, is not grounded in the text.

The Rule is rational and supported by a robust record. SDWA requires EPA to issue a drinking water regulation that prevents adverse health effects from lead *to the extent feasible*. 42 U.S.C. § 300g-1(b)(7)(A) (emphasis added). EPA must

18

therefore set a standard that is as protective as feasible.  The Rule does just that.

Based on extensive data and evidence, EPA reasonably concluded that mandatory

replacement of all lead service lines as fast as feasible meets SDWA's mandate.

*Id.*; *see also* Rule at 86445–46, 86460, 86467, JA__–__, __, __; RTC at 9-89–100,

1-400, JA__–__, __.  Corrosion control treatment and tap monitoring alone have

been inadequate to meet SDWA's requirements.  EPA also reasonably determined

that the Rule and its 10-year implementation rate are feasible, *see* 42 U.S.C.

§ 300g-1(b)(4)(D), because that replacement timetable is both technically possible

and affordable.

Petitioner does not meaningfully dispute that lead service lines pose serious

health risks or that mandatory full replacement of those lines, as fast as feasible,

removes the risk.  Instead, Petitioner criticizes EPA's findings that the Rule

(focusing primarily on lead service replacement) is technically possible and

affordable.  But EPA based its feasibility findings on an extraordinarily

comprehensive and voluminous record.  To support its feasibility determination,

EPA analyzed the best available scientific studies and up-to-date data regarding

lead service lines and public water systems, considered empirical examples of lead

replacement programs, and reviewed and addressed thousands of comments.  EPA

explained that full mandatory lead service line replacement had already occurred in

a wide range of local communities.  Rule at 86452–58, JA__–__; *see also* RTC at

19

9-258–9-59, JA\_\_–\_\_; 88 Fed. Reg. at 84926–27, JA\_\_–\_\_.  EPA also reasonably completed an Economic Analysis, consistent with SDWA, 42 U.S.C. § 300g-1(b)(3)(C), that examined all seven statutory components, before concluding that the benefits of the Rule justify the costs.  EPA's technical analyses, which undergird the Rule, deserve deference.

If the Court does find prejudicial error, it should keep the Rule in place. EPA could likely address any errors on remand, and vacatur would unnecessarily disrupt and confuse the efforts of states and water systems that are already taking steps to comply with the Rule.

The Rule is lawful, reasonable, and should be upheld.

## ARGUMENT

**I.     The best interpretation of "control" in the definition of "public water system" is that it includes lines that the system can access to conduct full replacement of lead service lines.**

SDWA authorizes EPA to regulate public water systems, which include lines that are under the system operator's control.  A lead line is under the system operator's control if the system can access the line to replace it.  EPA thus requires public water systems to replace lead lines that they may access for replacement purposes.

20

**A.    SDWA authorizes EPA to regulate public water systems.**

SDWA authorizes EPA to promulgate drinking water regulations that "shall apply to each public water system in each State," subject to certain exceptions not relevant here.  42 U.S.C. §§ 300g, 300f(1) (defining primary drinking water regulation).  "Public water system" is defined as:

> a system for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen service connections or regularly serves at least twenty-five individuals. Such term includes (i) any collection, treatment, storage, and distribution facilities under control of the operator of such system and used primarily in connection with such system, and (ii) any collection or pretreatment storage facilities not under such control which are used primarily in connection with such system.

*Id.* § 300f(4)(A).

EPA regulates public water systems regardless of the system's ownership structure.  The first sentence of the definition of public water system encompasses lead service lines because they are "pipes or other constructed conveyances" that are used for the "provision to the public of water for human consumption."  *Id.* Therefore, EPA has authority to regulate service lines under this sentence.

The second sentence further clarifies that public water systems include "distribution facilities *under control of the operator of such system*" (emphasis added).  Congress deliberately chose to avoid using any form of "own" or "ownership" in the definition of public water system.  *See Biden v. Texas*, 597 U.S.

21

785, 798 (2022) ("If Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote.").  Instead, Congress used "control" and "operator" of the public water system.

Nothing in the definition limits EPA to regulating lead in drinking water based on whether any component of it, such as service lines, are owned by the public water system or customer-owned.  *Contra* Pet. Br. 26.  This makes sense. Public water systems, which *themselves* may be publicly or privately owned, may or may not own all of the pipes, service connections, and other components that comprise the systems—this depends on state and local laws.  RTC at 9-259–60, JA__–__.  In addition, public water system operators may not be the same entity as the owner.  *Id*.[8]  And where the water system does own a portion of some service lines, the system often shares such lines with the customer.  Rule at 86449, 86451, JA__, __.  Thus, ownership of the lines, which depends on the nuances of local law, has limited significance in determining the scope of a system's control and, by extension, the scope of EPA's regulatory authority.

---

[8] SDWA requires that "[e]ach owner *or* operator of a public water system shall identify and provide notice to persons that may be affected by lead contamination" under certain circumstances, which suggests that the two can be distinct.  42 U.S.C. § 300g-6(a)(2) (emphasis added).  *See also id.* § 300f(5) (defining "supplier of water").

22

**B.    The best interpretation of the statute is that service lines are under the "control" of public water system operators if systems have access to fully replace the lines.**

The best interpretation of "control" in the definition of "public water system" is that service lines are under operator "control" if the system determines that it may access and fully replace the lead service line.  "Control" is not further defined by SDWA, and so courts "interpret this language according to its ordinary, contemporary, common meaning," in context.  *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (internal quotations omitted).  *See also BP P.L.C. v. Mayor & City Council of Balt.*, 593 U.S. 230, 141 S.Ct. 1532, 1537 (2021) (considering "the ordinary meaning of [statutes'] terms at the time of their adoption.").

Equating control with "where a water system has access"—as determined by the system—is consistent with dictionary definitions of control when the definition of "public water system" was adopted in 1974.  *See* Pub. L. No. 93-523, 88 Stat. 1661 (Dec. 16, 1974); *see also* Webster's New World (1974) (defining "control" as "to exercise authority over; direct; command"), Ex. A; Black's Law Dictionary (1979) (defining "control" as "[p]ower or authority to manage, direct, superintend, restrict, regulate, govern, administer, or oversee"), Ex. B.  Notably, *none* of these definitions equate "control" with "ownership."

