NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 24-1376

———————————————

UNITED STATES COURT OF APPEALS

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

AMERICAN WATER WORKS ASSOCIATION,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents*.

———————————————

On Petition for Review of Final Agency Action of the

United States Environmental Protection Agency

———————————————

**RESPONDENTS' SUPPLEMENTAL STATUTORY, REGULATORY, AND UNPUBLISHED DECISION ADDENDUM**

———————————————

|  |  |
|---|---|
|  | ADAM R.F. GUSTAFSON |
|  | *Principal Deputy Assistant General* |
| Of Counsel: | BRADLEY CRAIGMYLE |
|  | *Deputy Assistant Attorney General* |
| Leslie Darman | SARAH IZFAR |
| Katie Spidalieri | *Senior Attorney* |
|  | Environment and Natural Resources Division |
| U.S. Environmental Protection Agency | U.S. Department of Justice |
|  | 150 M Street, N.E. |
|  | Washington, D.C. 20002 |
|  | (202) 532-3050 |
|  | sarah.izfar@usdoj.gov |

# **<u>TABLE OF CONTENTS</u>**

**PAGE**

## STATUTES

42 U.S.C. § 300g-5...............................................................SUPP. ADD-1

Pub. L. No. 93-523, 88 Stat. 1661 (1974)............................................SUPP. ADD-6

## CODE OF FEDERAL REGULATIONS

40 C.F.R. § 114.84 (1991) ......................................................SUPP. ADD-7

40 C.F.R. § 114.84 (2000) ....................................................SUPP. ADD-10

40 C.F.R. § 141.84 (2021) ....................................................SUPP. ADD-13

## CASES

*Oakland Water Res. Comm'r v. Mich. DEQ*,
   No. 18-000259-MZ (2019) ...........................................SUPP. ADD-16

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 6A. Public Health Service (Refs & Annos)
      Subchapter XII. Safety of Public Water Systems
        Part B. Public Water Systems

42 U.S.C.A. § 300g-5

§ 300g-5. Exemptions

Effective: August 6, 1996
Currentness

**(a) Requisite findings**

A State which has primary enforcement responsibility may exempt any public water system within the State's jurisdiction from any requirement respecting a maximum contaminant level or any treatment technique requirement, or from both, of an applicable national primary drinking water regulation upon a finding that--

**(1)** due to compelling factors (which may include economic factors, including qualification of the public water system as a system serving a disadvantaged community pursuant to section 300j-12(d) of this title), the public water system is unable to comply with such contaminant level or treatment technique requirement, or to implement measures to develop an alternative source of water supply,

**(2)** the public water system was in operation on the effective date of such contaminant level or treatment technique requirement, or, for a system that was not in operation by that date, only if no reasonable alternative source of drinking water is available to such new system,

**(3)** the granting of the exemption will not result in an unreasonable risk to health; [1] and

**(4)** management or restructuring changes (or both) cannot reasonably be made that will result in compliance with this subchapter or, if compliance cannot be achieved, improve the quality of the drinking water.

**(b) Compliance schedule and implementation of control measures; notice and hearing; dates for compliance with schedule; compliance, enforcement; approval or revision of schedules and revocation of exemptions**

**(1)** If a State grants a public water system an exemption under subsection (a), the State shall prescribe, at the time the exemption is granted, a schedule for--

**(A)** compliance (including increments of progress or measures to develop an alternative source of water supply) by the public water system with each contaminant level requirement or treatment technique requirement with respect to which the exemption was granted, and

SUPP. ADD-1

**(B)** implementation by the public water system of such control measures as the State may require for each contaminant, subject to such contaminant level requirement or treatment technique requirement, during the period ending on the date compliance with such requirement is required.

Before a schedule prescribed by a State pursuant to this subsection may take effect, the State shall provide notice and opportunity for a public hearing on the schedule. A notice given pursuant to the preceding sentence may cover the prescribing of more than one such schedule and a hearing held pursuant to such notice shall include each of the schedules covered by the notice.

**(2)(A)** A schedule prescribed pursuant to this subsection for a public water system granted an exemption under subsection (a) shall require compliance by the system with each contaminant level and treatment technique requirement with respect to which the exemption was granted as expeditiously as practicable (as the State may reasonably determine) but not later than 3 years after the otherwise applicable compliance date established in section 300g-1(b)(10) of this title.

**(B)** No exemption shall be granted unless the public water system establishes that--

**(i)** the system cannot meet the standard without capital improvements which cannot be completed prior to the date established pursuant to section 300g-1(b)(10) of this title;

**(ii)** in the case of a system which needs financial assistance for the necessary improvements, the system has entered into an agreement to obtain such financial assistance or assistance pursuant to section 300j-12 of this title, or any other Federal or State program is reasonably likely to be available within the period of the exemption; or

**(iii)** the system has entered into an enforceable agreement to become a part of a regional public water system; and

the system is taking all practicable steps to meet the standard.

**(C)** In the case of a system which does not serve more than a population of 3,300 and which needs financial assistance for the necessary improvements, an exemption granted under clause (i) or (ii) of subparagraph (B) may be renewed for one or more additional 2-year periods, but not to exceed a total of 6 years, if the system establishes that it is taking all practicable steps to meet the requirements of subparagraph (B).

**(D) Limitation**

A public water system may not receive an exemption under this section if the system was granted a variance under section 300g-4(e) of this title.

**(3)** Each public water system's exemption granted by a State under subsection (a) shall be conditioned by the State upon compliance by the public water system with the schedule prescribed by the State pursuant to this subsection. The requirements of each schedule prescribed by a State pursuant to this subsection shall be enforceable by the State under its laws. Any requirement of a schedule on which an exemption granted under this section is conditioned may be enforced under section 300g-3 of this title as if such requirement was part of a national primary drinking water regulation.

**(4)** Each schedule prescribed by a State pursuant to this subsection shall be deemed approved by the Administrator unless the exemption for which it was prescribed is revoked by the Administrator under subsection (d)(2) or the schedule is revised by the Administrator under such subsection.


**(c) Notice to Administrator; reasons for exemption**

Each State which grants an exemption under subsection (a) shall promptly notify the Administrator of the granting of such exemption. Such notification shall contain the reasons for the exemption (including the basis for the finding required by subsection (a)(3) before the exemption may be granted) and document the need for the exemption.


**(d) Review of exemptions and schedules; publication in Federal Register, notice and results of review; notice to State; considerations respecting abuse of discretion in granting exemptions or failing to prescribe schedules; State corrective action**


**(1)** Not later than 18 months after the effective date of the interim national primary drinking water regulations the Administrator shall complete a comprehensive review of the exemptions granted (and schedules prescribed pursuant thereto) by the States during the one-year period beginning on such effective date. The Administrator shall conduct such subsequent reviews of exemptions and schedules as he deems necessary to carry out the purposes of this subchapter, but each subsequent review shall be completed within each 3-year period following the completion of the first review under this subparagraph. Before conducting any review under this subparagraph, the Administrator shall publish notice of the proposed review in the Federal Register. Such notice shall (A) provide information respecting the location of data and other information respecting the exemptions to be reviewed (including data and other information concerning new scientific matters bearing on such exemptions), and (B) advise of the opportunity to submit comments on the exemptions reviewed and on the need for continuing them. Upon completion of any such review, the Administrator shall publish in the Federal Register the results of his review, together with findings responsive to comments submitted in connection with such review.


