**<u>ORAL ARGUMENT NOT YET SCHEDULED</u>**

No. 24-1376

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

AMERICAN WATER WORKS ASSOCIATION,
*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents.*

---

On Petition for Review of a Final Rule of the Environmental Protection Agency,
89 Fed. Reg. 86,418 (Oct. 30, 2024)

---

# PROOF BRIEF OF RESPONDENT-INTERVENORS

---

Dated: March 13, 2026


SUZANNE NOVAK
NICHOLAS LOH
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7376
snovak@earthjustice.org
nloh@earthjustice.org

JARED J. THOMPSON
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
(202) 513-6249
jared.thompson@nrdc.org


(Additional counsel listed on inside cover)

MOLLY PROTHERO
Earthjustice
1250 I Street NW, 4th Floor
Washington, DC 20005
(202) 770-3974
mprothero@earthjustice.org

*Counsel for Respondent-Intervenors Newburgh Clean Water Project and Sierra Club*

KAREN CHEN
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-8261
kchen@nrdc.org

ERIK D. OLSON
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6240
eolson@nrdc.org

*Counsel for Respondent-Intervenor Natural Resources Defense Council*

## RESPONDENT-INTERVENORS' CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Respondent-Intervenors Newburgh Clean Water Project, Natural Resources Defense Council, and Sierra Club certify as follows:

### A. Parties and *Amici*

Petitioner is American Water Works Association ("AWWA"). Respondents are the United States Environmental Protection Agency and Lee M. Zeldin, Administrator of the United States Environmental Protection Agency (collectively, "EPA"). Respondent-Intervenors are Newburgh Clean Water Project, Natural Resources Defense Council ("NRDC"), and Sierra Club.

Chamber of Commerce of the United States of America is amicus curiae for Petitioner AWWA.

New York, California, Connecticut, Illinois, Maryland, Massachusetts, Minnesota, North Carolina, Wisconsin, and the District of Columbia are amici curiae for Respondent EPA. Respondent-Intervenors are aware that the American Academy of Pediatrics, the American College of Physicians, the American College of Obstetricians and Gynecologists, and the American Public Health Association (APHA); the Green & Healthy Homes Initiative; and the BlueGreen Alliance are seeking consent of the parties or, if necessary, leave of the Court to participate as amici curiae in support of Respondent EPA.

### B. Ruling under review

The petition for review challenges the Environmental Protection Agency's final rule titled "National Primary Drinking Water Regulations for Lead and Copper: Improvements (LCRI)," 89 Fed. Reg. 86,418 (Oct. 30, 2024).

### C. Related cases

All related cases are identified in Petitioner AWWA's Opening Brief (Dkt. No. 2134752).

*/s/ Jared J. Thompson*
Jared J. Thompson

*Counsel for Respondent-Intervenor*
*Natural Resources Defense Council*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Respondent-Intervenors Newburgh Clean Water Project, Natural Resources Defense Council, and Sierra Club certify that each is a non-governmental organization with no parent corporation and no publicly held company holding 10 percent or more of its stock.

Newburgh Clean Water Project is a grassroots community organization dedicated to ensuring that residents of Newburgh, New York have access to drinking water free from lead, PFAS, and other contaminants.

Sierra Club is a national nonprofit organization dedicated to the protection and enjoyment of the environment.

The Natural Resources Defense Council ("NRDC") is a national nonprofit organization dedicated to improving human health and the quality of the human environment and to protecting the nation's endangered natural resources. A central part of its mission is to protect communities from toxic chemicals in the environment, including the air people breathe and the water they drink.

*/s/ Jared J. Thompson*
Jared J. Thompson

*Counsel for Respondent-Intervenor*
*Natural Resources Defense Council*

## TABLE OF CONTENTS

RESPONDENT-INTERVENORS' CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........ i

A. Parties and *Amici* ........ i

B. Ruling under review ........ ii

C. Related cases ........ ii

RULE 26.1 DISCLOSURE STATEMENT ........ iii

TABLE OF AUTHORITIES ........ viii

GLOSSARY ........ ix

INTRODUCTION ........ 1

STATUTES AND REGULATIONS ........ 2

STATEMENT OF THE CASE ........ 2

I. Any Lead in Drinking Water Threatens Human Health. ........ 2

II. EPA Must Address Lead in Drinking Water to Prevent Adverse Effects to the Extent Feasible. ........ 4

III. EPA Promulgated the 2024 Rule to Address Deficiencies in the 1991 and 2021 Rules and Fulfill Its SDWA Mandate. ........ 5

SUMMARY OF ARGUMENT ........ 7

STANDING ........ 9

ARGUMENT ........ 9

I. The Safe Drinking Water Act Requires Mandatory Lead Service Line Replacement. ........ 9

II. AWWA's Contention that the Best Reading of "Control" in SDWA is "Ownership" Lacks Merit ........ 12

A. The Plain Meaning of "Control" is Broader Than "Ownership" ....................13

B. SDWA's Language Shows Congress Did Not Intend "Control" to Mean "Ownership" ....................14

1. SDWA Differentiates Between Ownership and Control ....................14

2. Congress Intended Full Service Lines to Be Part of Public Water Systems, Regardless of Ownership, and Has Reconfirmed That Intention. ....................15

C. Water Systems Have Exercised Control Over Service Lines They Do Not Own, Including by Replacing Parts of Lead Service Lines They Do Not Own ....................17

D. Equating Ownership with Control Would Lead to Absurd Results ....................19

III. EPA's Use of "Access" is the Best Meaning of "Control" in the Context of Lead Service Line Replacement ....................20

IV. The 2024 Rule's Approach Fits with EPA's Prior Interpretations of "Control" and, to the Extent It is a Departure, It is Justified. ....................23

V. The Record Shows EPA Rationally Determined the Rule is Feasible ....................25

A. The Rule's Mandatory Lead Service Line Replacement is Feasible ....................25

B. AWWA's Arguments that Lead Service Line Replacement in Ten Years is Not Technically Possible Lack Merit ....................28

C. Mandatory Lead Service Line Replacement and the Rule as a Whole are Affordable ....................31

D. The Rule's Service Line Replacement Requirement Presents Both Justified and Statutorily Required Departures from the 2021 Rule ....34

E. EPA Rationally Determined that Other Aspects of the Rule are also Feasible ....36

VI. EPA's Cost-Benefit Analysis Reasonably Concluded the Rule's Benefits Vastly Outweigh Its Costs ....37

VII. Remedy ....38

CONCLUSION ....39

CERTIFICATE OF COMPLIANCE ....41

CERTIFICATE OF SERVICE ....42

## TABLE OF AUTHORITIES

### Cases

*Allied-Signal v. NRC*,
988 F.2d 146 (D.C. Cir. 1993) .............................................................. 38, 39

*Centro de Trabajadores Unidos v. Bessent*,
No. 25-5181, --- F.4th. ----, 2026 WL 503310 (D.C. Cir. Feb. 24, 2026) .....23

**City of Portland v. EPA*,
507 F.3d 706 (D.C. Cir. 2007) .......................................................... 4, 25, 34

*Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*,
788 F.3d 312 (D.C. Cir. 2015) ..........................................................................9

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)......................................................................... 24, 35, 36

*Greenbaum v. Islamic Republic of Iran*,
67 F.4th 428 (D.C. Cir. 2023) ........................................................................14

*Healthy Gulf v. FERC*,
107 F.4th 1033 (D.C. Cir. 2024) ....................................................................39

*Kungys v. United States*,
485 U.S. 759 (1988)..........................................................................................15

**Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)......................................................................... 13, 20, 23

*McCarthy v. Bronson*,
500 U.S. 136 (1991)..........................................................................................21

*Midwest Ozone Grp. v. EPA*,
61 F.4th 187 (D.C. Cir. 2023) .........................................................................25

*Mingo Logan Coal Co. v. EPA*,
829 F.3d 710 (D.C. Cir. 2016) .........................................................................35

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*Oncor Elec. Delivery Co., LLC v. Murillo*,
449 S.W.3d 583 (Tex. App. 2014) ....................22

*Sebelius v. Auburn Reg'l Med. Ctr.*,
568 U.S. 145 (2013)....................14

*Tanzin v. Tanvir*,
592 U.S. 43 (2020)....................13

*United States ITC v. ASAT, Inc.*,
411 F.3d 245 (D.C. Cir. 2005) ....................22