EPA's interpretation of requiring lead service line replacement whenever the system determines it has "access (e.g., legal access, physical access) to conduct full

23

service line replacement" comports with the ordinary meaning of control. 40 C.F.R. § 141.84(d)(2); *see also* Rule at 86450–51, JA__–__; RTC at 9-260, JA__. If the water system operator can, as a legal and factual matter, gain access to disconnect a service line from use and replace it, then the public water system operator exercises power or oversight over the line—i.e., the line is "under control" of the operator.

Contrary to Petitioner's assertion that EPA relied improperly on modern-day definitions, Pet. Br. 23, the definition of "control" has not changed significantly. "Control" still means the "power or authority to guide or manage." Rule at 86451 (quoting Merriam-Webster Dictionary, 2024), JA__. And the phrase "under control" is defined in the Oxford English Dictionary as "subject to a restraining or controlling influence, esp. so as not to cause damage or harm; (of a situation) so as to be managed competently or dealt with successfully." *Id.*

Petitioner ignores the common-sense relationship between "access" to conduct lead service line replacement, used in 40 C.F.R. § 141.84(d)(2), and "control," used in 42 U.S.C. § 300f(4)(A). In fact, water systems have long exercised "control" over areas they can access but do not own. For example, water systems may access or control a customer-owned line to complete an emergency repair or to read or change a water meter. *See* RTC 9-259, JA__. Further, water systems can conduct full lead service line replacement even when they do not own

24

the entire service line—because they have done so—and, some states and localities have changed laws to facilitate full replacement of lines not owned by the system. RTC at 9-98; 9-258–259, JA__, __–__; Rule at 86452, JA__.  None of these laws change the ownership of the line but they show that water systems can obtain access to replace service lines (i.e., exercise control over the lines) without owning the line.

EPA's interpretation is also consistent with SDWA's purpose of ensuring that water systems offer safe drinking water to the public.  Equating "ownership" with "control" ignores this purpose because legal ownership over different parts of service lines is irrelevant to preventing lead contamination.  The Court should decline such an interpretation which contravenes the plain text and further undermines the statutory purpose.  *See N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 420 (1973).

> **C.    Equating control with ownership is not the best interpretation.**

Petitioner offers a muddled and inconsistent theory of what "control" means, asserting that "a system's control over service lines exists over only that part of the line that underlies public property," Pet. Br. 23.  But this interpretation makes several incorrect assumptions, beginning with the assumption that *any* of the lines in a public water system underlie "public property."  Service lines do not always underlie "public property," and both the systems themselves and the roads in which

25

they lie may be privately owned.  *See supra* Arg.I.A.  As EPA explained, a water system's control depends on specific local circumstances such that water systems may have control to conduct lead service line replacement—ownership is not relevant.  *See supra* Arg.I.B.

Petitioner concedes that the ordinary meaning of control should govern, Pet. Br. 20, but provides no textual analysis to support why its counterinterpretation—that control means ownership—is the best interpretation of the statutory definition of "public water system."  Instead, Petitioner offers inapt examples of access, in unrelated contexts under common law, to misconstrue the Rule.  *See id.* at 20–22; *see also* Chamber Br. at 9–14, ECF No. 2136096.

First, the Rule does not equate control with any generic access but with access *to conduct lead service line replacement*.  None of Petitioner's common law examples undercut *this* definition of control, nor do they even hint that control is equivalent to ownership.  For example, Petitioner's description of "possessory interest in land" has no relevance here.  *See id.* at 21.  But if anything, the description undermines Petitioner's argument by recognizing that control in the context of a possessory interest could exist without ownership.  *Id.* (citing Restatement).  Nor does *Lucero v. Holland* make Petitioner's case or address ownership.  *See id.* (citing 902 F.3d 979, 993 (9th Cir. 2018)).  While access to a coworker's desk does not *always* entail that the employee has control, it also does

26

not follow that the employee has no control.[9]  Control will depend on the circumstances, as it does in the Rule, and does not necessitate "complete" control. *See, e.g.*, *Mass. Lobstermen's Ass'n v. Ross*, 349 F. Supp. 3d 48, 60 (D.D.C. 2018), *aff'd as modified*, 945 F.3d 535 (D.C. Cir. 2019) (interpreting "control" as less than absolute dominion and distinct from ownership).

Second, Petitioner refers to a state law decision, *Bass v. Ledbetter*, 363 S.E.2d 760, 761 (Ga. 1988), that is lacking in analysis or reasoning, to assert that public water systems include only pipes that they own.  That case, however, supports EPA's adoption of a definition of control that does not make any assumptions about state property law.  Indeed, Petitioner ignores another state law case, *Oakland Water Resources Commissioner v. Michigan DEQ*, Case No. 18-000259-MZ, that concluded that customer-owned pipes could be regulated.  *See* SUPP. ADD-16.

Third, Petitioner points to practical concerns, asserting that "access" is too vague to be administrable, Pet. Br. 23–25.  These concerns are not relevant to determining the best interpretation of "control" using traditional tools of statutory interpretation.  *Loper Bright*, 603 U.S. at 400.  Moreover, these same alleged administrability concerns would exist in any rule requiring full lead service line

---

[9] *Lucero* appears to recognize that an employee would have control over his own desk even though the employer, and not the employee, likely owns the desk.

replacement, even if EPA equated control with ownership, which is also fact-specific, based on the nuances of local laws.  Full lead service line replacement is inherently complex to administer because lead service lines, and thus lead contamination, often traverse private property.  But regardless, the Rule is feasible and administrable.  *See infra* Arg.II.

Lastly, Petitioner is incorrect that *AWWA* concluded that customer-owned service lines were outside EPA's regulatory reach.  *See* Pet. Br. 26 n.11.  The Court remanded the action on procedural grounds and declined to reach the substantive issues.  *See AWWA*, 40 F.3d at 1275.

At bottom, Petitioner fails to justify its atextual reading.  SDWA authorizes EPA to require public water system operators to replace service lines under their control.  And the best interpretation of control is "[w]here a water system has access (e.g., legal access, physical access) to conduct full service line replacement"—as determined by the system.  Rule at 86637 (quoting 40 C.F.R. § 141.84(d)(2)), JA__.

### D. In every lead rule, EPA has consistently required lead service line replacement of some customer-owned service lines, and the Rule does not expand EPA's authority.