**(2)(A)** If the Administrator finds that a State has, in a substantial number of instances, abused its discretion in granting exemptions under subsection (a) or failed to prescribe schedules in accordance with subsection (b), the Administrator shall notify the State of his findings. In determining if a State has abused its discretion in granting exemptions in a substantial number of instances, the Administrator shall consider the number of persons who are affected by the exemptions and if the requirements applicable to the granting of the exemptions were complied with. A notice under this subparagraph shall--


**(i)** identify each exempt public water system with respect to which the finding was made,


**(ii)** specify the reasons for the finding, and


**(iii)** as appropriate, propose revocations of specific exemptions or propose revised schedules for specific exempt public water systems, or both.


**(B)** The Administrator shall provide reasonable notice and public hearing on the provisions of each notice given pursuant to subparagraph (A). After a hearing on notice pursuant to subparagraph (A), the Administrator shall (i) rescind the finding for which the notice was given and promptly notify the State of such rescission, or (ii) promulgate (with such modifications as he deems appropriate) such exemption revocations and revised schedules proposed in such notice as he deems appropriate. Not

later than 180 days after the date a notice is given pursuant to subparagraph (A), the Administrator shall complete the hearing on the notice and take the action required by the preceding sentence.

**(C)** If a State is notified under subparagraph (A) of a finding of the Administrator made with respect to an exemption granted a public water system within that State or to a schedule prescribed pursuant to such an exemption and if before a revocation of such exemption or a revision of such schedule promulgated by the Administrator takes effect the State takes corrective action with respect to such exemption or schedule which the Administrator determines makes his finding inapplicable to such exemption or schedule, the Administrator shall rescind the application of his finding to that exemption or schedule. No exemption revocation or revised schedule may take effect before the expiration of 90 days following the date of the notice in which the revocation or revised schedule was proposed.

**(e) "Treatment technique requirement" defined**

For purposes of this section, the term "treatment technique requirement" means a requirement in a national primary drinking water regulation which specifies for a contaminant (in accordance with section 300f(1)(C)(ii) of this title) each treatment technique known to the Administrator which leads to a reduction in the level of such contaminant sufficient to satisfy the requirements of section 300g-1(b) of this title.

**(f) Authority of Administrator in a State without primary enforcement responsibility**

If a State does not have primary enforcement responsibility for public water systems, the Administrator shall have the same authority to exempt public water systems in such State from maximum contaminant level requirements and treatment technique requirements under the same conditions and in the same manner as the State would be authorized to grant exemptions under this section if it had primary enforcement responsibility.

**(g) Applications for exemptions; regulations; reasonable time for acting**

If an application for an exemption under this section is made, the State receiving the application or the Administrator, as the case may be, shall act upon such application within a reasonable period (as determined under regulations prescribed by the Administrator) after the date of its submission.

**CREDIT(S)**

(July 1, 1944, c. 373, Title XIV, § 1416, as added Pub.L. 93-523, § 2(a), Dec. 16, 1974, 88 Stat. 1672; amended Pub.L. 95-190, § 10(a), Nov. 16, 1977, 91 Stat. 1398; Pub.L. 96-502, §§ 1, 4(b), Dec. 5, 1980, 94 Stat. 2737, 2738; Pub.L. 99-339, Title I, §§ 101(c)(4), 105, June 19, 1986, 100 Stat. 646, 649; Pub.L. 104-182, Title I, § 117(a), Aug. 6, 1996, 110 Stat. 1644.)

---

**Footnotes**

1    So in original. Semicolon probably should be a comma.

42 U.S.C.A. § 300g-5, 42 USCA § 300g-5

Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Public Law 93-523
93rd Congress, S. 433
December 16, 1974

# An Act

To amend the Public Health Service Act to assure that the public is provided with safe drinking water, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Safe Drinking<br>Water Act.

## SHORT TITLE

SECTION 1. This Act may be cited as the "Safe Drinking Water Act".

42 USC 300f.<br>note.

## PUBLIC WATER SYSTEMS

SEC. 2. (a) The Public Health Service Act is amended by inserting after title XIII the following new title:

42 USC 201<br>note.<br>88 STAT. 1660<br>88 STAT. 1661

## "TITLE XIV—SAFETY OF PUBLIC WATER SYSTEMS

### "PART A—DEFINITIONS

#### "DEFINITIONS

"SEC. 1401. For purposes of this title:

42 USC 300f.

"(1) The term 'primary drinking water regulation' means a regulation which—

"(A) applies to public water systems;

"(B) specifies contaminants which, in the judgment of the Administrator, may have any adverse effect on the health of persons;

"(C) specifies for each such contaminant either—

"(i) a maximum contaminant level, if, in the judgment of the Administrator, it is economically and technologically feasible to ascertain the level of such contaminant in water in public water systems, or

"(ii) if, in the judgment of the Administrator, it is not economically or technologically feasible to so ascertain the level of such contaminant, each treatment technique known to the Administrator which leads to a reduction in the level of such contaminant sufficient to satisfy the requirements of section 1412; and

Post, p. 1662.

"(D) contains criteria and procedures to assure a supply of drinking water which dependably complies with such maximum contaminant levels; including quality control and testing procedures to insure compliance with such levels and to insure proper operation and maintenance of the system, and requirements as to (i) the minimum quality of water which may be taken into the system and (ii) siting for new facilities for public water systems.

"(2) The term 'secondary drinking water regulation' means a regulation which applies to public water systems and which specifies the maximum contaminant levels which, in the judgment of the Administrator, are requisite to protect the public welfare. Such regulations may apply to any contaminant in drinking water (A) which may adversely affect the odor or appearance of such water and consequently may cause a substantial number of the persons served by the public water system providing such water to discontinue its use, or (B) which may otherwise adversely affect the public welfare. Such regulations may vary according to geographic and other circumstances.





# Protection of Environment

# **40**

PARTS 100 to 149

**Revised as of July 1, 1991**

CONTAINING
A CODIFICATION OF DOCUMENTS
OF GENERAL APPLICABILITY
AND FUTURE EFFECT

AS OF JULY 1, 1991

*With Ancillaries*

Published by
the Office of the Federal Register
National Archives and Records
Administration

as a Special Edition of
the Federal Register

(iii) The technical aspects of a State's determination would be indefensible in an expected Federal enforcement action taken against a system.

§ 141.84  Lead service line replacement requirements.

(a) Systems that fail to meet the lead action level in tap samples taken pursuant to § 141.86(d)(2), after installing corrosion control and/or source water treatment (whichever sampling occurs later), shall replace lead service lines in accordance with the requirements of this section. If a system is in violation of § 141.81or § 141.83 for failure to install source water or corrosion control treatment, the State may require the system to commence lead service line replacement under this section after the date by which the system was required to conduct monitoring under § 141.86(d)(2) has passed.

(b) A system shall replace annually at least 7 percent of the initial number of lead service lines in its distribution system. The initial number of lead service lines is the number of lead lines in place at the time the replacement program begins. The system shall identify the initial number of lead service lines in its distribution system based upon a materials evaluation, including the evaluation required under § 141.86(a). The first year of lead service line replacement shall begin on the date the action level was exceeded in tap sampling referenced in paragraph (a) of this section.

(c) A system is not required to replace an individual lead service line if the lead concentration in all service line samples from that line, taken pursuant to § 141.86(b)(3), is less than or equal to 0.015 mg/L.

(d) A water system shall replace the entire service line (up to the building inlet) unless it demonstrates to the satisfaction of the State under paragraph (e) of this section that it controls less than the entire service line. In such cases, the system shall replace the portion of the line which the State determines is under the system's control. The system shall notify the user served by the line that the system will replace the portion of the service line

under its control and shall offer to replace the building owner's portion of the line, but is not required to bear the cost of replacing the building owner's portion of the line. For buildings where only a portion of the lead service line is replaced, the water system shall inform the resident(s) that the system will collect a first flush tap water sample after partial replacement of the service line is completed if the resident(s) so desire. In cases where the resident(s) accept the offer, the system shall collect the sample and report the results to the resident(s) within 14 days following partial lead service line replacement.