*Williams-Yulee v. Florida Bar*,
575 U.S. 433 (2015)....................17

*Wisconsin v. EPA*,
938 F.3d 303 (D.C. Cir. 2019) ....................38

**Statutes**

5 U.S.C. § 706 ....................34

*42 U.S.C. § 300f(4)(A) .................... 8, 10, 14 19

42 U.S.C. § 300g .................... 8, 10, 14

42 U.S.C. § 300g-1(b)(2) ....................4

42 U.S.C. § 300g-1(b)(3)(C)(i)(III) ....................38

42 U.S.C. § 300g-1(b)(4)(C)....................37

42 U.S.C. § 300g-1(b)(4)(D)....................25

*42 U.S.C. § 300g-1(b)(7)(A)....................4, 5, 7, 9, 11, 25, 35

42 U.S.C. § 300g-1(b)(9) .................... 4, 39

42 U.S.C. § 300g-3....................14

42 U.S.C. § 300g-4....................31

42 U.S.C. § 300g-5 ........................................................................................31

42 U.S.C. § 300g-6 ........................................................................................16

42 U.S.C. § 300g-6(a)(2)(A) ..........................................................................14

42 U.S.C. § 300g-9 ........................................................................................14

42 U.S.C. § 300j-5 ..........................................................................................6

42 U.S.C. § 300j-12 ........................................................................................14

42 U.S.C. § 300j-12(a)(2)(B) ..........................................................................16

42 U.S.C. § 300j-12(h)(2) ...............................................................................16

42 U.S.C. § 300j-19b ......................................................................................15

42 U.S.C. § 300j-19b(a)(1) .............................................................................16

42 U.S.C. § 300j-19b(a)(2)(B) ........................................................................16

42 U.S.C. § 300j-19b(a)(4) .............................................................................16

42 U.S.C. § 300j-19f(a)(4)(B) .........................................................................14

**Regulations**

40 C.F.R. § 141.2 ..........................................................................................20

40 C.F.R. § 141.80(a)(3) .................................................................................29

40 C.F.R. § 141.84(d)(1)-(2) ...........................................................................10

40 C.F.R. § 141.84(d)(2) .................................................................................20

40 C.F.R. § 141.84(d)(4) .................................................................................29

40 C.F.R. § 141.84(d)(5)(vi) ...................................................................... 28, 29

48 Fed. Reg. 45,502 (Oct. 5, 1983) ........ 4

56 Fed. Reg. 26,460 (June 7, 1991) ........ 4, 17

86 Fed. Reg. 4198 (Jan. 15, 2021) ........ 3, 5, 18

86 Fed. Reg. 71,574 (Dec. 17, 2021) ........ 35

*89 Fed. Reg. 86,418 (Oct. 30, 2024) ........ 1-8, 10-11, 18-21, 23, 25-39

**Other Authorities**

*H.R. Rep. No. 93-1185 (1974) ........ 15, 26, 31

Pub. L. 115-270, 132 Stat. 3765 ........ 16

S. Rep. No. 104-169 (1995) ........ 26

## GLOSSARY

| | |
|---|---|
| 1991 Rule | Maximum Contaminant Level Goals and National Primary Drinking Water Regulations for Lead and Copper, 56 Fed. Reg. 26,460 (June 7, 1991), as amended 65 Fed. Reg. 1950 (Jan. 12, 2000) |
| 2021 Rule | National Primary Drinking Water Regulations: Lead and Copper Rule Revisions, 86 Fed. Reg. 4198 (Jan. 15, 2021) |
| APA | Administrative Procedure Act |
| AWWA | American Water Works Association |
| Chamber | U.S. Chamber of Commerce |
| EPA | Environmental Protection Agency |
| NRDC | Natural Resources Defense Council |
| Rule or 2024 Rule | National Primary Drinking Water Regulations for Lead and Copper: Improvements (LCRI), 89 Fed. Reg. 86,418 (Oct. 30, 2024) |
| SDWA | Safe Drinking Water Act |

# INTRODUCTION

There is no safe level of lead in drinking water. But millions of Americans live in homes where their drinking water passes through decades-old lead service lines, which connect the water main to the home and typically constitute the biggest source of lead in drinking water. In 2024, EPA sought to end this longstanding public health crisis by promulgating a rule that requires public water systems to replace lead service lines (most by 2037). National Primary Drinking Water Regulations for Lead and Copper: Improvements (LCRI), 89 Fed. Reg. 86,418 (Oct. 30, 2024) (the "Rule" or "2024 Rule"). The Rule also amended other aspects of EPA's regulation of lead in drinking water.

The Rule's vital public health protections are projected to yield net benefits of $12 to $23 billion *per year*. Despite these tremendous projections and its prior endorsement of a recommendation that EPA require complete removal of lead service lines, Petitioner AWWA seeks here to have the Rule vacated in full. AWWA Br. 35, 54.

AWWA's claims, which focus primarily on the Rule's mandatory lead service line replacement provisions, lack merit. AWWA's statutory arguments misconstrue the scope of EPA's longstanding authority under the Safe Drinking Water Act ("SDWA"). And AWWA's attacks on the Rule's feasibility are belied by

EPA's exhaustive, reasoned explanations in the record. The Court should uphold the Rule.

Respondent-Intervenors ("Intervenors") adopt EPA's brief in full and, consistent with D.C. Circuit Rule 28(d)(2), supplement it as follows.[1]

## STATUTES AND REGULATIONS

Pertinent statutes and regulations not provided with AWWA's and EPA's addenda (Dkt. Nos. 2134754, 2160315) are provided in the accompanying addendum.

## STATEMENT OF THE CASE

### I. Any Lead in Drinking Water Threatens Human Health

Uncontroverted science establishes that there is no safe level of lead exposure. *See, e.g.*, Rule at 86,419, JA___. Lead causes a myriad of detrimental health effects. Lead causes irreversible brain damage affecting the ability to learn, intelligence, attention spans, and child and adolescent behavior. *See id*. It also can trigger serious heart-related diseases and death, and harm the kidneys, reproductive and immune function, pregnancy, and birth outcomes. *Id.* at 89,420, JA___. Lead is particularly dangerous for fetuses, infants, and young children because it harms brain and body development. *Id.* at 86,429, JA___; Lead and Copper Rule

[1] Intervenors adopt EPA's Statement of the Issues and Statement of the Standard of Review without supplementation.

Revisions, 86 Fed. Reg. 4198, 4205-06, 4231, 4259 (Jan. 15, 2021) (the "2021 Rule"), JA___. As illustrated tragically by the widely publicized lead crisis in Flint, Michigan, the brunt of this damage is disproportionately borne by low wealth communities and communities of color. Rule at 86,431, 86,458, 86,612, JA___, ___, ___.

Drinking water is a significant source of lead exposure. *See* Rule at 86,429, JA___. EPA modeling shows that drinking water can constitute up to 80 percent of bottle-fed infants' lead exposures. *See, e.g.,* Lindsay W. Stanek et al., Modeled Impacts of Drinking Water Pb Reduction Scenarios on Children's Exposures and Blood Lead Levels, 54 Env't Sci. & Tech. 9474, 9474 (2020), EPA-HQ-OW-2022-0801-0256, JA___. Lead generally does not occur in source water; rather, it is released into water through corrosion of lead service lines—pipes that connect water mains to homes—and lead plumbing materials. Rule at 86,441, JA___.

As AWWA acknowledges, lead service lines are "typically the most significant source of lead in water." Rule at 86,429, JA___; AWWA Br. 5. There are millions of lead service lines distributing drinking water, particularly to homes built before 1986. Rule at 86,419, 86,436, JA___, ___. Historically, and until 1986, many water systems required lead service lines. *See, e.g.*, Comments of Natural Resources Defense Council et al. on Proposed Lead and Copper Rule Improvements, 2-37 n.145 (Feb. 5, 2024), EPA-HQ-OW-2022-0801-1119,

JA___("NRDC Comments") (noting Chicago required lead service lines until 1986 and 85 percent of cities installed or mandated lead service lines at the turn of the 20th Century).