EPA's statutory interpretation is consistent with its longstanding approach to lead service line replacement, which has long regulated more than just portions of

28

the service line owned by the system.[10]  Continuously since 1991, EPA has required water systems to take some actions related to replacement of the entire length of the service line, regardless of ownership.  The 1991 Rule (as amended) and 2021 Rule both required systems to replace lead service lines they own, but they also required systems to offer to replace customer-owned lines, necessarily interpreting "control" to go beyond ownership.

Petitioner oversimplifies EPA's approach to interpreting control; EPA has never concluded that the best interpretation of the statute is that control equates to ownership.  *Supra* Background I.B.2.  Although EPA required replacement of those lines that water systems owned beginning in 2000, EPA clarified that this was for policy and practical considerations, *not* because of limitations to its authority under SDWA.  *Id.*; *see also* Rule at 86449, JA__.

Further, EPA thoroughly explained the grounds for the Rule and the changes that it made*.  See infra* Arg.II.  This reasoned explanation is all that EPA must provide to change its position.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  After EPA accumulated new data and information on the dangers of partial lead service line replacements, EPA took a new approach in the 2021 Rule to require full replacement of lead service lines, including customer-owned lines.

---

[10] Any departure from policy would not matter because EPA's interpretation of "control" is the best, as required by *Loper*.  *See* Arg.I.A.2.

The Rule changes EPA's approach to addressing *payment* for customer-owned lines, but this is not relevant to the definition of control.

Petitioner also contends that the Rule unlawfully expands EPA's authority and runs afoul of the major questions doctrine, *see* Pet. Br. 25, but that doctrine does not apply here.  It applies to cases in which an agency has discovered "in a long-extant statute an unheralded power."  *West Virginia v. EPA*, 597 U.S. 697, 724 (2022).  There is no such assertion of "unheralded power" here akin to that in *West Virginia*.  EPA has explicit authority under SDWA to regulate lead in public water systems and historically has done so through the exact same manner as it does here:  requiring replacement of lead service lines.

The Rule revises past regulations, but any changes fall squarely within EPA's regulatory authority under 42 U.S.C. § 300f(1).  Rule at 86447, JA__.  Lead service line replacement has been a core treatment technique since the 1991 Rule.  *Id*.  The Rule's lead service line requirement differs from prior regulation in two ways, but neither expands the scope of EPA's authority.  Rather, they are technical revisions to an existing complex framework that maintains the same structure, informed by experience and updated science.

First, the Rule requires mandatory replacement of lead service lines regardless of tap monitoring results.  *Id*.  But this merely changes the circumstances that trigger lead service line replacement.  In the past, EPA tied lead

30

service line replacement to tap monitoring results, and now it has taken a more proactive approach.  Second, the Rule *removes* regulatory language about payment based on service line ownership assumptions.  *Id*.  Both the Rule and its predecessor require replacement of the entire service line, including any customer-owned portion with customer consent.  And neither requires water system operators to replace customer-owned service lines if the customer refuses. *Compare* Rule at 86637 (40 C.F.R. § 141.84(d)(2) (no replacement required if access lacking), JA__ *with* 2021 Rule, 86 Fed. Reg. at 4294 (40 C.F.R. § 141.84(g)(7) (2021)), JA__.  While the 2021 Rule expressly stated that EPA does not require public water systems to pay for replacing lines not owned by the system, this Rule declines to make this statement, to better align with EPA's *lack* of statutory authority to address how costs are allocated among ratepayers.  Rule at 86448, JA__.  This change, therefore, is based on a *lack* of authority, not an expansion.

A throughline in Petitioner's brief is that the Rule unlawfully regulates private property, suggesting that water system operators must enter homes to replace customer-owned service lines.  Pet. Br. 25–28.  Consistent with past regulations, the Rule regulates only public water systems, not homeowners or interior plumbing.  Petitioner cites to legislative history related to a completely different SDWA provision, 42 U.S.C. § 300g-6, which banned the use of lead

31

pipes in building materials going forward, to contend that "Congress did not intend for EPA to have the authority to require water systems to remove lead on private property." Pet. Br. 27. But that provision applies broadly and is not specific to water systems. Nor does it address the removal of existing lead service lines by water systems. RTC at 9-343, JA__; *see also* 85 Fed. Reg. 54235, 54237 (Sept. 1, 2020). Petitioner further asserts that EPA has departed from its longstanding policy of corrosion control treatment. Pet. Br. 28. This ignores clear evidence of EPA's longstanding policy of lead service line replacement in the 1991 and 2021 Rules. *See supra* Background I.B.2–4. Further, the Rule has plainly not abandoned corrosion control treatment, which remains a treatment technique. Rather, EPA based changes to the Rule on its extensive record that shows that corrosion control treatment *alone* does not reliably protect public health where lead service lines are present. *See infra* Arg.II; *see also* Rule at 86446, JA__.

The Rule falls well within the traditional and historical breadth of EPA's authority under SDWA to issue drinking water regulations that regulate public water systems. The Rule does not depart from its past policy, which has consistently required replacement of lead service lines, including customer-owned lines that customers consent to replacing. In any event, EPA reasonably explained the basis for any perceived changes.

32

## II. EPA reasonably required public water systems to conduct full lead service line replacement of lines under their control within 10 years.

EPA reasonably required water system operators to conduct full lead service line replacement of lines under their control, irrespective of tap monitoring results, after concluding this would prevent adverse health effects to the extent feasible.  In setting a drinking water regulation using treatment techniques, EPA must identify those treatment techniques that "would prevent known or anticipated adverse effects on the health of persons to the extent feasible."  42 U.S.C. § 300g-1(b)(7)(A).  This means that EPA must identify and require implementation of the most protective treatment technique requirement that is feasible, defined as "feasible with the use of the best technology, treatment techniques or other means which … are available (taking cost into consideration)."  42 U.S.C. 300g-1(b)(4)(D); *see also* Rule at 86434, JA__; *see also City of Portland*, 507 F.3d at 712 (upholding interpretation of "feasible" as technically possible and affordable).

Once EPA specifies lead service line replacement as a treatment technique because it is necessary to prevent adverse health effects, SDWA requires EPA to then identify the fastest replacement rate that is "feasible."  EPA based its determination that water systems must replace all service lines under their control by the fastest feasible rate on four findings: (1) lead service line replacement prevents known or anticipated adverse health effects; (2) the fastest feasible rate

33

for lead service line replacement is 10 years from the compliance deadline, subject to certain exceptions; (3) lead service line replacement over this timeframe is technically possible; and (4) lead service line replacement over this timeframe is affordable.  Each determination was critical to meeting SDWA's mandate, supported by a robust record, and reasonable.  Rule at 86445, 86459–60. JA__, __–__.