(e) A water system is presumed to control the entire lead service line (up to the building inlet) unless the system demonstrates to the satisfaction of the State, in a letter submitted under § 141.90(e)(4), that it does not have any of the following forms of control over the entire line (as defined by state statutes, municipal ordinances, public service contracts or other applicable legal authority): authority to set standards for construction, repair, or maintenance of the line, authority to replace, repair, or maintain the service line, or ownership of the service line. The State shall review the information supplied by the system and determine whether the system controls less than the entire service line and, in such cases, shall determine the extent of the system's control. The State's determination shall be in writing and explain the basis for its decision.

(f) The State shall require a system to replace lead service lines on a shorter schedule than that required by this section, taking into account the number of lead service lines in the system, where such a shorter replacement schedule is feasible. The State shall make this determination in writing and notify the system of its finding within 6 months after the system is triggered into lead service line replacement based on monitoring referenced in paragraph (a) of this section.

(g) Any system may cease replacing lead service lines whenever lead service line samples collected pursuant to § 141.86(d)(3) meet the lead action level during each of two consecutive

**697**

monitoring periods and the system submits the results to the State. If the lead service line samples in any such water system thereafter exceeds the lead action level, the system shall recommence replacing lead service lines, pursuant to paragraph (b) in this section.

(h) To demonstrate compliance with paragraphs (a) through (d) of this section, a system shall report to the State the information specified in § 141.90(e).

### § 141.85  Public education and supplemental monitoring requirements.

A water system that exceeds the lead action level based on tap water samples collected in accordance with § 141.86 shall deliver the public education materials contained in paragraphs (a) and (b) of this section in accordance with the requirements in paragraph (c) of this section.

(a) *Content of written materials.* A water system shall include the following text in all of the printed materials it distributes through its lead public education program. Any additional information presented by a system shall be consistent with the information below and be in plain English that can be understood by laypersons.

(1) *Introduction.* The United States Environmental Protection Agency (EPA) and [insert name of water supplier] are concerned about lead in your drinking water. Although most homes have very low levels of lead in their drinking water, some homes in the community have lead levels above the EPA action level of 15 parts per billion (ppb), or 0.015 milligrams of lead per liter of water (mg/L). Under Federal law we are required to have a program in place to minimize lead in your drinking water by [insert date when corrosion control will be completed for your system]. This program includes corrosion control treatment, source water treatment, and public education. We are also required to replace each lead service line that we control if the line contributes lead concentrations of 15 ppb or more after we have completed the comprehensive treatment program. If you have any questions about how we are carrying out the requirements of the lead regulation please give us a call at [insert water system's phone number]. This brochure explains the simple steps you can take to protect you and your family by reducing your exposure to lead in drinking water.

(2) *Health effects of lead.* Lead is a common metal found throughout the environment in lead-based paint, air, soil, household dust, food, certain types of pottery porcelain and pewter, and water. Lead can pose a significant risk to your health if too much of it enters your body. Lead builds up in the body over many years and can cause damage to the brain, red blood cells and kidneys. The greatest risk is to young children and pregnant women. Amounts of lead that won't hurt adults can slow down normal mental and physical development of growing bodies. In addition, a child at play often comes into contact with sources of lead contamination—like dirt and dust—that rarely affect an adult. It is important to wash children's hands and toys often, and to try to make sure they only put food in their mouths.

(3) *Lead in Drinking Water.* (i) Lead in drinking water, although rarely the sole cause of lead poisoning, can significantly increase a person's total lead exposure, particularly the exposure of infants who drink baby formulas and concentrated juices that are mixed with water. The EPA estimates that drinking water can make up 20 percent or more of a person's total exposure to lead.

(ii) Lead is unusual among drinking water contaminants in that it seldom occurs naturally in water supplies like rivers and lakes. Lead enters drinking water primarily as a result of the corrosion, or wearing away, of materials containing lead in the water distribution system and household plumbing. These materials include lead-based solder used to join copper pipe, brass and chrome plated brass faucets, and in some cases, pipes made of lead that connect your house to the water main (service lines). In 1986, Congress banned the use of lead solder containing greater than 0.2% lead, and restricted the lead content of faucets, pipes and other plumbing materials to 8.0%.

# 40

**Parts 136 to 149**
Revised as of July 1, 2000

## Protection of Environment

Containing a Codification of documents
of general applicability and future effect

As of July 1, 2000

*With Ancillaries*

Published by
Office of the Federal Register
National Archives and Records
Administration

As a Special Edition of the Federal Register

Code of Federal Regulations

of this section. A request for modification by a system or other interested party shall be in writing, explain why the modification is appropriate, and provide supporting documentation. The State may modify its determination where it concludes that such change is necessary to ensure that the system continues to minimize lead and copper concentrations in source water. A revised determination shall be made in writing, set forth the new treatment requirements, explain the basis for the State's decision, and provide an implementation schedule for completing the treatment modifications.

(7) *Treatment decisions by EPA in lieu of the State.* Pursuant to the procedures in §142.19, the EPA Regional Administrator may review treatment determinations made by a State under paragraphs (b) (2), (4), or (6) of this section and issue Federal treatment determinations consistent with the requirements of those paragraphs where the Administrator finds that:

(i) A State has failed to issue a treatment determination by the applicable deadlines contained in §141.83(a),

(ii) A state has abused its discretion in a substantial number of cases or in cases affecting a substantial population, or

(iii) The technical aspects of a State's determination would be indefensible in an expected Federal enforcement action taken against a system.

### §141.84   Lead service line replacement requirements.

(a) Systems that fail to meet the lead action level in tap samples taken pursuant to §141.86(d)(2), after installing corrosion control and/or source water treatment (whichever sampling occurs later), shall replace lead service lines in accordance with the requirements of this section. If a system is in violation of §141.81 or §141.83 for failure to install source water or corrosion control treatment, the State may require the system to commence lead service line replacement under this section after the date by which the system was required to conduct monitoring under §141.86(d)(2) has passed.

(b) A water system shall replace annually at least 7 percent of the initial number of lead service lines in its distribution system. The initial number of lead service lines is the number of lead lines in place at the time the replacement program begins. The system shall identify the initial number of lead service lines in its distribution system, including an identification of the portion(s) owned by the system, based on a materials evaluation, including the evaluation required under §141.86(a) and relevant legal authorities (*e.g.,* contracts, local ordinances) regarding the portion owned by the system. The first year of lead service line replacement shall begin on the date the action level was exceeded in tap sampling referenced in paragraph (a) of this section.

(c) A system is not required to replace an individual lead service line if the lead concentration in all service line samples from that line, taken pursuant to §141.86(b)(3), is less than or equal to 0.015 mg/L.

(d) A water system shall replace that portion of the lead service line that it owns. In cases where the system does not own the entire lead service line, the system shall notify the owner of the line, or the owner's authorized agent, that the system will replace the portion of the service line that it owns and shall offer to replace the owner's portion of the line. A system is not required to bear the cost of replacing the privately-owned portion of the line, nor is it required to replace the privately-owned portion where the owner chooses not to pay the cost of replacing the privately-owned portion of the line, or where replacing the privately-owned portion would be precluded by State, local or common law. A water system that does not replace the entire length of the service line also shall complete the following tasks.