## II. EPA Must Address Lead in Drinking Water to Prevent Adverse Effects to the Extent Feasible

Under SDWA, EPA must protect the public from lead and other contaminants in drinking water. *City of Portland v. EPA*, 507 F.3d 706, 709 (D.C. Cir. 2007); 42 U.S.C. § 300g-1(b)(2); 48 Fed. Reg. 45,502, 45,511 (Oct. 5, 1983). There are two ways EPA can regulate contaminants—via a "maximum contaminant level" or a "treatment technique," which is a prescribed practice or set of practices to control the amount of a contaminant. 42 U.S.C. § 300g-1(b)(7)(A); *see* Rule at 86,432-33, JA___. To address evolving circumstances and scientific knowledge, EPA must review and strengthen, if appropriate, drinking water regulations every six years. 42 U.S.C. § 300g-1(b)(9).

For contaminants such as lead regulated via treatment techniques, EPA's regulation "shall specify each treatment technique" that "prevent[s] known or anticipated adverse effects on the health of persons to the extent feasible." *Id.* § 300g-1(b)(7)(A). In 1991, EPA promulgated the initial suite of treatment techniques for lead, known as the Lead and Copper Rule ("1991 Rule"). 56 Fed. Reg. 26,460 (June 7, 1991), JA___-___; *see* Rule at 86,441, JA___. The 1991 Rule required public water systems to: use corrosion control technology to reduce the

release of lead from service lines and plumbing fixtures; treat source water; replace lead service lines (at a rate of seven percent per year after a system exceeds a non-health based "lead action level"); and educate the public in an array of circumstances. *Id.* at 86,442, 86,456, JA___, ___.

EPA made its first major revision to the 1991 Rule in the 2021 Rule. 86 Fed. Reg. 4198, JA___. That 2021 Rule, which AWWA intervened in litigation to defend, continued the 1991 Rule's replacement requirement triggered by a lead action level exceedance, but it shifted to require full, rather than partial, lead service line replacements because partial replacements do not prevent adverse effects and may exacerbate risks. Rule at 86,431, 86,445, 86,450, JA___, ___, ___; *see* AWWA Br. 10-11, EPA Br. 11-13 (Dkt. No. 2160313). The 2021 Rule defined full replacement as replacing "the entire length of the service line, regardless of service line ownership." 86 Fed. Reg. at 4281, JA___.

## III. EPA Promulgated the 2024 Rule to Address Deficiencies in the 1991 and 2021 Rules and Fulfill Its SDWA Mandate

EPA promulgated the 2024 Rule after recognizing that the 1991 and 2021 Rules were "insufficient to protect public health," Rule at 86,419, JA___, and to meet EPA's mandate to prevent adverse health effects "to the extent feasible," 42 U.S.C. § 300g-1(b)(7)(A). Scientific understanding of lead risks has advanced over the years, developing a consensus that even "[l]ow-level lead exposure is of particular concern for children." Rule at 86,429, JA___. And lead in drinking water

has harmed children nationwide, not only in water systems that have lead action level exceedances, but in many that do not. *See* NRDC Comments 4-15—4-16, JA___-___. Corrosion control alone cannot and does not eliminate lead in drinking water. Rule at 86,445, JA___; EPA Br. 35. To address these shortcomings, the 2024 Rule mandates, among other things, that water systems preemptively replace full lead service lines[2]—the dominant source of lead in drinking water—at the fastest feasible rate, which is over a 10-year period for most water systems. *See* Rule at 86,418-19, 86,429, 86,443, JA___-___, ___, ___; NRDC Comments 11-2—11-3, JA___.

The 2024 Rule's mandatory and full lead service line replacement mandate follows the 2015 recommendation by the National Drinking Water Advisory Council, *see* 42 U.S.C. § 300j-5, that EPA require all water systems to fully replace all lead service lines. *See* Report of the Lead and Copper Rule Working Group to the National Drinking Water Advisory Council 13-14 (2015), EPA-HQ-OW-2022-0801-0245, JA___. In 2017, AWWA endorsed the Advisory Council's recommendation and called for "the complete removal of lead service lines." AWWA Policy Statement on Lead Service Line Management (Jan. 14, 2017), https://web.archive.org/web/20241011175701/https://www.awwa.org/policy-

---

[2] The Rule requires replacement of both lead service lines and certain other service lines that can adsorb and release lead particles. *See* EPA Br. 13 n.6. For simplicity, this brief refers to all such pipes as "lead service lines."

statement/lead-service-line-management/ [https://perma.cc/D9RJ-UHD8] (last accessed Mar. 10, 2026), JA__.

The 2024 Rule will significantly benefit public health. *See* EPA, Economic Analysis for the Final Lead and Copper Rule Improvements ("Economic Analysis") ES-5, EPA-HQ-OW-2022-0801-2649, JA___. EPA calculated that, annually, the rule will protect up to 903,341 infants from low birthweight, prevent up to 1,483 premature deaths from cardiovascular disease, prevent up to 2,577 children from experiencing Attention-Deficit/Hyperactivity Disorder, and prevent up to 199,775 lost IQ points in children. *See* Economic Analysis 5-60—5-63, Exs. 5-32—5-35, JA___-___. These health benefits generate annualized monetized benefits of about $13.5 to $25.1 billion,[3] compared with annualized costs of about $1.5 to $2 billion, yielding annualized net "benefits that range from $12.0 to $23.2 billion." Rule at 86,592 Ex. 15, 86,594, JA___, ___.

## SUMMARY OF ARGUMENT

The Rule's mandate that public water systems remove full lead service lines they control was necessary to fulfill SDWA's requirement that EPA implement techniques that "would prevent known or anticipated adverse effects on the health of persons to the extent feasible." 42 U.S.C. § 300g-1(b)(7)(A). No party contests

[3] If additional health benefits had been quantified, total annualized benefits would exceed $36 billion. *See* NRDC Comments 12-3—12-7, JA___-___.

that lead service lines are "typically the most significant source of lead in water." Rule at 86,429, JA___.

EPA has authority to mandate the removal of full service lines that public service systems control, regardless of who owns them, because EPA is charged with regulating public water systems, the definition of which includes "pipes" and "distribution facilities under control of the operator[s] of such system[s]." 42 U.S.C. §§ 300g, 300f(4)(A). AWWA argues that such control does not extend to privately owned portions of lead service lines because "control" must be synonymous with "ownership," but that is not the best reading of the statute. Such an interpretation is contrary to the plain meaning of "control," Congressional intent, and how water systems function, and would lead to absurd results. Equating "control" with "access," as defined in the Rule, is the best reading of the statute with respect to lead service line replacement and is not a departure from EPA's previous interpretations of the term.

EPA rationally determined that the 2024 Rule is feasible, as defined in SDWA. In particular, the mandatory lead service line replacement component of the Rule, including the default 10-year timeline for completing replacements, is a well-justified improvement on prior rules that is mandated by SDWA (as noted above).

The Rule should be upheld. If the Court were to find error, the Rule should be remanded without vacatur because full or partial vacatur would be extremely disruptive for regulated entities, states, and drinking water consumers.

## STANDING

Intervenors' members are served by water systems with unsafe levels of lead in drinking water, receive water through lead service lines, and have found lead coming out of their taps. *See* Mot. to Intervene of Newburgh Clean Water Project et al. 9-15, Dkt. No. 2090841 (Dec. 20, 2024). To the extent it is required, Intervenors have standing to defend all aspects of the Rule because their members benefit from the Rule, *see id.*, and "an unfavorable decision would remove the … benefit." *Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 317 (D.C. Cir. 2015).

## ARGUMENT

### I. The Safe Drinking Water Act Requires Mandatory Lead Service Line Replacement

The Rule requires public water systems to replace entire lead service lines, including both publicly and privately owned portions ("full lead service line replacement"), and replace all lead service lines under water systems' control ("mandatory lead service line replacement"). These provisions are mandated by SDWA because they are both necessary and feasible to prevent adverse health effects from lead in drinking water. *See* 42 U.S.C. § 300g-1(b)(7)(A). The Rule

was required to include feasible treatment techniques to reduce the level of lead in drinking water as close to zero as possible because, as noted earlier, any amount of lead in drinking water presents risk of harm. Rule at 86,420, JA___. Full lead service line replacement is the single best method for doing that. Rule at 86,446, JA___.