This Court gives "an extreme degree of deference" to technical determinations within the Rule because EPA "is evaluating scientific data within its technical expertise."  *City of Waukesha v. EPA*, 320 F.3d 228, 247 (D.C. Cir. 2003).  The Rule reflects an extraordinary undertaking involving review of various complex lead rules over the last three decades, extensive stakeholder involvement, the analysis of thousands of scientific materials and empirical examples, and the consideration of thousands of comments.  On such a record, the Rule is reasonable and reasonably explained.  *See Prometheus*, 592 U.S. at 423.

A.    **EPA reasonably determined that mandatory full lead service line replacement prevents adverse health effects.**

EPA reasonably determined that mandatory full lead service line replacement would prevent adverse health effects, a finding that Petitioner does not meaningfully dispute.  In particular, EPA found that lead service lines can continue to cause significant health effects even where systems are properly operating corrosion control treatment.  Rule at 86446, JA__; Proposed Rule at 84911, JA__.

34

Where present, lead service lines are the most significant sources of lead in drinking water.  Rule at 86446, JA___.  Petitioner concedes this and acknowledges the unpredictability and variability of lead release.  Pet. Br. 5.

EPA explained why past regulatory efforts were inadequate to protect public health.  Rule at 86446, JA___.  EPA also considered whether lead contamination from lead service lines could be addressed using corrosion control treatment alone but concluded that would not prevent adverse health effects to the extent feasible. *Id*.  While corrosion control treatment is important—it is also a treatment technique—it requires consistent and proper operation, which does not always occur.  *Id*.  Operational failures are not readily addressed by monitoring, in part because lead releases can be sporadic.  *Id*.  Where lead service lines are present in the distribution system, the resulting contamination can be widespread and long-lasting, as evidenced in communities across the country.  *Id*.  EPA's experience with corrosion control over the past 30 years has therefore shown that this technology is insufficient to adequately protect health from exposure risks associated with lead service lines.  Rule at 86446, JA___.  Ultimately, EPA reasonably concluded that even optimized corrosion control has limitations, whereas mandatory lead service line replacement permanently removes the primary source of lead.  *Id.*; *see also* RTC at 1-400, JA___.

35

### B.    EPA reasonably found that full lead service line replacement within 10 years is feasible.

EPA reasonably concluded that full lead service line replacement within 10 years (at an annual rate of 39 replacements per 1,000 connections) is feasible.  To meet the statutory standard of preventing adverse health effects "to the extent feasible," EPA set a deadline of 10 years from the compliance date, with procedures for shortening and lengthening the deadline.  Rule at 86446, JA__.  EPA evaluated the two components of feasibility: (1) whether the treatment technique is technically possible within that timeframe; and (2) whether the treatment technique is affordable within that timeframe.  *Id*. at 86433, JA__.

### 1.    EPA reasonably identified the fastest feasible rate for lead service line replacement.

EPA recognized the difficulty with setting a singular deadline and reasonably determined that a 10-year default deadline, with provisions for reducing or extending that time frame on a case-by-case basis, would ensure that the Rule complies with SDWA's mandate.  Rule at 86466–67, JA__–__; *see also* TSD at 9, JA__.  This default deadline is EPA's best approximation of the fastest feasible service line replacement rate for most systems.  Rule at 86459, JA__.  EPA derived

36

the deadline from the most up-to-date replacement data,[11] specifically data from 44 systems that had proactive replacement programs.[12]  TSD at 4–5, JA __–__; Rule at 86458, JA__.  EPA took a conservative approach, calculating the rate using the 95th percentile of annual replacements per service connection.  RTC at 9-93, JA__; Rule at 86458, JA__.  EPA arrived at a rate of 0.039 annual replacements (or 39 replacements per 1,000 connections).  Rule at 86460, JA__.  EPA used this rate and data on the number of lead lines to be replaced to calculate the 10-year deadline.[13]  *Id*.  Then, based on service line data provided from over 2,000 systems, EPA concluded that 98–99% of all systems—regardless of size—would be able to meet this replacement rate and finish service line replacement in 10 years or less.  *See* Econ. Analysis at 3-9–3-11, JA__–__; *see also* Rule at 86457, 86460, JA__, __; RTC at 9-97–9-101, JA__–__; TSD at 8–9, JA__–__.

---

[11] EPA looked at available data from existing replacement programs as the best available data.  Due to the complexity of service line replacement, modeling or projecting future replacement rates is highly uncertain.  Rule at 86457, JA__.

[12] EPA requested data on replacement rates in the Proposed Rule and incorporated all the data that EPA received.  88 Fed. Reg. at 84913, JA__; Rule at 86458, JA__; *see also* TSD at 5, JA__.  Petitioner declined to provide replacement data for EPA to use in its analysis.

[13] Contrary to Petitioner's suggestion, Pet. Br. 48, EPA based the replacement rate on its review of the best available data, not state laws requiring lead service line replacement.  Rule at 86457, JA__; TSD at 6, JA__; RTC at 9-98, JA__.

Because some systems will be able to complete replacement much sooner, the Rule requires states that implement the SDWA program to put systems on a shorter schedule to ensure the Rule meets SDWA's mandate to set the most protective standard that is feasible.  Rule at 86459, JA__.  To address the estimated 1–2% of systems that may not meet the 10-year deadline at the replacement rate (39 replacements per 1,000 connections), the Rule includes a deferred deadline provision that allows systems as many years as needed to replace lines so long as they maintain the replacement rate.  *Id*.

All of Petitioner's critiques concerning EPA's replacement rate and default deadline fail.  First, Petitioner erroneously claims that EPA found that 40% of water systems will fail to meet the Rule's 10-year deadline, but this is based on misunderstanding data.  Pet. Br. 47 (citing TSD at 2–4, JA __–__); *see also* Pet. Br. 48–49.  EPA never found that 40% of water systems would be unable to comply with the Rule.  Rather, EPA concluded that 98–99% of systems would be able to comply with the Rule and meet the 10-year deadline, and all systems would be able to comply with the deferred deadlines.  Petitioner does not critique or even acknowledge this conclusion and instead extrapolates the 40% figure after looking at preliminary data that EPA never considered dispositive as to feasibility.  EPA initially identified replacement data from 48 systems and noted that 18 would not have finished their own replacement programs in 10 years or less.  TSD at 6, JA__.