(1) At least 45 days prior to commencing with the partial replacement of a lead service line, the water system shall provide notice to the resident(s) of all buildings served by the line explaining that they may experience a temporary increase of lead levels in their drinking water, along with guidance on measures consumers can take to minimize their exposure to lead. The State may allow the water system to

446

provide notice under the previous sentence less than 45 days prior to commencing partial lead service line replacement where such replacement is in conjunction with emergency repairs. In addition, the water system shall inform the resident(s) served by the line that the system will, at the system's expense, collect a sample from each partially-replaced lead service line that is representative of the water in the service line for analysis of lead content, as prescribed under §141.86(b)(3), within 72 hours after the completion of the partial replacement of the service line. The system shall collect the sample and report the results of the analysis to the owner and the resident(s) served by the line within three business days of receiving the results. Mailed notices post-marked within three business days of receiving the results shall be considered "on time."

(2) The water system shall provide the information required by paragraph (d)(1) of this section to the residents of individual dwellings by mail or by other methods approved by the State. In instances where multi-family dwellings are served by the line, the water system shall have the option to post the information at a conspicuous location.

(e) The State shall require a system to replace lead service lines on a shorter schedule than that required by this section, taking into account the number of lead service lines in the system, where such a shorter replacement schedule is feasible. The State shall make this determination in writing and notify the system of its finding within 6 months after the system is triggered into lead service line replacement based on monitoring referenced in paragraph (a) of this section.

(f) Any system may cease replacing lead service lines whenever first draw samples collected pursuant to §141.86(b)(2) meet the lead action level during each of two consecutive monitoring periods and the system submits the results to the State. If first draw tap samples collected in any such system thereafter exceeds the lead action level, the system shall recommence replacing lead service lines pursuant to paragraph (b) of this section.

(g) To demonstrate compliance with paragraphs (a) through (d) of this section, a system shall report to the State the information specified in §141.90(e).

[56 FR 26548, June 7, 1991; 57 FR 28788, June 29, 1992, as amended at 65 FR 2005, Jan. 12, 2000]

§ 141.85  Public education and supplemental monitoring requirements.

A water system that exceeds the lead action level based on tap water samples collected in accordance with §141.86 shall deliver the public education materials contained in paragraphs (a) and (b) of this section in accordance with the requirements in paragraph (c) of this section.

(a) *Content of written public education materials.* (1) *Community water systems.* A community water system shall include the following text in all of the printed materials it distributes through its lead public education program. Systems may delete information pertaining to lead service lines, upon approval by the State, if no lead service lines exist anywhere in the water system service area. Public education language at paragraphs (a)(1)(iv)(B)(5) and (a)(1)(iv)(D)(2) of this section may be modified regarding building permit record availability and consumer access to these records, if approved by the State. Systems may also continue to utilize pre-printed materials that meet the public education language requirements in 40 CFR 141.85, effective November 6, 1991, and contained in the 40 CFR, parts 100 to 149, edition revised as of July 1, 1991. Any additional information presented by a system shall be consistent with the information below and be in plain English that can be understood by lay people.

(i) *Introduction.* The United States Environmental Protection Agency (EPA) and [insert name of water supplier] are concerned about lead in your drinking water. Although most homes have very low levels of lead in their drinking water, some homes in the community have lead levels above the EPA action level of 15 parts per billion (ppb), or 0.015 milligrams of lead per liter of water (mg/L). Under Federal law we are required to have a program in place to minimize lead in your drinking water by [insert date when

447

USCA Case #24-1376      Document #2160315      Filed: 02/20/2026      Page 15 of 35

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter D. Water Programs
        Part 141. National Primary Drinking Water Regulations (Refs & Annos)
          Subpart I. Control of Lead and Copper (Refs & Annos)

This section has been updated. Click here for the updated version.

40 C.F.R. § 141.84

§ 141.84 Lead service line replacement requirements.

Effective: December 10, 2007 to December 15, 2021

(a) Systems that fail to meet the lead action level in tap samples taken pursuant to § 141.86(d)(2), after installing corrosion control and/or source water treatment (whichever sampling occurs later), shall replace lead service lines in accordance with the requirements of this section. If a system is in violation of § 141.81 or § 141.83 for failure to install source water or corrosion control treatment, the State may require the system to commence lead service line replacement under this section after the date by which the system was required to conduct monitoring under § 141.86(d)(2) has passed.

(b)(1) A water system shall replace annually at least 7 percent of the initial number of lead service lines in its distribution system. The initial number of lead service lines is the number of lead lines in place at the time the replacement program begins. The system shall identify the initial number of lead service lines in its distribution system, including an identification of the portion(s) owned by the system, based on a materials evaluation, including the evaluation required under § 141.86(a) and relevant legal authorities (e.g., contracts, local ordinances) regarding the portion owned by the system. The first year of lead service line replacement shall begin on the first day following the end of the monitoring period in which the action level was exceeded under paragraph (a) of this section. If monitoring is required annually or less frequently, the end of the monitoring period is September 30 of the calendar year in which the sampling occurs. If the State has established an alternate monitoring period, then the end of the monitoring period will be the last day of that period.

(2) Any water system resuming a lead service line replacement program after the cessation of its lead service line replacement program as allowed by paragraph (f) of this section shall update its inventory of lead service lines to include those sites that were previously determined not to require replacement through the sampling provision under paragraph (c) of this section. The system will then divide the updated number of remaining lead service lines by the number of remaining years in the program to determine the number of lines that must be replaced per year (7 percent lead service line replacement is based on a 15–year replacement program, so, for example, systems resuming lead service line replacement after previously conducting two years of replacement would divide the updated inventory by 13). For those systems that have completed a 15–year lead service line replacement program, the State will determine a schedule for replacing or retesting lines that were previously tested out under the replacement program when the system re-exceeds the action level.

(c) A system is not required to replace an individual lead service line if the lead concentration in all service line samples from that line, taken pursuant to § 141.86(b)(3), is less than or equal to 0.015 mg/L.

SUPP. ADD-13

§ 141.84 Lead service line replacement requirements., 40 C.F.R. § 141.84...

USCA Case #24-1376     Document #2160315     Filed: 02/20/2026     Page 16 of 35

(d) A water system shall replace that portion of the lead service line that it owns. In cases where the system does not own the entire lead service line, the system shall notify the owner of the line, or the owner's authorized agent, that the system will replace the portion of the service line that it owns and shall offer to replace the owner's portion of the line. A system is not required to bear the cost of replacing the privately-owned portion of the line, nor is it required to replace the privately-owned portion where the owner chooses not to pay the cost of replacing the privately-owned portion of the line, or where replacing the privately-owned portion would be precluded by State, local or common law. A water system that does not replace the entire length of the service line also shall complete the following tasks.

(1) At least 45 days prior to commencing with the partial replacement of a lead service line, the water system shall provide notice to the resident(s) of all buildings served by the line explaining that they may experience a temporary increase of lead levels in their drinking water, along with guidance on measures consumers can take to minimize their exposure to lead. The State may allow the water system to provide notice under the previous sentence less than 45 days prior to commencing partial lead service line replacement where such replacement is in conjunction with emergency repairs. In addition, the water system shall inform the resident(s) served by the line that the system will, at the system's expense, collect a sample from each partially-replaced lead service line that is representative of the water in the service line for analysis of lead content, as prescribed under § 141.86(b)(3), within 72 hours after the completion of the partial replacement of the service line. The system shall collect the sample and report the results of the analysis to the owner and the resident(s) served by the line within three business days of receiving the results. Mailed notices post-marked within three business days of receiving the results shall be considered "on time."

(2) The water system shall provide the information required by paragraph (d)(1) of this section to the residents of individual dwellings by mail or by other methods approved by the State. In instances where multi-family dwellings are served by the line, the water system shall have the option to post the information at a conspicuous location.

(e) The State shall require a system to replace lead service lines on a shorter schedule than that required by this section, taking into account the number of lead service lines in the system, where such a shorter replacement schedule is feasible. The State shall make this determination in writing and notify the system of its finding within 6 months after the system is triggered into lead service line replacement based on monitoring referenced in paragraph (a) of this section.