EPA has authority to mandate lead service line replacement. SDWA requires EPA to regulate public water systems. 42 U.S.C. § 300g; EPA Br. 4-5. "Public water system" is defined as "a system for the provision to the public of water for human consumption *through pipes or other constructed conveyances* … [that] includes (i) any collection, treatment, storage, and *distribution facilities under control of the operator of such system*." 42 U.S.C. § 300f(4)(A) (emphasis added).[4] The 2024 Rule requires water systems to replace lead service lines under their control, and deems a service line under a water system's control if the water system can both physically and legally access the line to perform the replacement. 40 C.F.R. § 141.84(d)(1)-(2); Rule at 86,449-53, JA___-___. Thus, lead service lines underlying private property ("private-side lead service lines") that a water system

[4] Many "public water systems" are in fact private entities. The term "public" in that phrase refers to provision of drinking water to the public.

has access to are under the system's control and are part of the public water system, and EPA can mandate their replacement.[5]

AWWA challenges the Rule's lead service line replacement mandate on both factual and legal grounds. AWWA does not dispute that lead service lines are "typically the most significant source of lead in water." Rule at 86,429, JA___; AWWA Br. 5. Rather, it suggests that lesser interventions, particularly corrosion control treatment, meet SDWA's requirement to prevent adverse health effects from lead "to the extent feasible." 42 U.S.C. § 300g-1(b)(7)(A); AWWA Br. 8. They do not. "Mandatory full service line replacement … reduces lead levels in drinking water more than other risk mitigation actions and treatment …." Rule at 86,446, JA___. And partial replacement of a portion of a lead service line is not only less effective but can actually increase risk of harm. Rule at 86,431, 86,445, JA___, ___; *see* EPA Br. 11-13, 29, 49.

AWWA also argues, incorrectly, that the Rule's lead service line replacement mandate is invalid because it includes replacement of privately owned lead service

[5] Service line ownership depends on state and local law and does not always correlate with ownership of the overlying estate. *See* AWWA Br. 3, 23 ("A system's ownership [of service lines] may extend up to the property line, building, or only the curb."). For example, in Lansing, Michigan, the water system owns the entire service line "from the water main to the meter," including any portions under private property. Lansing Bd. of Water & Light, Lead Information, https://www.lbwl.com/customers/water-resource-center/lead-information [https://perma.cc/6FBJ-CNG9] (last accessed Mar. 11, 2026).

lines. While its arguments are intertangled, AWWA essentially makes three arguments: 1) "control" in SDWA must be defined as ownership and therefore any privately owned lead service lines, or portions thereof, are not part of a "public water system" and EPA lacks authority to order their replacement;[6] 2) "control" in SDWA's definition of public water system cannot be established by "access" for lead service line replacement because "access" is not the best reading of the term; and 3) the interpretation of control in the Rule is an inadequately justified departure from EPA's prior interpretation of control. For the reasons discussed below, these arguments fail.

## II. AWWA's Contention that the Best Reading of "Control" in SDWA is "Ownership" Lacks Merit

AWWA incorrectly and unpersuasively argues that the best reading of the term "control" in SDWA is "ownership," and thus EPA exceeded its authority by

---

[6] AWWA argues that "EPA lacks authority under the Act to regulate privately owned service lines" and that "the single, best reading of [SDWA] equates control with water system ownership." AWWA Br. 18, 34. But, in some places, AWWA argues that "a system's control over service lines exists only over that part of the line that underlies public property." AWWA Br. 23. These arguments are not interchangeable. As AWWA admits, AWWA Br. 3, 23, and as set forth *supra* in footnote 5, some water systems own service lines on private property. And water systems often do *not* own the public property that typically (but not always, *see* EPA Br. 25-26) overlies water mains and portions of service lines. Any argument that SDWA cannot reach system-owned infrastructure underlying real property not owned by the water system goes far beyond any plausible interpretation of "control." For purposes of responding, Intervenors interpret AWWA's arguments that EPA cannot regulate lead service lines on private property as imprecise arguments that EPA cannot regulate privately-owned lead service lines.

requiring water systems to replace full lead service lines to which they have access, regardless of whether the systems own all portions of the line. AWWA Br. 25, 29. AWWA's atextual argument runs counter to both Congressional intent and how water systems operate and would also lead to absurd results.

### A. The Plain Meaning of "Control" is Broader Than "Ownership"

Courts exercise "independent judgment in deciding whether an agency has acted within its statutory authority," using "traditional tools of statutory construction" to find the statute's "single, best meaning." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400-01 (2024). Here, the tools of statutory construction demonstrate that the best reading of "control" in SDWA is not "ownership." Because SDWA does not define "control," courts must first "turn to the phrase's plain meaning at the time of enactment." *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020).

Dictionary definitions of "control" at the time SDWA was enacted show that its plain meaning was not synonymous with "ownership." Notably, AWWA never argues that dictionaries support its view that "control" should be equated with "ownership," likely because none of the dictionary definitions it cites define "control" to mean "ownership." AWWA Br. 23-24, 29-34; *see* EPA Br. 23. Instead, the parties agree that dictionaries defined "control" to mean something akin to "exercise authority over; direct; command" or to "regulate" or "govern." AWWA

Br. 23; EPA Br. 23; *see Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428, 432 (D.C. Cir. 2023) (looking to dictionary definitions to find plain meaning).

### B. SDWA's Language Shows Congress Did Not Intend "Control" to Mean "Ownership"

#### 1. SDWA Differentiates Between Ownership and Control

SDWA's language confirms that "control," as used in the definition of public water system, is not synonymous with "ownership." A public water system includes certain infrastructure (such as pipes) "under control of" the operator, rather than "owned by" the operator. 42 U.S.C. § 300f(4)(A). Congress used the word "owned" to refer to ownership of a water system elsewhere in SDWA. *E.g.*, 42 U.S.C. §§ 300g, 300j-19f(a)(4)(B). This shows that Congress knew of and could have used the phrase "owned by" in the public water system definition but chose the phrase "under control of" instead. "Congress's use of certain language in one part of the statute and different language in another" generally indicates "that different meanings were intended." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 156 (2013) (citation modified).

SDWA's language also confirms that the term "operator" in the phrase "under control of the operator" is not synonymous with "owner." SDWA refers to the "owner or operator of a public water system" in multiple locations. *See, e.g.*, 42 U.S.C. §§ 300g-3, 300g-6(a)(2)(A), 300g-9, 300j-12. It is a "cardinal rule of

statutory interpretation that no provision should be construed to be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778 (1988).

Congress's choice of terminology in SDWA demonstrates its intent that it is the operation of water provision functions—rather than ownership of water infrastructure—that is central to what constitutes a public water system.

### 2. Congress Intended Full Service Lines to Be Part of Public Water Systems, Regardless of Ownership, and Has Reconfirmed That Intention

Legislative history at the time of SDWA's enactment demonstrates Congress's intent for EPA to regulate full service lines because Congress's focus was on the delivery of safe water to the consumer. *See* H.R. Rep. No. 93-1185, at 13 (1974), 1974 U.S.C.C.A.N. 6454, 6505 ("drinking water regulations are intended to be met at the consumer's tap"); *id.* at 15, 1974 U.S.C.C.A.N. at 6468 (explaining that SDWA should ensure "water meeting national primary drinking water regulations … will be delivered reliably to consumers"). Delivering safe water solely to the private property line would not fulfill Congress's goal.

More recent Congressional actions demonstrate both Congress's intent that full lead service lines be replaced through SDWA and its understanding that some water systems control the full line. Congress created in 2016, and updated in 2021, a funding program for "lead reduction projects" to replace lead service lines. 42 U.S.C. § 300j-19b. Congress defined "lead service line" as "a pipe and its fittings,

which are not lead free … *that connect the drinking water main to the building inlet*." *Id.* § 300j-19b(a)(4) (emphasis added). To be eligible for federal funding, Congress required lead reduction projects to replace the entire lead service line, including any privately owned portion. *Id.* § 300j-19b(a)(2)(B) (a "'lead reduction project' does not include a partial lead service line replacement if, at the conclusion of the service line replacement, drinking water is delivered to a household through a publicly *or privately owned* portion of a lead service line." (emphasis added)). Water systems are eligible to receive funding under this program, *id.* § 300j-19b(a)(1), which strongly implies that Congress understood that full service lines, regardless of ownership, can be under the control of public water system operators, because otherwise water systems would not be able to access this funding.[7]

Congress's forward-looking ban on lead pipes and plumbing fixtures, 42 U.S.C. § 300g-6, does not show any contrary Congressional intent. *See* EPA Br. 31-32; *contra* AWWA Br. 26-27. Lawmakers "need not address all aspects of

[7] Similarly, Congress showed its understanding that full lead service lines, from the water main to the building inlet, are "distribution facilities" and thus part of public water systems by adding provisions to SDWA in 2018 that, collectively, required EPA to study the nationwide funding needs for full lead service line replacements and amended SDWA to allow federal revolving funding to be used for full lead service line replacements as part of projects to "replac[e] … aging … distribution facilities of public water systems." America's Water Infrastructure Act of 2018, Pub. L. 115-270, § 2015(a), (e)(2), 132 Stat. 3765, 3854-55 (2018) (amending 42 U.S.C. § 300j-12(a)(2)(B), (h)(2) and incorporating by reference 42 U.S.C. § 300j-19b(a)(4)).

a problem in one fell swoop." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015).