38

But no data supports that these systems were replacing at the fastest rate feasible, which is what SDWA requires.  TSD at 13, JA___; RTC at 9-96–98, JA___–___.  Nonetheless, while these 18 programs were entirely voluntary without a mandate to complete replacement within 10 years, many did finish or were on pace to finish shortly outside of 10 years.  *See* RTC at 9-97, JA___; TSD at 2, JA___.  For example, EPA noted that Denver embarked on lead service line replacement efforts, which took several years to ramp up, but ultimately replaced lead service lines significantly faster in later years.  *See* RTC at 9-718, JA___.  EPA also concluded that the replacement rate would change as future programs would benefit from advantages that were unavailable to past programs, such as additional resources, assistance, guidance, and lessons learned from completed replacement programs.  RTC at 9-96–98, JA___–___; TSD at 13, 32–34, JA___, ___–___.

Second, Petitioner's claim that EPA departed, without explanation, from past policy—by requiring a faster replacement rate than the 2021 Rule—is simply incorrect.  *See* Pet. Br. 50–51.  First, EPA explained its reasoning for shifting to a mandatory replacement requirement.  *See infra* Arg.II.A.  Over the years, EPA had determined that mandatory full lead service line replacement was needed and that past efforts were not preventing adverse health effects to the extent feasible.  *See, e.g.*, Rule at 86446, 86454, JA___, ___.  Further, EPA used new evidence and updated data available after the promulgation of the 2021 Rule to take a fresh look

39

at the feasibility of conducting full service line replacement at a faster rate. *Id*. at 86457, JA__. The Rule's faster replacement rate therefore is not a change in policy but the application of the best available data to the statutory standard under which EPA must determine the fastest feasible rate of replacement.

Third, contrary to Petitioner's assertion, Pet. Br. 42–44, EPA analyzed a sound cross-section of data. Rule at 86458, JA__. During the rulemaking, EPA received comments suggesting that it should exclude replacement rate data from Newark and Flint and should consider replacement data from small systems, serving less than 10,000 people. Rule at 86458, JA__. The Rule excludes Newark's replacement data from the quantitative analysis for determining the replacement rate because of uncertainties created by an ongoing state audit. *Id*. However, EPA recognized that Newark provides an example of full lead service line replacement across a large metropolitan or regional area in a short period of time. *Id*. The data indicate that Newark was able to employ 20 service line replacement crews simultaneously and replace 20,000 lines in less than three years. *Id*. Thus, EPA reasonably found that Newark provides qualitative evidence that it is possible to conduct full replacement at a large scale. *Id*. With respect to Flint, EPA did not exclude such data, explaining that EPA relied on replacement rate data that occurred over a longer period of time, not just during the crisis where there was considerable pressure to replace lines. *Id*. In addition, EPA explained

40

that while Flint received substantial financial assistance, its population also faced severe economic challenges, including high rates of poverty, that other cities would not likely face. Rule at 86458, JA__. EPA also highlighted other systems which were not experiencing crises and did not receive financial support or public attention. *Id.*; *see also* RTC at 9-91–9-93, 9-97, JA__–__, __.

In any event, Petitioner does not identify an alternative deadline that is feasible and supported by the data. EPA rationally recognized the difficulty of setting one deadline for nearly 66,000 systems that must comply with the Rule. Rule at 86457, 86464–66, JA__, __–__. Notably, EPA considered both a shorter five-year deadline and a longer 15-year deadline. Rule at 86459, JA__. EPA rejected a nationally applicable five-year deadline that would result in too many requests for exemptions under 42 U.S.C. § 300g-5, which allows extensions of the compliance deadline. *Id.* And EPA rejected a 15-year deadline because the evidence shows that systems can replace their lines at a faster rate. *Id.* EPA therefore reasonably set the 10-year replacement deadline only after concluding that it represents the best estimate of the fastest feasible service line replacement rate for most systems. *Id.*

> **2.    Lead service line replacement is technically possible within the Rule's timeframe.**

Lead service line replacement has been an effective and available treatment technique for decades as reflected in the 1991 and 2021 Rules. Based on its

41

evaluation of the best available market conditions and material and supply data, EPA reasonably determined that requiring full lead service line replacement within 10 years is technically possible.  Replacement of lead service lines, unlike some conventional water treatment technologies, is not particularly complex.  A crew does not require specific operator certifications and can replace one service line in approximately four hours.  RTC at 21-53, JA__; *see also* Rule at 86576, JA__.  And the replacement materials (e.g., copper or PVC) are readily available.  Rule at 86468, JA__.  Filters, to be used during replacement, are also commonly available and already used by water systems conducting replacement.  *Id*.  There is no real dispute that, as a general matter, lead service line replacement is technically feasible.  RTC at 9-799, JA_.

In the Proposed Rule, EPA identified new data showing that the proposed requirement—full lead service line replacement within 10 years—is feasible.  Proposed Rule at 84911–13, JA__–__.  EPA considered empirical data of communities undertaking such projects all around the country.  *See* Rule at 86457, 86468, JA__, __; *see also* TSD at 18–19, JA__–__ (listing systems with completed lead service line replacement programs).  EPA also looked at both the existing inventory of lead service lines and the availability of supplies, materials, and labor, and determined that full lead service line replacement on a nationwide scale is

42

technically possible.  Rule at 86457, 86468, JA__, __; *see also* RTC at 21-53, JA__.

Contrary to Petitioner's assertion, Pet. Br. 45–48, EPA considered potential supply chain delays and labor shortages before concluding that the Rule would not strain markets, which could easily adjust.  Rule at 86468, JA__.  EPA addressed anecdotal comments, including Petitioner's, and described confirmatory data received after the Proposed Rule.  *Id.*; RTC at 9-98, JA__.  EPA estimated that full replacement would not impose significant demands on raw materials (35.61 million pounds of copper, or 2.06 % of the average annual share of domestic production, and 57.09 million pounds of PVC, or 0.22 % of the average annual share).  Rule at 86468, JA__.  Numerous suppliers of copper and filters confirmed their readiness to provide the necessary supplies.  *Id*.  Workers and trade unions also made similar representations.  *Id*. at 86469, JA__.  Indeed, EPA considered data indicating that complying with the lead service line replacement requirement would require only a small percentage of the overall projected pipe labor workforce.  *Id.*; *see also* RTC at 21-53–21-54, JA__–__.