(f) Any system may cease replacing lead service lines whenever first draw samples collected pursuant to § 141.86(b)(2) meet the lead action level during each of two consecutive monitoring periods and the system submits the results to the State. If first draw tap samples collected in any such system thereafter exceeds the lead action level, the system shall recommence replacing lead service lines pursuant to paragraph (b)(2) of this section.

(g) To demonstrate compliance with paragraphs (a) through (d) of this section, a system shall report to the State the information specified in § 141.90(e).

**Credits**

[56 FR 32113, July 15, 1991; 57 FR 28788, June 29, 1992; 65 FR 2005, Jan. 12, 2000; 72 FR 57815, Oct. 10, 2007]

SOURCE: 40 FR 59570, Dec. 24, 1975; 50 FR 46900, Nov. 13, 1985; 52 FR 20674, June 2, 1987; 52 FR 41546, Oct. 28, 1987; 53 FR 37410, Sept. 26, 1988; 54 FR 27526, June 29, 1989; 56 FR 26548, June 7, 1991; 56 FR 32113, July 15, 1991; 63 FR 43846, Aug. 14, 1998; 63 FR 44526, Aug. 19, 1998, unless otherwise noted.

SUPP. ADD-14

AUTHORITY: 42 U.S.C. 300f, 300g–1, 300g–2, 300g–3, 300g–4, 300g–5, 300g–6, 300j–4, 300j–9, and 300j–11.

**End of Document**                                     © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# STATE OF MICHIGAN

# COURT OF CLAIMS

OAKLAND COUNTY WATER RESOURCES
COMMISSIONER, GREAT LAKES WATER
AUTHORITY, CITY OF DETROIT and CITY OF
LIVONIA,

        Plaintiffs,

v                                   Case No. 18-000259-MZ

MICHIGAN DEPARTMENT OF               Hon. Christopher M. Murray
ENVIRONMENTAL QUALITY,

        Defendant.
_____/

## ORDER GRANTING DEFENDANT MICHIGAN DEPARTMENT OF ENVIRONMENTAL QUALITY'S FEBRUARY 1, 2019 MOTION FOR SUMMARY DISPOSITION PURSUANT TO MCR 2.116(C)(8).

At a session of said Court held in the City of
Detroit, County of Wayne, State of Michigan.

The Court, having reviewed defendant's February 1, 2019 motion for summary disposition, and otherwise being fully advised in the premises;

IT IS HEREBY ORDERED that defendant's February 1, 2019 motion for summary disposition is GRANTED, and Counts I-V of plaintiffs' complaint are DISMISSED with prejudice.

IT IS SO ORDERED.

This is a not a final order that closes this case.

Date: July 26, 2019

_____
Christopher M. Murray
Judge, Court of Claims

# STATE OF MICHIGAN

# COURT OF CLAIMS

OAKLAND COUNTY WATER RESOURCES
COMMISSIONER, GREAT LAKES WATER
AUTHORITY, CITY OF DETROIT, and CITY
OF LIVONIA,

**OPINION REGARDING DEFENDANT'S
FEBRUARY 1, 2019 MOTION FOR
SUMMARY DISPOSITION PURSUANT
TO MCR 2.116(C)(8).**

               Plaintiffs,

v

Case No.  18-000259-MZ

DEPARTMENT OF ENVIRONMENTAL
QUALITY,

Hon. Christopher M. Murray

               Defendant.

_____/

     Pending before the Court is defendant's motion for summary disposition pursuant to

MCR 2.116(C)(8).  For the reasons that follow, the motion will be GRANTED.

## I. BACKGROUND

     Pursuant to the Michigan Safe Drinking Water Act (MSDWA), defendant Michigan

Department of Environmental Quality (MDEQ)[1] has the authority to promulgate and enforce

rules to carry out the act, "pursuant to the administrative procedures act of 1969, 1969 PA

306[.]"  MCL 325.1005(1).  The case at bar involves MDEQ's promulgation of revised lead and

copper rules, pursuant to MDEQ's authority to promulgate rules pertaining to "State drinking

---

[1]  Effective April 22, 2019, the Department of Environmental Quality was renamed the
"Department of Environment, Great Lakes, and Energy."  Executive Order No. 2019-06.  This
opinion will refer to the Department as "MDEQ" because the Department was so designated at
all times pertinent to this case.

-1-

water standards and associated monitoring requirements[.]" MCL 325.1005(1)(b). These State drinking water standards are intended to work in tandem with pertinent federal law, set forth at 42 USC 300f *et seq.* Federal law sets "national primary drinking water regulations," and the states are permitted to adopt their own standards that are "no less stringent" than the national standards. 42 USC 300g-2(a)(1). Federal law sets forth a "maximum contaminant level" for drinking water regulations and, in certain instances, such as situations pertaining to lead levels in water, the federal standards set forth a "treatment technique in lieu of establishing a maximum contaminant level[.]" 42 USC 300g-1; 40 CFR 141.80. The current federal lead action level is triggered "if the concentration of lead in more than 10 percent of tap water samples collected during any monitoring period . . . is greater than .015 ml/L" (also referred to as 15 parts per billion). 40 CFR 141.80(c)(1).

Pursuant to its rule-making authority, MDEQ submitted a Request for Rulemaking to the Office of Regulatory Reform in March 2017.[2] The request noted that the proposed rules were prompted by "immense public pressure to update the rules to protect public health" in the wake of what occurred with the Flint water system. Between July 2017 and November 2017, MDEQ held five "stakeholder" meetings with entities—including plaintiffs—that would be affected by the proposed rule changes. After receiving comments and suggestions, MDEQ produced a 13-page Regulatory Impact Statement and Cost-Benefit Analysis (RIS). The RIS proposed making

---

[2] Many of the documents outlining the rule-making process have been attached to the parties' briefing. These documents were not attached to plaintiffs' complaint, however. Because the Court considers these documents and because the parties' briefing repeatedly cites the same, the Court will consider them and will evaluate defendant's motion pursuant to MCR 2.116(C)(10), as well as pursuant to (C)(8), where appropriate and noted.

-2-

Michigan's lead and copper rule more stringent than the current federal standard, including a lowering of the lead action level, and the removal of lead service lines.

The rulemaking process continued in February and March 2018 with notices and a public hearing. In response to comments received at the March 1, 2018 public hearing, MDEQ made additional changes to the rules and submitted them, along with public comments, to the Joint Committee on Administrative Rules (JCAR). Based on requests for changes made by JCAR, MDEQ re-submitted the rules to JCAR prior to their formal adoption. MDEQ filed the rules with the Office of the Great Seal in June 2018, and the rules took immediate effect.

The rules promulgated during this process are what plaintiffs' complaint describes as some of the "toughest" lead rules in the nation and are set forth, in pertinent part, in Mich Admin Code, R 325.10604f(6), 325.10401a, 325.11604(c), and 325.10410(7). Plaintiffs' complaint notes that Rule 325.10604f(6) requires a water supply to replace every lead service line in a water system, including any portion of a service line that is privately owned,[3] at the supply's expense. The rules require a materials inventory at certain intervals to assess the type of piping at issue. The rules also require that service lines "shall be replaced at a rate averaging 5% per year, not to exceed 20 years total for replacement of all service lines under this subrule, unless an alternate schedule in an asset management plan is approved by" MDEQ. Mich Admin Code, R

---

[3] According to the pleadings and documents attached to plaintiffs' complaint as Exhibit B, some of the piping sought to be replaced belongs to private property owners (customers of the water system). A diagram purports to show a typical water distribution system, which includes water mains that disburse water into areas served by the water system. Water enters individual properties through service lines; these service lines are sometimes owned in part by the water system and in part by the property owner. In a scenario of split ownership, the water system owns the service line up to a point known as a "curb stop," and the remainder of the service line is owned by the property owner.