### C. Water Systems Have Exercised Control Over Service Lines They Do Not Own, Including by Replacing Parts of Lead Service Lines They Do Not Own

Both historical and current real-world practices reflect that public water systems "exercise … influence over," "direct," or "regulate" private-side service lines, *see* AWWA Br. 23 (quoting dictionaries), sometimes to an extreme degree. Many water utilities historically installed lead service lines themselves, including on private property, or required home and building owners to use lead service lines; indeed, Chicago required lead service lines until the federal ban in 1986. NRDC Comments 2-32, 2-37 n.145, JA___, ___. In the 1991 Rule, EPA referenced a study of water system authority across major cities and investor-owned utilities and noted that the majority of these water systems reserved the right to perform work on privately owned service lines and required such lines to meet specifications like location, size, and material composition. 56 Fed. Reg. at 26,504, JA___. Water systems often regulate customers' water connections in these ways via terms of service that customers must accept before water is delivered through the service line to the building inlet. NRDC Comments 2-34, 2-37 n. 145, JA___, ___.

Public water systems' historic exercise of control over full service lines also extends to their replacement. The 1991 Rule required water systems that exceeded

the lead action level to replace "the portion of the service line that is owned by the system and [to] *offer to replace the portion of the line not owned by the system*." Rule at 86,449 (emphasis added), JA___; *see* EPA Br. 9-10, 29. Presumably AWWA's members have been complying with this mandate for decades. State or local laws often give water systems the right to enter private property to replace service lines, NRDC Comments 2-34, JA___, or allow water systems to use the threat of water shutoff to encourage private property owners to cooperate with service line replacement programs, *e.g.,* The Pittsburgh Water and Sewer Authority, Tariff Water – Pa. P.U.C. No. 1, Supplement No. 18, Dkt. No. R-2025-3055010 (Feb. 19, 2026), at Part VI(3)(f)(i)-(ii).[8]

Water systems' control over full service lines was affirmed in the 2021 Rule, which AWWA intervened to defend in litigation. As AWWA notes, the 2021 Rule "shifted from partial to full service line replacement" and "requir[ed] full replacement." AWWA Br. 10. That Rule also explicitly recognized that full replacement might involve privately owned lines, defining full lead service line replacement as "the replacement of a lead service line … that results in the entire length of the service line, *regardless of service line ownership*, meeting the … definition of lead free." 86 Fed. Reg. at 4281 (emphasis added), JA___.

---

[8] https://www.pgh2o.com/sites/default/files/2026-03/CURRENT%20Pittsburgh%20Water%20-%20Water%20Tariff.pdf [https://perma.cc/B84D-YSR4] (last accessed March 11, 2026).

### D. Equating Ownership with Control Would Lead to Absurd Results

Adoption of AWWA's argument—that systems should be responsible only for infrastructure they own—would create absurd results. SDWA defines "public water system" to include "pipes" and "collection, treatment, storage, and distribution facilities *under control of the operator*." 42 U.S.C. § 300f(4)(A) (emphasis added). "Public water system operators may not be the same entity that 'owns'" this infrastructure. Rule at 86,451, JA___. For example, in Allentown, Pennsylvania, the Lehigh County Authority leases and operates the entire public water system owned by the city. *See* Lehigh County Authority, LCA Customer Notice – September 2020.[9] Similarly, in Camden, New Jersey, the private company "American Water Contract Services operates and maintains the water supply and distribution system assets owned by the City." *See* Camden's Continued Investment in Water Quality.[10] If control meant ownership in SDWA, some or all of the vital infrastructure operated by water systems like these would not be part of a "public water system" under SDWA and thus would be outside the purview of EPA and not subject to the 2024 Rule or any other federal drinking water regulations.

---

[9] https://www.lehighcountyauthority.org/wp-content/uploads/2020/09/SB-3rdQtr-Sep2020.pdf [https://perma.cc/BAG9-PENY] (last accessed March 11, 2026).

[10] https://www.camdennj.gov/wp-content/uploads/2021/04/AW-Camden-CCI_Water-Quality_FAQ_Final-4-13-21.pdf [https://perma.cc/2L8H-V3PH] (last accessed March 11, 2026).

## III. EPA's Use of "Access" is the Best Meaning of "Control" in the Context of Lead Service Line Replacement

EPA's definition and use of "access" in the 2024 Rule, *see* Rule at 86,449, JA___, is carefully tailored to be the "single, best meaning" of "control" as used in SDWA, for the purposes of service line replacement.[11] *See Loper*, 603 U.S. at 400. It stems from EPA's commonsense conclusion that "whether a service line is under the control of the water system" ultimately depends on "(1) [t]he relevant laws that authorize and/or condition a water system's ability to exert control over the line in order to replace it and (2) whether, as a factual matter, a water system can gain physical access to the service line in order to conduct a full replacement." Rule at 86,451, JA___. In the Rule, EPA boiled this concept down to "[w]here a water system has access (e.g., legal access, physical access) to conduct full service line replacement, the service line is under its control." 40 C.F.R. § 141.84(d)(2).

Thus, the term "access," as used in the Rule, is not a lay definition. It does not mean merely the ability to enter private property, but also requires legal permission for the public water system to replace lead service lines. *See* Rule at 86,451, JA___. And it was carefully tailored to this context. For example, the Rule defers to State and local laws and water tariff agreements to determine the extent of

[11] The Rule's interpretation of control as access is contained in a provision about service line replacement, 40 C.F.R. § 141.84(d)(2), rather than the Rule's general definitions section, 40 C.F.R. § 141.2, and thus applies only to lead service line replacement. *See* Rule at 86,625, 86,637, JA___.

public water system access to privately owned lines, and recognizes that, under some local laws, "customer consent may be a prerequisite for access." Rule at 86,445, JA___. And even if legal access is present, if "threats to the safety of system personnel [exist] due to site characteristics," there is no physical access and thus those lead service lines are not "under control" of the public water system, and do not have to be replaced. *Id.* at 86,449, JA___.

Access, as defined in the 2024 Rule, is the best and most practical way to apply the plain meaning of "control" in this context. As EPA recognized, "[i]f the water system can, as a factual matter, gain access over the service line to disconnect it from use and replace it with a new line, then the water system is directing influence over the line and exercises power or authority to manage it and it is … 'under control' of the system." Rule at 86,451, JA___; *see supra* Arg.II.A (discussing dictionary definitions of control at time of SDWA enactment that included to "exercise influence over," "regulate," and "govern"). And EPA reasonably determined that interpreting "control" in that way is the best way to achieve SDWA's purpose of delivering safe drinking water to the tap and prevent adverse health effects "to the extent feasible." *See supra*, Arg.I, II.B.2.

Contrary to AWWA's assertions, AWWA Br. 20-22, common law usages or definitions of "control" and "access" in other contexts like criminal or property law have no bearing here. *See McCarthy v. Bronson*, 500 U.S. 136, 139 (1991)

(“[S]tatutory language must always be read in its proper context.”); EPA Br. 26-27. But even if they did, many uses of the terms “access” and “control” in other contexts support equating “control” with “access.” For example, Federal Rule of Civil Procedure 34(a) allows a party to request documents from an adversary if the sought items are in the adversary’s “possession, custody, or control.” Control in that context does not require the party to have legal ownership of the documents requested, but rather “the legal right, authority or ability to obtain documents upon demand,” including from third parties to the litigation. *United States ITC v. ASAT, Inc.*, 411 F.3d 245, 254 (D.C. Cir. 2005) (citation modified). And state courts have found that utilities holding easements may exercise sufficient control as to be subject to tort liability, without owning the property at issue. *See, e.g.*, *Oncor Elec. Delivery Co., LLC v. Murillo*, 449 S.W.3d 583, 591 (Tex. App. 2014).