EPA reasonably determined the Rule is technically possible based on the best available replacement data, empirical examples of successful full lead service line replacement efforts, and careful consideration of myriad other sources.

43

### 3.   Lead service line replacement is affordable within the Rule's timeframe.

Based on its evaluation of the best available data, EPA reasonably determined that requiring full lead service line replacement within 10 years is affordable. EPA assessed affordability of the proposed lead service line replacement requirement by evaluating the replacement programs of 44 systems serving 10,000 or more customers. Rule at 86460, JA__. EPA evaluated regional and large metropolitan systems to determine an affordable replacement rate consistent with 42 U.S.C. § 300g-1(b)(4)(D) and then used that rate, combined with service line data provided from over 2,000 systems, to estimate whether the Rule is affordable for all systems regardless of size.[14] EPA found that the requirement is affordable for 98–99% of systems. Rule at 86460, JA__. But with the inclusion of the deferred deadline option, which would spread the cost of replacement over more time, EPA concluded that the requirement is affordable for all systems. Rule at 86460, 86467, JA__, __; TSD at 5, JA__.

---

[14] When EPA considers affordability for assessing feasibility under 42 U.S.C. § 300g-1(b)(4)(D), it does so relative to "what may reasonably be afforded by large metropolitan or regional public water systems." Rule at 86433, JA__ (citing legislative history). This comports with the statutory framework for setting drinking water standards because SDWA requires a separate evaluation of affordability for small systems elsewhere. *See* 42 U.S.C. § 300g-1(b)(4)(E)(ii) and (b)(15); TSD to Proposed Rule at 1–3, 8, JA__–__, __.

44

Petitioner misunderstands EPA's legal obligations to consider costs when assessing feasibility.  Pet. Br. 39–42; *see also* Chamber Br. at 22–29.  EPA's feasibility analysis includes "consideration" of costs to assess whether the treatment technique is affordable.  *City of Portland*, 507 F.3d at 712.  As applied to lead service line replacement, EPA identifies the annual number of replacements a system can afford to conduct, which accounts for a community's ability to pay.  The Economic Analysis EPA prepared also includes a comprehensive consideration of costs for multiple purposes, but most significantly for determining whether benefits of a treatment technique justify its costs.  *See* 42 U.S.C. § 300g-1(b)(3)(C)(i)-(ii); *see also infra* Arg.III.

Petitioner's claim that the Rule will result in "widespread noncompliance" by small systems is both misleading and wrong.  Pet. Br. 36–37.  Petitioner points to EPA's longstanding statutory interpretation that it considers affordability relative to regional and large metropolitan areas.  *Id*.  While this accurately describes EPA's affordability analysis in assessing the Rule's feasibility, EPA also reasonably considered costs, including to small systems, as part of its Economic Analysis, and concluded that the Rule was affordable for them.  RTC at 2-1–2-2, JA__–__.  In addition, EPA explained that the replacement cost per line is generally the same for systems, regardless of size.  Rule at 86459, JA__.  EPA further noted that despite potential resource limitations, small systems have fewer

45

lead lines, which makes replacement of all lines "relatively easier to complete for small systems than for large systems." *Id.*[15]  Nothing in the record suggests the Rule would result in "widespread noncompliance," as Petitioner contends.  Pet. Br. 39.[16]  Indeed, if EPA had included data from systems serving fewer than 10,000 people to calculate the replacement rate, that would have resulted in a faster replacement rate and consequently a shorter deadline to replace their lines as those systems had significantly faster replacement rates than many large systems.  Rule at 86433, 86459–60, JA__, __−__.

Petitioner also misunderstands EPA's consideration of external funding.  *See* Pet. Br. 42–45.  EPA did not account for external funding in calculating the Rule's costs.  Rule at 86420, 86448, 86460, JA__, __, __; Econ. Analysis at 4-2, JA__.[17]  While it is true that EPA recognized the significant amount of federal funding available for lead service line replacement, including funding received by some of

---

[15] In contrast to service line replacement, it is relatively difficult for small systems to comply with corrosion control treatment.  The Rule addresses that by providing small systems with alternatives to compliance for that treatment technique.  *See* Rule at 86517–19, 86661, JA__−__, __.

[16] Petitioner seems to base its fears of widespread noncompliance on findings in the 1991 Rule, which are irrelevant here.  Those findings and that data are now more than three decades old and cannot undermine the best available and most recent data that EPA considered.  *See, e.g.*, Pet. Br. 37–39 (citing 1991 Rule).

[17] Petitioner questions the availability of this funding, Pet Br. 43, but funds in the Bipartisan Infrastructure Law were appropriated.  Rule at 86569, JA__.

46

the systems considered in EPA's feasibility analysis, EPA did not assume the availability of any specific type or amount of future funding.  EPA set its feasible replacement rate based on the 95th percentile of annual replacements per service connection and then extrapolated the 10-year deadline from that.  *See supra* Arg.II.B.1.  This ensured the rate did not incorporate outliers with potentially unique circumstances.  Rule at 86459, JA__.  Moreover, EPA identified examples of systems conducting lead service line replacement without external funding.  RTC 9-96, JA__.

### 4.    Petitioner's remaining scattershot infeasibility claims fail.

Petitioner recycles its comment letter and does not explain how the Rule's feasibility analysis fails to comply with SDWA.  In particular, Petitioner raises hypothetical concerns about the impacts on small systems, the availability of materials and labor, and the appropriateness of EPA's data.  Pet. Br. 35–54.  In doing so, Petitioner mischaracterizes SDWA's requirements, conflating its Economic Analysis, addressed *infra* Arg.III, with its feasibility analysis.  *Compare* 42 U.S.C. § 300g-1(b)(3)(C) *with id.* § 300g-1(b)(4)(D).  None of Petitioner's claims are grounded in reliable data, connected to SDWA's requirements, nor ignored by EPA, who considered and exhaustively addressed them all.