325.10604f(6)(b). See also Rule 325.11604(c). And if a water supply "controls the entire service line, the supply shall replace the entire service line at the water supply's expense." Rule 325.10604f(6)(c).

In addition to imposing these service-line replacement parameters, Table 1 of Rule 325.10401a lowers the federal lead action level from 15 parts per billion (ppb) to 12 ppb as of January 1, 2025. As noted above, the action level refers to the level of a contaminant—in this case, lead—that must be found in a water supply in order to trigger the implementation of remedial requirements and public notification.

In December 2018, plaintiffs filed a complaint alleging, among other matters, that the new rules fail to take into consideration a number of public health issues and that they impose high and allegedly unnecessary costs on a water supply. The complaint cites what plaintiffs have identified as several "key deficiencies," including that the rules: (1) mandate service line replacement without a meaningful study of affordability and funding; (2) fail to consider the legal implications of providing free services—replacement of service lines—to private property owners; (3) require a materials inventory before replacing service lines, meaning that a water supply will need to excavate and access service lines on at least two occasions, which will lead to increased costs; and (4) lower the lead action level without reasoned explanation or justification.

The complaint alleges five counts against MDEQ and seeks a declaratory judgment that the rules are, for one or multiple reasons, invalid. In Count I plaintiffs allege that MDEQ violated the APA in its promulgation of the rules, while in Count II plaintiffs allege that the rules are substantively invalid because they: (1) are arbitrary and capricious; and (2) are beyond the scope of the MSDWA. In Count III, plaintiff Wayne County Water Resources Commissioner

-4-

alleges that the rules violate Const 1963, art 9, § 18 by extending the credit of a local government. Along a somewhat similar vein, Count IV—brought by plaintiff City of Livonia and plaintiff City of Detroit—alleges that the replacement of private service lines violates Const 1963, art 7, § 26 by giving away a public service for free. Finally, Count V contains an allegation that, by requiring water supplies to pay for service line replacement on private property, MDEQ has required water supplies to provide a free service in violation of the Revenue Bond Act, MCL 141.101 *et seq.* In addition, plaintiffs contend that the rules violate the Revenue Bond Act by regulating the rates charged to plaintiffs' customers.

## II. ANALYSIS

The validity of the rules are now before the Court on summary disposition.[4] "To be enforceable, administrative rules must be constitutionally valid, procedurally valid, and substantively valid." *Mich Farm Bureau v Dep't of Environmental Quality*, 292 Mich App 106, 129; 807 NW2d 866 (2011). Plaintiffs raise challenges to all three components of enforceability, i.e., procedural invalidity, substantive invalidity, and constitutional invalidity. As it concerns their constitutional challenges, the Court must remain mindful that administrative rules, like legislative enactments, are presumed to be constitutional. *Id.* at 129 n 8.

---

[4] MDEQ moved pursuant to MCR 2.116(C)(8), which tests the validity of the allegations in the complaint, and nothing more. However, as mentioned in footnote 2, the complaint had numerous documents attached to it, including the RIS and certain emails from MDEQ employees, and *both* parties attached numerous documents to their briefs. Thus, the motion will be treated as brought pursuant to MCR 2.116(C)(10), see *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 457; 750 NW2d 615 (2008), because the Court considered the RIS, the MDEQ emails and several other noted documents in deciding this motion. Additionally, both parties addressed documents during oral argument, and the Court noted it may treat the motion as one also brought under (C)(10).

## A. WHETHER THE RULES ARE PROCEDURALLY INVALID

Turning first to plaintiffs' allegations of procedural invalidity, caselaw has held that "[a]n agency's failure to follow the process outlined in the APA" with respect to rule promulgation "renders a rule invalid." *Mich Charitable Gaming Ass'n v Michigan*, 310 Mich App 584, 594; 873 NW2d 827 (2015). See also *Clonlara, Inc v State Bd of Ed*, 442 Mich 230, 239; 501 NW2d 88 (1993). Here, plaintiffs allege procedural deficiencies with respect to the Regulatory Impact Statement or RIS mandated by MCL 24.245(3), as well as with respect to MDEQ's engagement of the public during the promulgation process.

Turning first to the RIS, plaintiffs' complaint and briefing articulate a number of ways in which the RIS is allegedly inadequate. For example, they contend that the RIS is inadequate because it fails to provide an "estimate of the actual statewide compliance costs of the proposed rule on individuals" as is required by MCL 24.245(3)(*l*).[5] However, the RIS contains several pages pertaining to cost estimates and includes, as plaintiffs' briefing even admits, a cost estimate of the actual statewide costs of compliance. Contrary to plaintiffs' suggestions, the plain language of MCL 24.245(3)(*l*) does not demand an exacting factual justification for the estimate provided, and a court's review of a challenge to the facts underlying the implementation of a rule is not as broad as plaintiffs have asserted. See *Mich Ass'n of Home Builders v Dir of Dep't of Labor & Econ Growth*, 481 Mich 496, 500-501; 750 NW2d 593 (2008). And there is a reasoned justification for the number contained in the RIS—MDEQ looked to actual costs

---

[5] The APA was amended, effective January 1, 2019, by 2018 PA 602. The amendments did not effectuate any substantive changes pertinent to the challenges plaintiffs raise; however, the amendments re-numbered some of the subrules at issue. This opinion will address plaintiffs challenge while citing the current subrules to which the challenges pertain.

-6-

experienced by the Lansing Board of Water and Light when replacing all of the lead service lines it services, and then extrapolated those numbers to what MDEQ determined were the statewide needs. This is not by any means an arbitrary number, and the emails submitted by plaintiffs regarding the pre-administrative process number of $2.5 billion do not change that conclusion. The simple fact is the RIS contained the estimated actual cost of the requirements, explained why the cost was justified,[6] and any and all stakeholders or interested parties were given the opportunity to address those numbers. While plaintiffs object to the sufficiency of the estimate, the estimate is plainly included within the RIS, and the Court declines to conclude that the rules were procedurally invalid as a result.

Plaintiffs' arguments regarding the RIS lacking a justification as to why the proposed rules were necessary in proportion to the burden placed on individuals, see MCL 24.245(3)(m), as well as an estimate regarding the benefits of the rule, see MCL 24.245(3)(x), suffer from a similar flaw. That is, while plaintiffs fault the RIS for failing to address these matters, pages 5 and 11 of the RIS address these very subjects. Thus, each aspect of the RIS challenged by plaintiffs appears within the RIS. While plaintiffs disagree with many of the conclusions asserted by MDEQ in the RIS, plaintiffs have not identified any instances where MDEQ shirked its responsibility to divulge information or where MDEQ otherwise failed to follow appropriate procedures.

---

[6] Contrary to plaintiffs' argument, the MDEQ repeatedly acknowledges in the RIS the significant financial and logistics burden placed on water systems by these rules. But each time the MDEQ states that those burdens are outweighed by the state interest in safe drinking water.

At oral argument (but not in their response brief) plaintiffs stressed that *Michigan Charitable Gaming* controls on their APA argument, as that Court stated that there is no "temporal limit" on the ability to change a rule submitted to JCAR, "so long as those changes are consistent with impact statements that have already been submitted . . . ." *Michigan Charitable Gaming*, 310 Mich App at 602. That decision, however, does not support plaintiffs' argument. For one, the RIS addresses the final cost estimate of $499 million. Additionally, the Legislature amended the APA after *Michigan Charitable Gaming* to allow modifications to proposed rules without necessarily needing to alter an RIS. MCL 24.245c(4).