AWWA’s contention that EPA’s access-based interpretation of “control” will endlessly shift public water systems’ responsibilities depending on the whims of property owners stems from an incorrect understanding of the Rule and lacks merit. *Contra* AWWA Br. 24; Chamber Br. 15 (Dkt. No. 2136096). Under the Rule, if necessary, a public water system seeks consent from an owner to access their property, which the owner either grants or denies. If access is granted, the public water system replaces the lead service line and its obligations for that property are

complete.[12] Only if an owner denies consent for access and later sells their property does the water system's obligation to seek consent renew. Rule at 86,453, JA___. And to the extent administrability concerns exist, they have no bearing on the best interpretation of "control." *See* EPA Br. 27-28.

## IV. The 2024 Rule's Approach Fits with EPA's Prior Interpretations of "Control" and, to the Extent it is a Departure, it is Justified

The best reading of SDWA—equating "control" with "access" in the context of service line replacement—is dispositive here. *See Centro de Trabajadores Unidos v. Bessent*, No. 25-5181, --- F.4th. ----, 2026 WL 503310, at *12-14 (D.C. Cir. Feb. 24, 2026). However, to the extent AWWA argues in the alternative that SDWA delegated authority to EPA to "give meaning to [this] particular statutory term," *Loper Bright*, 603 U.S. at 394, EPA reasonably exercised that discretion.

Contrary to AWWA's arguments, AWWA Br. 29-31, EPA's interpretation of "control" in the 2024 Rule is not a departure from prior regulations. AWWA argues that EPA never suggested it could mandate service line replacement of privately owned service lines, citing EPA statements that premise plumbing (as opposed to privately owned service lines) can be outside water systems' control and that water systems are not responsible for service line replacement when customers withhold consent. AWWA Br. 27. Not only are those arguments non-sequiturs, but EPA's

---

[12] A typical service line replacement takes about four hours (though inspection and permits occur prior). *See* EPA Br. 42.

response to comments on the 2021 Rule, which AWWA cites, explains that the 2021 Rule, in line with EPA's approach to lead in drinking water since 1991, "required water systems to take actions with respect to service lines and premise plumbing not owned by the system," including "the requirement … to … offer to replace … non-system owned [lead service lines]." EPA, Public Comment and Response Document for the Final Lead and Copper Rule Revisions 195 (Dec. 2020), EPA-HQ-OW-2022-0801-0179, JA___.

Even if, however, this Court were to view the 2024 Rule's interpretation of "control" as an exercise of delegated interpretive authority that is a departure from EPA's prior approach, the agency adequately justifies its approach. When an agency promulgates a new policy, it "must show that there are good reasons for the new policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The agency does not, however, "need [to] demonstrate … that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.* (emphasis in original). Here, EPA has not only demonstrated that an access-based definition of "control" is permissible; it has shown that adopting that definition fulfills the agency's mandate under SDWA to prevent "to the extent feasible" documented adverse health effects from lead like brain damage, cardiovascular-linked disease and premature death, and harm to the

kidneys, immune functioning, and birth outcomes. 42 U.S.C. § 300g-1(b)(7)(A); *see supra*, Arg.I; *see also* EPA Br. 33-35.

## V. The Record Shows EPA Rationally Determined the Rule is Feasible

AWWA's arguments that the 2024 Rule is not feasible fail. AWWA misconstrues the meaning of "feasible" in SDWA and largely relies on its own comments and EPA's outdated statements about prior rules, while ignoring or downplaying EPA's reasoned responses to AWWA's comments and the preamble to this Rule. AWWA's disagreements with EPA's technical judgments do not establish a violation of SDWA or the APA. Instead, EPA's "determinations based upon highly complex and technical matters are entitled to great deference." *Midwest Ozone Grp. v. EPA*, 61 F.4th 187, 192 (D.C. Cir. 2023) (cleaned up).

### A. The Rule's Mandatory Lead Service Line Replacement Is Feasible

SDWA defines "feasible" to mean "feasible with the use of the best technology, treatment techniques and other means which the Administrator finds, after examination for efficacy under field conditions and not solely under laboratory conditions, are available (taking cost into consideration)." 42 U.S.C. § 300g-1(b)(4)(D). In short, "feasible" means effective, technically possible, and affordable. Rule at 86,433, JA___ (citing *City of Portland*, 507 F.3d at 712). Importantly, as EPA recognized, Congress required affordability "to be evaluated relative to 'what may reasonably be afforded by large metropolitan or regional

public water systems.'" Rule at 86,433, JA___ (quoting H.R. Rep. No. 93-1185 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6454, 6471); *see also* S. Rep. No. 104-169, at 3 (1995).[13]

EPA reasonably determined and explained why the mandatory lead service line replacement required by the Rule is effective, technically possible, and affordable. As discussed above, *supra*, Arg.I, EPA reasonably determined that lead service line replacement is effective to reduce lead in drinking water. Rule at 86,446, JA___ (concluding mandatory replacement "reduces lead levels in drinking water more than other risk mitigation actions"); *see also* EPA Br. 34-35.

To ensure that mandatory lead service line replacement is both affordable and technically possible, the crux of EPA's feasibility analysis was its determination of the fastest feasible rate for replacements, based on real world data, which in turn determined the Rule's deadlines for replacements. EPA analyzed the best available data on lead service line replacement rates achieved by large water systems (those serving more than 10,000 people). Rule at 86,458, JA___; EPA, Technical Support Document for the Final Lead and Copper Rule Improvements ("Technical Support Document") 1-5, EPA-HQ-OW-2022-0801-2646, JA___; EPA Br. 36-37. The fastest real-world replacement rate in EPA's

[13] Amicus Chamber proposes an inapposite analysis of feasibility based on interpretations of other statutes. *Contra* Chamber Br. 26-27.

dataset was 144 annual replacements per 1,000 service connections, showing that rate is achievable. Technical Support Document 5 Ex. 2.2, JA___. But, in the Rule, EPA concluded that the fastest feasible rate to mandate for all water systems should be the 95th percentile of the range of actual rates achieved by the large water systems in EPA's dataset, which is 39 annual replacements per 1,000 service connections. Rule at 86,458, JA___; EPA, Response to Public Comments on the Lead and Copper Rule Improvements ("Response to Comments") 9-93 (Oct. 2024), EPA-HQ-OW-2022-0801-0245, JA___. EPA reasonably and conservatively used the 95th percentile rate from the dataset, rather than the maximum rate, "to set the fastest feasible" rate to avoid having "any single system with potentially unique circumstances [] determine the rate for a broad range of systems covered by a national rule." Rule at 86,459, JA___.

EPA set ten years as the default replacement period because 98 percent or more of water systems of all sizes will finish their lead service line replacements within ten years if they replace lead service lines at the fastest feasible rate of 39 replacements per 1,000 service connections. Technical Support Document at 7-9 & Ex. 2.3, JA___; Rule at 86,460, JA __. However, to accommodate water systems of any size with unusually high proportions of lead service lines, the Rule allows a water system to take as many years as necessary to complete replacements as long

as it replaces lines at the fastest feasible rate. Rule at 86,467, JA___; 40 C.F.R. § 141.84(d)(5)(vi).

EPA's reliance on replacement rate data from large water systems was reasonable. *Contra* AWWA Br. 36-39; Chamber Br. 22-24. EPA estimated that about 88 percent of lead service lines nationwide are in water systems that serve more than 10,000 people, Economic Analysis 3-44 & Ex. 3-18, JA___,[14] so EPA's replacement rate analysis focused on the systems that contain the vast majority of lines to be replaced. Furthermore, only two small systems had usable replacement rate data and both achieved comparatively high replacement rates. Technical Support Document 4, JA___. Indeed, if EPA had included the small system data, its calculation of the 95th percentile feasible replacement rate for *all* systems would have *increased* from 39 to 59 annual replacements per 1,000 service connections, supporting a default deadline even shorter than ten years. Technical Support Document 5 & Ex. 2.2, JA___; EPA Br. 46.

### B. AWWA's Arguments that Lead Service Line Replacement in Ten Years Is Not Technically Possible Lack Merit

AWWA argues that 40 percent of water systems would be unable to meet the 10-year deadline based on recent replacement rates. AWWA Br. 15, 47-48. But

---

[14] EPA estimated that 8,592,603 of 9,791,351 projected total lead content service lines (87.8 percent) are in water systems serving 10,001 or more people (adding the values in column F: 2,950,142 + 1,418,488 + 2,854,391 + 1,369,582 = 8,592,603).