First, Petitioner claims the Rule is infeasible because it requires water systems to document attempts to obtain and verify access when customer-owned

47

lines change owners.  Pet. Br. 24.  EPA addressed Petitioner's concerns directly during the rulemaking.  EPA received comments advocating for broader and narrower views of control.  Rule at 86450, JA__.  While EPA based its interpretation on SDWA's plain meaning, EPA addressed the commenters' implementation issues, explaining that a fact-specific view of control was not only administrable but made practical sense.  A water system operator's ability to obtain access depends on (1) relevant state and local laws governing a system's ability to replace customer-owned lines; and (2) whether, as a factual matter, a water system operator can gain physical access to the service line.  *Id*.  For example, EPA recognized that a system operator's ability to gain access could depend on state or local laws, water tariff agreements, and physical safety concerns.  *Id.*  And EPA limited administrative burden by leaving it to the water system to determine whether it has access because it is best positioned to do so.  RTC at 9-261, JA__; *see also* Rule at 86451, JA__.  EPA thus carefully considered the practical implementation concerns associated with its interpretation.  *See* RTC at 9-256–66, JA__–__; Rule at 86451, JA__.

Petitioner overstates the burden imposed by the regulation, which simply requires that water system operators make reasonable efforts to determine changes in accessibility but does not require water system operators to replace service lines they cannot access.  RTC at 9-205, JA__.  Customer-owned service lines have

48

presented a logistical complication in all rules regulating lead. EPA grappled at length with this quandary, ultimately finalizing a requirement that would increase the chances of full lead service line replacement and thus minimize the adverse health effects from partial lead service line replacements, which cause short-term increases in lead and do not reduce lead in the long term. *See id*. at 9-483, 9-749, JA\_\_, \_\_. Water systems can do this. They already track new service or transfer requests. *Id.* at 9-205, JA\_\_. Even under the 2021 Rule, which Petitioner intervened to defend, system operators had to request consent to replace customer-owned lines, which imposed its own administrative burden. 86 Fed. Reg. at 4219, JA\_\_. Empirical evidence of compliance also exists: Denver Water is already tracking changes in ownership while conducting thousands of service line replacements per year. RTC at 9-202, JA\_\_. At bottom, the requirement is feasible: verifying access is both technically possible (because system operators can do this) and affordable (because documenting access does not cost very much).

Second, Petitioner claims that "other elements" of the Rule, apart from lead service line replacement, are "cumulatively infeasible" for systems, Pet. Br. 52, but it does not tie these purported flaws to any specific statutory requirements that EPA failed to meet. Petitioner seems to take issue with the Rule's complexity, *id*., but this does not render the Rule infeasible under SDWA's statutory requirements. There is no dispute that the Rule includes various treatment techniques that impose

49

several requirements, but this is no different from any of the other lead rules over the years, from the 1991 Rule to the 2021 Rule. Indeed, the Rule made several changes to simplify the 2021 Rule. Rule at 86418, JA__. Nor does Petitioner provide a unique reason why the specific requirements of filters, increased public education, or optimizing corrosion control, all of which existed in past regulations, are either not technically possible or unaffordable. Pet. Br. 52–53.[18] In any event, EPA carefully considered the availability of labor and filters and verified that the Rule would not impose supply or labor constraints. *See supra* Arg.II.B.2; *see also* Rule at 86469, JA__. For instance, EPA concluded that lead service line replacement would involve a fraction of a percentage of the pipe worker labor force and the excavator workforce.[19] *See supra* Arg.II.B.2; *see also* RTC at 21-53– 21-54, JA__–__.

---

[18] Petitioner appears to argue that the Rule is infeasible because it lowers the action level, which would require more monitoring and corrosion control. Pet. Br. 53. Notably, Petitioner does not contest that more monitoring and corrosion control would prevent adverse health effects. In any event, EPA found the treatment technique requirements for corrosion control, including a lower action level, are feasible based on over 30 years of data since the 1991 Rule. Rule at 86498–501, JA__–__.

[19] Petitioner's concerns about future retirements are misplaced. Pet. Br. 46. Petitioner refers to the expected retirement of skilled labor required for corrosion control, which is irrelevant to lead service line replacement. Regardless, EPA streamlined some corrosion control requirements in the Rule and provided flexibilities to address some technical concerns. *See, e.g.*, Rule at 86501, JA__.

50

### III. EPA's health risk reduction and cost analysis (Economic Analysis) is reasonable.

EPA reasonably complied with its obligation to prepare an Economic Analysis. When promulgating a drinking water regulation, SDWA requires EPA to prepare an analysis that includes at least seven distinct components. 42 U.S.C. § 300g-1(b)(3)(C). Among these are quantifiable and nonquantifiable benefits of the regulation, the effects of the contaminant on the general population and sensitive subpopulations, and the "[q]uantifiable and nonquantifiable costs for which there is a factual basis in the rulemaking record to conclude that such costs are likely to occur *solely* as a result of compliance with the [regulation], . . . excluding costs resulting from compliance with other proposed or promulgated regulations." *Id*. (emphasis added). SDWA requires EPA to use its analysis to determine "whether the benefits of the [treatment technique] justify, or do not justify, the costs." *Id*. § 300g-1(b)(4)(C).

EPA complied with this requirement and fully weighed the costs and benefits in a robust Economic Analysis. *See* Rule at 86567–68, 86594, JA__–__, __; *see generally* Econ. Analysis, EPA-HQ-OW-2022-0801-2649. After analyzing quantifiable costs and benefits, EPA estimated that the Rule would yield net annual benefits ranging from $12.0 to $23.2 billion. Rule at 86488, JA__ (low and high scenarios at a two percent discount rate in 2022 dollars); *see also* Econ. Analysis at 6-7–6-10, JA__–__. EPA also robustly considered nonquantifiable costs and

51

benefits.  Rule at 86420, JA__.  Ultimately, EPA determined that the quantifiable and non-quantifiable benefits of the Rule not only justified the costs but far outweighed them.  88 Fed. Reg. at 85034–35, JA__–__; Rule at 86594 (affirming Proposed Rule determination), JA__.

Petitioner does not challenge EPA's compliance with SDWA's requirement to complete an Economic Analysis and instead uses EPA's exhaustive Economic Analysis to attack EPA's feasibility analysis.  *See, e.g.*, Pet. Br. 37–45.  While EPA's feasibility analysis also takes costs into consideration, the two require distinct statutory analyses and determinations.  *Compare* 42 U.S.C. § 300g-1(b)(7)(A), 300g-1(b)(4)(D) (feasibility) *with id.* § 300-g-1(b)(3)(C), 300-g-1(b)(4)(C) (Economic Analysis).