Finally, plaintiffs' criticism that the RIS does not contain an analysis of any conflicting laws is misplaced. Nothing within MCL 24.245(3)(a)-(dd) requires a discussion of conflicting state laws or constitutional provisions; instead, MCL 24.245(3)(a) requires an analysis of "parallel federal rules set by" certain federal or state agencies or associations, while MCL 24.245(3)(d) requires (if requested) information about other similar states. The legal arguments put forth by plaintiffs regarding purported conflicts with state statutes or constitutional provisions that are not parallel to what these rules address are simply not statutorily required to be addressed in the RIS.

Instead, the arguments raised by plaintiffs sound more in the nature of matters that could have—and in fact appear to have been—addressed during the public comment period. With respect to the public comment afforded by MDEQ during the promulgation process, plaintiffs' own briefing admits that MDEQ provided public comment and that plaintiffs "submitted a

-8-

detailed critique of the cost estimate" during the period for public comment.[7] Plaintiffs have not alleged that MDEQ dispensed with the requisite public comment; instead, they contend there was no meaningful public comment because their suggestions and protestations were ignored. Again, plaintiffs' assertions sound in the nature of disagreements with the decision reached by MDEQ, not that MDEQ failed to follow the requisite procedures. For that reason, they have failed to state a claim or establish a genuine issue of material fact that the rules are procedurally invalid.

## B. WHETHER THE RULES ARE SUBSTANTIVELY INVALID

Plaintiffs next allege in Count II that the rules are substantively invalid. "To determine the substantive validity of an administrative rule, Michigan courts employ a three-part test: (1) whether the rule is within the subject matter of the enabling statute, (2) whether it complies with the legislative intent underlying the enabling statute, and (3) whether it is arbitrary or capricious." *Mich Farm Bureau*, 292 Mich App at 129. In determining whether a rule is within the subject-matter of a statute, courts adopt a broad view of the statute at issue. See *Dykstra v Dir, Dep't of Natural Resources*, 198 Mich App 482, 486; 499 NW2d 367 (1993) (discussing, in general terms, what the act at issue concerned). When undertaking this analysis, the Court must give "respectful consideration" to MDEQ's construction of a statute, the MSDWA, with which it has been charged with administering. *Mich Farm Bureau*, 292 Mich App at 129 (citation and quotation marks omitted). "Administrative rules are valid so long as they are not unreasonable; and, if doubt exists as to their invalidity, they must be upheld." *Id.* (citation and quotation marks omitted).

---

[7] Not only did the MDEQ hold required public hearings on the proposed rules, but before the official APA process took place MDEQ held "stakeholder" meetings in which plaintiffs participated.

Turning to the question of whether the rules are within the subject matter of the enabling statute, the MSDWA[8] authorizes MDEQ to promulgate rules necessary to carry out the objectives of the act. The pertinent question is whether the subject matter of the rules "is encompassed by, or falls within, any of" MDEQ's statutory duties under the MSDWA. See *Mich Farm Bureau*, 292 Mich App at 134. Furthermore, "[i]t is well established that an agency may exercise some discretion concerning the rules that it promulgates, as long as the ultimate rules are consistent with the legislative scheme." *Id.* at 135.

Here, the primary allegations are that MDEQ exceeded its authority under the MSDWA by promulgating rules that mandate the replacement of public and private service lines. However, the MSDWA applies to a "waterworks system" which includes "a system of pipes and structures through which water *is obtained and distributed*, including but not limited to . . . *pipelines and appurtenances* . . . actually used or intended for use for the purpose of furnishing water for drinking or household purposes." MCL 325.1002(x) (emphasis added). There are no statutory prohibitions restricting MDEQ from reaching mixed public and private service lines, eliminating any merit to plaintiffs' contention that there was no statutory authority for the rules to reach private service lines that may exist in some municipalities after the "curb stop." Indeed, the ability to regulate the waterworks system of a public water supply is expressly within the realm of authority granted to MDEQ so long as the system does not consist *solely* of customer site piping. See MCL 325.1003 (giving MDEQ authority over a "public water suppl[y]"); MCL 325.1002(p) defining a "public water supply" as a waterworks system that does not consist

---

[8] Plaintiffs are within the MSDWA's definition of "supplier of water" set forth in MCL 325.1002(t).

"*solely of customer site piping*").  In other words, so long as the system is not entirely privately owned, it is plainly within the ambit of MDEQ's regulatory authority.  As a result, the challenged rules are not substantively invalid, as they are not outside the realm of MDEQ's statutory authority.  See *Mich Farm Bureau*, 292 Mich App at 134-135.

Nor are the rules arbitrary or capricious.  Caselaw has explained that the arbitrary and capricious analysis "equates with rational-basis analysis.  If a rule is rationally related to the purpose of the statute, it is neither arbitrary nor capricious."  *Johnson v Dep't of Natural Resources*, 310 Mich App 635, 650 n 8; 873 NW2d 842 (2015) (citation and quotation marks omitted).  "Arbitrary means fixed or arrived at through an exercise of will or by caprice, without consideration or adjustment with reference to principles, circumstances, or significance, and capricious means apt to change suddenly, freakish or whimsical."  *Mich Farm Bureau*, 292 Mich App at 141 (citation and quotation marks omitted).  "In general, an agency's rules will be found to be arbitrary only if the agency had no reasonable ground for the exercise of judgment."  *Id.* at 141-142.  And in undertaking this review, the Court must uphold the rule if "it is supported by any set of facts, either known or which could reasonably be assumed, even if such facts may be debatable."  *Johnson*, 310 Mich App at 651 (citation and quotation marks omitted).

In light of these controlling standards, plaintiffs have failed to show that the rules were arrived at "without consideration" or reference to principles, or that they are otherwise "apt to change suddenly, freakish, or whimsical."  See *id*.  For instance, MDEQ's decision to prioritize the replacement of lead service lines over what plaintiffs describe as other health concerns or infrastructure issues does not demonstrate that the rules were arbitrary and capricious.  A rule is not arbitrary and capricious simply "because it does not address every conceivable issue[.]"  *Dykstra*, 198 Mich App at 493.  Neither does MDEQ's decision to set a lead-action level lower

-11-

than the current federal standards make the rules arbitrary and capricious. See *Mich Farm Bureau*, 292 Mich App at 143. Furthermore, plaintiffs' contentions about the cost of replacing service lines and of performing the requisite materials inventory do not render the rules arbitrary and capricious. As articulated in *Mich Farm Bureau* "a rule is not arbitrary or capricious merely because it displeases the regulated parties. Nor is a rule arbitrary or capricious merely because it causes some inconvenience or imposes new or additional requirements." *Id.* at 145 (citations omitted). In short, plaintiffs have not presented a convincing argument as to why the rules were not rationally related to the MSDWA's purpose, articulated in MCL 325.1001a, of "assur[ing] the long-term health of [the State's] public water supplies and other vital natural resources." As a result, the rules are not invalid in their substance. See *Johnson*, 310 Mich App at 650 n 8.

Plaintiffs' remaining contentions as to why the rules are arbitrary and capricious involve allegations that the rules fail to take into account constitutional and statutory conflicts. Because plaintiffs have also raised these same issues as separate, substantive claims, the Court will address them below. And for the reasons set forth below, the conflicts identified by plaintiffs do not exist. As a result, the rules are not arbitrary and capricious for failing to take into account these non-conflicting authorities.