AWWA ignores the fact that most replacement programs to date have been voluntary or, to the extent there was any regulatory requirement, were meant to achieve the 1991 Rule's slower seven percent annual replacement rate requirement. *See* Rule at 86,447, JA___ (discussing inadequacy of existing "proactive and voluntary" programs); EPA Br. 9 (discussing 1991 Rule's limited replacement requirement). The lower service line replacement rates achieved in some systems conducting replacements voluntarily, without any deadline, do not show that the 10-year mandate is infeasible. EPA reasonably concluded and explained that "mandatory service line replacement and other [Rule] provisions will increase the replacement rates relative to previous voluntary programs." Response to Comments 9-122, JA___; Rule at 86,467, JA___; *see* EPA Br. 38-39.

AWWA's attack on the 10-year timeline also largely ignores the actual deadlines and flexibility built into the Rule. Because the Rule provides three years before water systems must start complying with it, systems will have a total of 13 years to prepare for and implement the lead service line replacement mandate. Rule at 86,560-61, JA___-___; 40 C.F.R. §§ 141.80(a)(3), 141.84(d)(4). On top of that lengthened timeline, systems with a high percentage of lead service lines will receive automatic extensions and need only replace lines at the fastest feasible annual rate. Rule at 86,467, JA___; 40 C.F.R. § 141.84(d)(5)(vi). AWWA's only attempt to rebut the feasibility of mandatory lead service line replacement in light

of the deferred deadline merely restates its arguments that the Rule applies an unworkable interpretation of which service lines are under a water system's control. AWWA Br. 51-52 n.20. As discussed above, these arguments are unpersuasive. *Supra*, Arg.III; *see* EPA Br. 27-28.

Finally, EPA reasonably concluded that materials and labor will be available to conduct mandatory lead service line replacements as required by the Rule. *See* EPA Br. 42-43; *contra* AWWA Br. 45-48. EPA reviewed estimates of construction backlogs and staffing levels to conclude that the construction industry is currently operating at an approximately median capacity. Response to Comments 21-53—21-54, JA___. Three large labor unions submitted comments highlighting workforce development and training programs already underway, and one "affirmed its capacity to develop the workforce to complete [lead service line replacements] within the next 10 years." Rule at 86,469, JA___; *see* Response to Comments 9-99—9-100, JA___-___. Similarly, EPA reviewed data and comments about the materials needed for service line replacement and reasonably confirmed the availability of the necessary copper, PVC, and point-of-use filters. Rule at 86,468-69, JA___-___.

### C. Mandatory Lead Service Line Replacement and the Rule as a Whole are Affordable

EPA also reasonably determined that both mandatory lead service line replacement and the Rule as a whole are affordable and explained its conclusions. *See* EPA Br. 44-47; Rule at 86,460, JA___.

Contrary to AWWA's arguments, AWWA Br. 36-39; *see also* Chamber Br. 22-24, affordability "is to be based on what may reasonably be afforded by large metropolitan or regional public water systems," even though "a reasonable cost for a large metropolitan (or regional) public water system may not be reasonable for a small system." H.R. Rep. No. 93-1185 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6454, 6470-71. Thus, EPA "may not reject a treatment technique because it is unaffordable to small systems." Rule at 86,433, JA ____. Instead of lowering the regulatory bar for *all* systems, SDWA includes "authority to grant exemption[s]" and "delay the date for compliance" for small water systems. H.R. Rep. No. 93-1185, 1974 U.S.C.C.A.N. at 6471; *see* 42 U.S.C. §§ 300g-4, 300g-5 (creating processes for variances and exemptions).

Although EPA's affordability analysis was not required to consider small water systems, EPA nevertheless did. EPA considered costs from all of the Rule's treatment techniques, including corrosion control treatment, service line replacement, and other requirements, and found "each treatment technique" and "the rule as a whole to be affordable" for water systems both large and small.

Response to Comments, 2-1—2-2, JA___-___; *see* Rule at 86,460, JA___; EPA Br. 45-46.[15] EPA further calculated that the "estimated mean annualized incremental cost per household ranges from $1-$67" for systems of all sizes. Response to Comments 21-60, JA___; *see* EPA Br. 54-55. For systems serving over 100 people (which includes most small systems), the mean cost per household is $22.50 or less per year—less than $2.00 per month. Rule at 86,578-79, Exs. 7-8, JA___-___; *see* Economic Analysis 3-16—3-20, JA___ (inventories of water systems). Also, EPA's estimates assume that water systems will bear the costs of full service line replacement and pass all costs on to customers, which may "overestimate actual costs given the potential that systems could obtain grants to offset the cost of [service line replacement] or other [Rule] related activities" and because the Rule does not require water systems to pay for replacements of privately-owned lines.[16] Economic Analysis, 4-280 & n.140, JA___; Rule at 86,453-54, JA___-___.

AWWA's argument that EPA "overestimates the extent to which these costs can be offset by outside financial assistance," AWWA Br. 42-45, has no merit. "EPA did not consider the availability of external funding in its calculation of

---

[15] EPA also analyzed small water system impacts under the Regulatory Flexibility Act. Rule at 86,607-10, JA___-___; *contra* Chamber Br. 21.

[16] EPA's cost estimates also assume that the Rule's costs are allocated evenly among customers, but water systems "may change rate structures to mitigate rate change impacts on lower income customers." Response to Comments 2-9, 21-61, JA___, ___.

household costs," Rule at 86,460, JA___, and "did not rely upon external funding … to support its finding that the proposed and final rules are affordable in accordance with SDWA's definition of 'feasible,'" Response to Comments, 1-413, JA___; *see* EPA Br. 46-47.

AWWA's argument that EPA "failed to adequately account for" a service line replacement cost estimate report that AWWA commissioned from CDM Smith, AWWA Br. 39-40, also is belied by the record. EPA evaluated the CDM Smith report and thoroughly compared its data and conclusions to the data from EPA's 7th Drinking Water Infrastructure Needs Survey and Assessment. Econ. Analysis, App'x A, A-4—A-9, JA___-___; EPA Br. 53. EPA reasonably concluded that its own data "provides the most complete picture of the range of possible service line replacement costs," explaining that the EPA data were more detailed, representative, and comprehensive.[17] Rule at 86,570, JA___; *see* Response to Comments, 21-35—21-37, JA___-___.

Based on the CDM Smith report, AWWA contends that the correct average cost for a full service line replacement is nearly double what EPA estimated ($12,500 instead of $6,930). AWWA Br. 39-40. But it cannot show that this would

[17] An independent analysis submitted by Intervenors confirmed that EPA's cost estimates were reasonable. Elin Betanzo & Vanessa Speight, Lead Service Line Replacement Costs and Strategies for Reducing Them 11 (Feb. 2024), EPA-HQ-OW-2022-0801-1834_attachment7, JA___; *see* Economic Analysis, App'x A, A-12, JA___.

make any difference in EPA's ultimate affordability determination. Even if AWWA were correct, the total cost of the Rule would double at most, because the total cost also includes costs unrelated to service line replacement. Thus, the average annualized cost of the Rule would, at most, increase from a range of $1-$67 to a range of $2-$134 per household per year, and monthly costs for the vast majority of households would be less than $4.00 per month. *See* Rule at 86,578-79, Exs. 7-8, JA___-___; *see supra*, p. 32. AWWA does not explain why this change would render the Rule unaffordable and any such error in EPA's analysis would be harmless. *See* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"); *City of Portland*, 507 F.3d at 716 (holding alleged errors that would have "no effect on the final rule" were "harmless"); EPA Br. 52-53.