Petitioner never disputes any of the expected health benefits from the Rule or EPA's ultimate finding that the benefits justify the costs.  While Petitioner disputes some of the calculations of quantified costs, it does not go so far as to say that those alleged errors matter.  Given that EPA found quantified *net* benefits in the range of $12–23 billion, minor differences over the cost of replacing individual lines are akin to harmless accounting errors.  *See* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"); *see also City of Portland*, 507 F.3d at 716 (holding that any errors in EPA's cost-benefit analysis were harmless errors because they could not have affected the final rule).

52

Nor is there any actual record support for Petitioner's assertion that EPA failed to consider costs. Petitioner cites primarily to its own comments, which preceded the Rule, *see* Pet. Br. 38–39, and to which EPA provided an extensive response. RTC at 21-28–21-56, JA__–__. For example, Petitioner flyspecks EPA's estimate for the average cost of replacing each line, claiming the cost is $12,500 instead of $6,930, Pet. Br. 39–40, but EPA considered and disagreed with Petitioner's assertion and explained the underlying data supporting its cost estimates during the rulemaking. Rule at 86570, JA__; Econ. Analysis at 4-10, JA__. EPA also directly accounted for the cost report submitted by Petitioner, concluding that Petitioner's figures may be inflated. Econ. Analysis App'x A at A-4, JA __. EPA even considered Petitioner's inflated data, concluding that the Rule would still result in annual net benefits between $7.2 billion and $18.4 billion. *Id.* at A-9, JA__. Petitioner does not acknowledge this analysis, let alone dispute it. Nor does Petitioner address an independent report submitted to EPA, which found that there is a "large degree of consistency" between EPA's cost estimates and those obtained from an independent review, and which further concluded that Petitioner's higher costs selectively included projects and overestimated auxiliary costs. *See id.* at A-12, JA__.

Petitioner asserts that EPA should have used a 10-year span to consider costs. Pet. Br. 39–40. But Petitioner ignores both that a 35-year span was

53

appropriate because the Rule includes other requirements that will outlast lead service line replacement and that EPA *did* consider costs over a 10-year span that corresponded to the expected time frame for lead service line replacement. Rule at 86568, JA__; RTC at 21-1–5, JA__–__. The 35-year span captures total costs associated with implementing the entirety of the Rule, including service line replacement and installing and operating corrosion control treatment. Rule at 86558, JA__. Further, in direct response to comments, EPA provided *year-by-year* estimated costs to better understand the difference in costs over the 35-year period and acknowledged that yearly costs would be higher during the 10-year period of lead service replacement. Econ. Analysis at 6-7–9, JA__–__; Rule at 86568, JA__.

Petitioner incorrectly claims that billions in costs will fall on households and other ratepayers, Pet. Br. 42, but does not support its assertion that all costs would be transferred to households. EPA estimated the potential increase in household cost that would result from *all* of the regulatory requirements of the Rule and found that the estimated annualized average incremental cost per household would range from $1–$67 per year over the 35-year analysis. Rule at 86578–79, JA__–__; RTC at 21-60–21-61, JA__–__.[20] EPA also reasonably considered the Rule's

---

[20] EPA concluded that the *highest* expected household cost of lead service line replacement would not exceed $332 per year (under $1/day) but that scenario was highly unlikely and assumed that the system would use only current revenues. RTC at 21-61, JA__.

54

small system compliance flexibility and the deferred deadline process for lead service line replacement, which would reduce the average annual costs to households.  RTC at 21-60–61, JA__–__.  And EPA reasonably considered strategies for mitigating impacts on low-income rate payers.  *Id.*  Taken together, EPA reasonably considered affordability challenges, including those associated with small, rural, low-income, and disadvantaged communities.  *Id.*

Lastly, Petitioner contends that EPA failed to consider the "cumulative costs of concurrently complying with other recently promulgated regulations."  Pet. Br. 41.  But SDWA explicitly prohibits EPA from considering any costs in the Economic Analysis except those arising "solely as a result of compliance" with the regulation.  *See* 42 U.S.C. § 300g-1(b)(3)(C)(i)(III); *see also* Rule at 86569, JA__.  Nonetheless, EPA did not identify any other drinking water regulations that may inhibit compliance with the Rule.  Rule at 86569, JA__.

## IV.  Petitioner's requested remedy is inappropriate.

The Rule is lawful and reasonable, and any errors would not be prejudicial.  But even if the Court finds prejudicial error, the Rule should remain in place.[21]

Under this Court's two-part framework, "[t]he decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt

---

[21] If the Court finds prejudicial error, EPA requests the opportunity for supplemental briefing on remedy to address with particularity the Court's findings.

whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied–Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). Both factors counsel against vacatur.

First, were the Court to find prejudicial error, it would likely not be so serious as to warrant vacatur and could be addressed through greater explanation on remand, supplementation of the record, or through guidance.

Second, vacating the Rule would be extraordinarily disruptive for states and water systems. Reduction of lead in drinking water is a critical health issue for water systems nationwide. States and water systems are already taking steps to meet the Rule's compliance date in 2027. These requirements are different from those in the 2021 Rule, which never went into effect and for which litigation remains pending. Changing the requirements mid-stream epitomizes the "disruptive consequences of an interim change that may itself be changed" that counsel against vacatur, particularly where EPA may fix any issues on remand. *Id.* at 150–51. Reinstatement of the 2021 Rule's lead service line replacement provisions would take a step backward in EPA's efforts to address the deficiencies of prior rules. Partial vacatur, *see* Pet. Br. 54 n.21, would also raise many of the same concerns as vacatur and, because the Rule consists of multiple interrelated treatment technique requirements, could disrupt other parts of the Rule.

56

# CONCLUSION

For the foregoing reasons, the Court should uphold the Rule and deny the

petition for review.

Dated:  February 20, 2026.

Respectfully submitted,

/s/ *Sarah Izfar*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
BRADLEY CRAIGMYLE
*Deputy Assistant Attorney General*
SARAH IZFAR
*Senior Attorney*

Of Counsel:                              Environment and Natural Resources Division
                                         U.S. Department of Justice
LESLIE DARMAN                            150 M Street, N.E.
KATIE SPIDALIERI                         Washington, D.C. 20002
*Attorneys*                              (202) 532-3050
U.S. Environmental Protection Agency     sarah.izfar@usdoj.gov

57

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit in Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 12,971 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Sarah Izfar*

SARAH IZFAR

Counsel for Respondents

58