## C. CONSTITUTIONAL CLAIMS

Plaintiffs' constitutional claims take aim at Rule 325.10604f, particularly subsection (6)(e), which states that a water supply "shall replace the entire lead service line," and shall do so "at the supply's expense," even if the supply does not own the entire line, i.e., does not own the portion of the line that goes from the curb stop to the customer's home or place of business. Plaintiffs argue that Rule 325.10604f(6)(e)'s requirement that the water supply pay for the entire cost of replacement, even if the pipe to be replaced is privately owned, violates this state's

-12-

Constitution. Plaintiffs point to Const 1963 art 9, § 18, which provides that "The credit of the state shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in this constitution." "The purpose of this provision is to make certain that the State, which itself cannot borrow, except as authorized, does not accumulate unauthorized debts by indorsing or guaranteeing the obligations of others." *In re Request for Advisory Opinion on Constitutionality of 1986 PA 281*, 430 Mich 93, 119; 422 NW2d 186 (1988). Caselaw interpreting this provision has held that art 9, § 18 prohibits the State[9] from giving away something of value without consideration. *Alan v Wayne Co*, 388 Mich 210, 325; 200 NW2d 628 (1972).

However, the prohibition against the lending of credit in art 9, § 18 is subject to an exception when such lending is "authorized in this constitution." And pertinent to municipalities, Const 1963, art 7, § 26 creates an exception to the prohibition against the lending of credit where the lending is "provided by law, for any public purpose." See also *In re Request for Advisory Opinion on Constitutionality of 1986 PA 281*, 430 Mich at 119 ("In order to conform to the requirements of the art 7, § 26 exception, the loan of a municipality's credit must be both: (1) authorized by law, and (2) for a public purpose.").

The first inquiry is whether there is a lending of credit, because if there is not, "then there is no need to consider art 7, § 26." *In re Request for Advisory Opinion on Constitutionality of 1986 PA 281*, 430 Mich at 119-120. The Court concludes that there is no lending of credit and

---

[9]Although art 9, § 18 refers to the "credit of the *state*," caselaw has held that the prohibition on the lending of credit "applies to local governments as political subdivisions and instrumentalities of the state." *In re Request for Advisory Opinion on Constitutionality of 1986 PA 281*, 430 Mich at 119.

-13-

that the municipalities have not been forced to give something away without consideration. As an initial matter, Rule 325.10604f(6)(e) permits a building owner to opt-out, so to speak, by refusing the replacement. If a homeowner exercises this option, "the supply shall not replace any portion of the service line, unless in conjunction with emergency repair." Moreover, even if a building owner consents to the replacement of the service lines, nothing prevents the water supply—as it freely acknowledges—from spreading out replacement costs and imposing the costs system-wide, on all users of the water supply.[10] In this scenario, the service lines are not given away for free. In addition, the replacement of lead service lines benefits the affected area and municipality by eliminating potential sources of lead contamination, system-wide. Thus, the municipality receives a benefit in return, and has not given something of value away in return for nothing in violation of the constitutional prohibition. See *Alan*, 388 Mich at 326-327 (explaining that courts will generally not inquire into whether a municipality "made a good bargain or a bad one" and will generally defer to the municipality's conclusion that value was received); *Ziegler v Witherspoon*, 331 Mich 337, 357; 49 NW2d 318 (1951) (concluding, under a substantively identical predecessor to art 9, § 18, that the receipt of a general benefit in exchange for a public expenditure did not amount to a lending of credit). Cf. *In re Request for Advisory Opinion on Constitutionality of 1986 PA 281*, 430 Mich at 127 (concluding that a municipality "giving away something of value in the hope that general economic growth will result within the district" was not a "value for value" exchange as contemplated by *Alan*, 388 Mich at 326-327).

---

[10] It must also be noted—as the parties have freely admitted—that, in some or many circumstances, the water supply owns the entire service line leading up to a home or building. In these instances, there is no replacement of a private line; the water supply only replaces its *own* service lines. Plaintiffs, despite seeking to invalidate the rule in its entirety, have not articulated a separate constitutional challenge in this scenario.

-14-

Furthermore, even if there were a lending of credit, the Court would conclude that the exception articulated in art 7, § 26 would apply. MDEQ is authorized by law to promulgate rules, which have the force and effect of law. See *Bloomfield Twp v Kane*, 302 Mich App 170, 177; 839 NW2d 505 (2013). The rule at issue authorizes the expenditure in this case, and does so, according to the rules, for the purported purpose of removing lead service lines and promoting the public health. This fits within the exception articulated in art 7, § 26. See *In re Request for Advisory Opinion on Constitutionality of 1986 PA 281*, 430 Mich at 119. Indeed, projects designed to promote the public health are generally considered to be projects which promote a public purpose, and the Court "decline[s] to second-guess the wisdom" of this public purpose determination. *Id.* at 129, 131.

### D. REVENUE BOND ACT

Plaintiffs' final challenge to the rules invokes two sections of the Revenue Bond Act, MCL 141.101 *et seq.* First, plaintiffs note that public improvements, such as water supply systems, see MCL 141.103(b), are prohibited from giving away free services, see *NL Ventures VI Farmington, LLC v Livonia*, 314 Mich App 222, 232; 886 NW2d 772 (2015). In this regard, MCL 141.118(1) provides that, with the exception of hospitals and health care facilities, "free service shall not be furnished by a public improvement to a person, firm, or corporation, public or private, or to a public agency or instrumentality." Plaintiffs have summarily asserted that the replacement of the lines[11] is the provision of a "service," but they have not meaningfully analyzed the same. Furthermore, and significantly, plaintiffs' own allegations note that they

---

[11] Again, this argument only pertains to the service lines that are partially owned, after the curb stop, by homeowners and/or building owners.

-15-

intend to recover the costs of service-line replacement by imposing the costs on all water customers. When the costs of the replacement service lines are charged to customers, nothing is given away for free, thereby defeating plaintiffs' claim under MCL 141.118(1).

Second, plaintiffs' argument under MCL 141.129 fares no better. That section of the Revenue Bond Act provides that "*Rates charged for the services furnished by any public improvement* purchased, acquired, constructed, improved, enlarged, extended and/or repaired under the provisions of this act *shall not be subject to supervision or regulation by any state bureau, board, commission or other like instrumentality or agency thereof.*" MCL 141.129 (emphasis added). Plaintiffs contend that MDEQ has supervised or regulated rates by forcing them to spread out the costs of service-line replacements among all customers. Again, the Court disagrees, as nothing in the rules *require* plaintiffs to charge back its customers for the improvements; rather, the rules only require that the replacement costs be initially borne by the supply and not charged to the homeowner. Secondly, plaintiffs' view takes too broad of an approach to the term "rates" and conflates what is essentially a cost imposed via regulation with the rate charged by a water supply. Adopting plaintiffs' view could lead to the conclusion that any regulation which leads to increased costs on the part of water supplies runs afoul of MCL 141.129. For instance, any MDEQ regulations regarding testing requirements or contaminant action levels that lead to an increase in a water supply's costs could, under plaintiffs view, amount to supervision or regulation of the supply's rates. For that matter, statutes setting minimum-wage requirements or other employment standards inevitably affect the water supply's costs and could, under plaintiffs' view, amount to supervision or regulation of the supply's rates. The Court declines to adopt this view. Rather, the service-line replacements mandated by MDEQ have, at most, an indirect effect on the rates charged by plaintiffs. MDEQ has not

-16-

supervised or regulated the rates charged to customers; it has simply imposed, via regulations, new costs on the water supply. It is left to plaintiffs' authority and discretion, see MCL 141.121, to determine how to set rates in response to rising costs. That plaintiffs intend to exercise that discretion by recovering service-line replacement costs from their customers does not mean that MDEQ has supervised or regulated the rates plaintiffs charge for services.

### III. CONCLUSION

For the foregoing reasons, and pursuant to MCR 2.116(C)(8) and (C)(10), the Court will enter an order contemporaneously with this opinion GRANTING defendant's motion for summary disposition.

Date: <u>July 26, 2019</u>

Christopher M. Murray
Chief Judge, Court of Claims

-17-