### D. The Rule's Service Line Replacement Requirement Presents Both Justified and Statutorily Required Departures from the 2021 Rule

AWWA's argument that EPA has not justified the differences between the lead service line replacement provisions in the 2021 Rule and the 2024 Rule, AWWA Br. 50-51, fails because it seeks to freeze EPA's technical judgments from early 2021 and mostly ignores EPA's statements and explanations since then. As explained above, *supra*, Arg.I, EPA correctly concluded that SDWA requires the 2024 Rule to mandate the fastest feasible rate of lead service line replacement.[18]

[18] Contrary to AWWA's arguments, AWWA Br. 50, EPA's prior conclusion that the 2021 Rule's lead service line replacement provisions were not "too slow"

But in late 2021, EPA concluded that the 2021 Rule would result in replacing only "five percent of [lead service lines] over a 35-year period," which left "opportunities to do significantly more to address this urgent health risk." 86 Fed. Reg. 71,574, 71,577 (Dec. 17, 2021), JA___. And EPA devoted hundreds of pages in the record to justifying and explaining its basis for the mandatory lead service line replacement program in the 2024 Rule. *E.g.*, Rule 86,445-69, JA___-___; Technical Support Document 1-13, JA___-___; Response to Comments 9-1—9-844, JA___-___.

AWWA is also wrong that a heightened standard of review applies to EPA's decision to require the fastest feasible rate of lead service line replacements. *Contra* AWWA Br. 50-51. When an agency changes its prior policy, the new policy must be permissible under the statute and the agency must "display awareness that it *is* changing position," show good reasons for the new policy, and show that the agency believes it to be better. *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515 (2009); *see Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 718-19 (D.C. Cir. 2016). Here, EPA more than met that standard by explaining in depth what it was

---

and were "most appropriate for a national rule" misstates the applicable test. The Rule must specify treatment techniques that prevent health effects "to the extent feasible," 42 U.S.C. § 300g-1(b)(7)(A), which requires a service line replacement rate that is "both feasible and the fastest feasible," 89 Fed. Reg. at 86,459, JA___.

changing and why, *e.g.* Rule at 86,446-47, JA___-___, which would also suffice even if a more detailed justification were required, *see Fox*, 556 U.S. at 515-16.

### E. EPA Rationally Determined that Other Aspects of the Rule are also Feasible

AWWA recites three other requirements in the Rule—validating service line inventories, distributing water filters, and the public education and corrosion control treatment requirements triggered by the lowered lead action level—and unpersuasively argues that they are "cumulatively infeasible." AWWA Br. 52-53. AWWA does not acknowledge or dispute EPA's reasoned conclusions that it is feasible for water systems to: (1) prepare and update service line inventories, Rule at 86,483-84, JA___-___; Response to Comments 7-35, JA___; (2) distribute water filters after service line replacements and in response to action level exceedances, Rule at 86,534 , JA___; Response to Comments 9-798—9-799, 14-1—14-3, JA___-___. ___-___; and (3) implement required corrosion control and public education treatment techniques triggered by action level exceedances, Rule at 86,498-501, 86,519-21, JA___-___, ___-___; Response to Comments 5-44—5-50, 5-164—5-165, 11-34—11-36, JA___-___, ___-___, ___-___. Nor does AWWA point to evidence in the record or explain why or how these aspects of the Rule would "come at the cost of delaying critical investments in water infrastructure" or which investments are purportedly more critical than preventing lead exposure. AWWA Br. 53.

## VI. EPA's Cost-Benefit Analysis Reasonably Concluded the Rule's Benefits Vastly Outweigh its Costs

As EPA explains, EPA Br. 51-55, there is no merit in AWWA's attempt to use EPA's economic analysis—which is distinct from its feasibility analysis—to undermine EPA's conclusion that the Rule is feasible.

Consistent with SDWA's requirements, 42 U.S.C. § 300g-1(b)(4)(C), EPA concluded that the Rule's "benefits justify the costs" because "the quantified and non-quantifiable benefits outweigh the quantified and non-quantifiable costs." Rule at 86,594, JA___; EPA Br. 51-52. Indeed, EPA's quantified benefits and costs yielded "net annualized incremental benefits that range from $12.0 to $23.2 billion," Rule at 86,592 Ex. 15, 86,594, JA___, ___, and would have been even higher if EPA had quantified additional health benefits. *See* NRDC Comments 12-3—12-7, JA___-___ .

AWWA's conclusory, one-sentence attack on EPA's use of a 35-year economic analysis period, AWWA Br. 40, does not rebut EPA's reasoned rationale for using that period, *see* EPA Br. 53-54. The 35-year analysis period allows apples-to-apples comparisons with baseline costs, costs for alternative service line replacement rates, and the post-implementation benefits of the Rule. Response to Comments, 21-4—21-5, JA___. It also better aligns with water systems' real world business practices because typically "[s]ome or all of the cost of capital projects, which includes service line replacement, are funded through debt or equity

issuance, thus spreading out the annual burden of paying for the capital improvements." Response to Comments, 21-64, JA___.

AWWA's similarly cursory argument that EPA should have considered the cumulative costs of compliance with other regulations, AWWA Br. 41 & n.13, also lacks merit. SDWA explicitly prohibits EPA from considering such costs, EPA Br. 55 (citing 42 U.S.C. § 300g-1(b)(3)(C)(i)(III)).

## VII. Remedy

The Court should deny AWWA's petition. But, if the Court finds any error, vacatur is not warranted here because, "[a]s a general rule, [the Court does] not vacate regulations when doing so would risk significant harm to the public health." *Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019); *see supra*, Statement of the Case I. AWWA's request to vacate the rule in whole or in part also fails under the two-part standard in *Allied-Signal v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993), because any error is unlikely to be serious and vacatur would be extremely disruptive for regulated entities, states, and drinking water consumers nationwide. EPA Br. 55-56. In addition to the disruptions EPA explains, *see id.*, the 2024 Rule retained certain requirements from the 2021 Rule that took effect in 2024 while otherwise requiring compliance with the 1991 Rule until the 2024 Rule's compliance date in 2027. Rule 86,420, 86,562, JA___, ___. This structure is likely to generate substantial confusion about which provisions are in effect if some or all

of the Rule is vacated. Courts have regularly found that disruptive consequences—even much lesser effects than would ensue here—weigh against vacatur. *See, e.g.*, *Healthy Gulf v. FERC*, 107 F.4th 1033, 1047 (D.C. Cir. 2024) (disruption of "construction plans and commercial operations"); *Allied-Signal*, 988 F.2d at 151 (refunding of fees that agency would be unable to recover later).

Furthermore, some "parts of the rule are interdependent" while others "may be easily severed," and partial vacatur would raise complex questions about whether the remaining provisions "meet [SDWA's] anti-backsliding standard." Rule 86,615, JA___; *see* 42 U.S.C. § 300g-1(b)(9) ("Any revision of a national primary drinking water regulation … shall maintain, or provide for greater, protection of the health of persons."). If the Court finds a prejudicial error and concludes that remand without vacatur is not warranted, the Court should order additional briefing on remedy to address the proper scope of vacatur based on the Court's specific conclusions. *See* EPA Br. 55 n.21.

## CONCLUSION

The Court should deny the petition for review.

Dated: March 13, 2026

Respectfully submitted,

*/s/ Suzanne Novak*
SUZANNE NOVAK
NICHOLAS LOH
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7376
snovak@earthjustice.org
nloh@earthjustice.org

MOLLY PROTHERO
Earthjustice
1250 I Street NW, 4th Floor
Washington, DC 20005
(202) 770-3974
mprothero@earthjustice.org

*Counsel for Respondent-Intervenors Newburgh Clean Water Project and Sierra Club*

*/s/ Jared J. Thompson*
JARED J. THOMPSON
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
(202) 513-6249
jared.thompson@nrdc.org

KAREN CHEN
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-8261
kchen@nrdc.org

ERIK D. OLSON
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6240
eolson@nrdc.org

*Counsel for Respondent-Intervenor Natural Resources Defense Council*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with Fed. R. App. P. 32(a)(4), (5), and (6) because it uses 14-point Times New Roman, a proportionally spaced font, with 1-inch margins.

I also certify that this document complies with the Court's Briefing Orders (Dkt. Nos. 2132323 and 2147314) and D.C. Cir. R. 32(e)(2)(B)(i) because, according to Microsoft Word's count, it has 9,098 words, excluding the parts exempted under Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

*/s/ Jared J. Thompson*
JARED J. THOMPSON

*Counsel for Respondent-Intervenor*
*Natural Resources Defense Council*

## CERTIFICATE OF SERVICE

I certify that on March 13, 2026, I caused the foregoing document and its addendum to be electronically filed with the Court's CM/ECF system, which will serve each party's counsel of record.

*/s/ Jared J. Thompson*
JARED J. THOMPSON

*Counsel for Respondent-Intervenor Natural Resources Defense Council*