**ORAL ARGUMENT NOT YET SCHEDULED**

No. 24-1376

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

AMERICAN WATER WORKS ASSOCIATION,

*Petitioner*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents*,

NATURAL RESOURCES DEFENSE COUNCIL, et al.,

*Respondent-Intervenors*.

On Petition for Review of Final Action by the
United States Environmental Protection Agency —
89 Fed. Reg. 86,418 (October 30, 2024)

**OPENING BRIEF OF PETITIONER AMERICAN WATER WORKS
ASSOCIATION**

(Names and addresses of counsel appear inside cover.)

Dated: April 17, 2026

Corinne V. Snow
Hannah Flesch
Vinson & Elkins LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Phone: (202) 639-6622
Fax: (917) 879-8998
Email: csnow@velaw.com
Email: hflesch@velaw.com

*Counsel for Petitioner American Water
Works Association*

<u>**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**</u>

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioner American Water Works Association submits this certificate as to parties, rulings, and related cases.

**A.  PARTIES AND *AMICI***

The Petitioner is the American Water Works Association.

The Respondents are the United States Environmental Protection Agency and Lee M. Zeldin, Administrator of the United States Environmental Protection Agency.

The Intervenors are Natural Resources Defense Council, Newburgh Clean Water Project, and Sierra Club.

The States of New York, California, Connecticut, Illinois, Maryland, Massachusetts, Minnesota, North Carolina, Wisconsin, and the District of Columbia have notified the Court of their intention to participate as *amici curiae* for Respondents. At this time, counsel is unaware of any other party that has moved to participate as *amicus curiae*.

**B.  RULINGS UNDER REVIEW**

The petition for review challenges the Environmental Protection Agency's final rule titled "National Primary Drinking Water Regulations for Lead and Copper: Improvements (LCRI)," 89 Fed. Reg. 86,418 (Oct. 30, 2024), JA1-250.

## C.  RELATED CASES

The instant case on review has not been previously before this Court or any other court. However, Association notes that Intervenors Newburgh Clean Water Project and the Sierra Club petitioned this Court for review of a final rule promulgated by the Environmental Protection Agency titled "National Primary Drinking Water Regulations: Lead and Copper Rule Revisions." That petition for review is captioned *Newburgh Clean Water Project v. EPA*, No. 21-1019 (D.C. Cir. Jan. 15, 2021). Association intervened in support of the Environmental Protection Agency. Mot. of Association for Leave to Intervene on Behalf of Resp'ts, *Newburgh Clean Water Project v. EPA*, Doc. #1885193 (D.C. Cir. Feb. 12, 2021). Two other petitions for review were consolidated with that case. They were *Natural Resources Defense Council v. EPA*, No. 21-1020 (D.C. Cir. Jan. 15, 2021) and *New York v. EPA*, No. 21-1076 (D.C. Cir. Mar. 1, 2021).

The Petitioners filed their opening briefs in August 2022. Since then, this Court has held all three cases in abeyance pending further agency action and resolution of the instant petition for review. *See* Order, *Newburgh Clean Water Project v. EPA*, No. 21-1019, Doc. #2094574 (D.C. Cir. Jan. 16, 2025).

At this time, counsel is unaware of any other related cases within the meaning of Circuit Rule 28(a)(1)(C).

/s/ Corinne V. Snow

Corinne V. Snow

*Counsel for American Water Works Association*

iii

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner American Water Works Association, through undersigned counsel, certifies as follows:

The American Water Works Association is a non-governmental corporation with no parent corporation and no publicly held company holding 10 percent or more of its stock. The American Water Works Association is a corporation organized and existing under the laws of the State of Illinois. The American Water Works Association is an international, nonprofit, scientific and educational society dedicated to assuring the effective management of water. Founded in 1881, Association is the largest organization of water supply professionals in the world. Association's membership includes more than 4,000 utilities that supply roughly 80 percent of the nation's drinking water and treat almost half of the nation's wastewater. Association's 50,000 membership represents the full spectrum of the water community: public water and wastewater systems, environmental advocates, scientists, academicians, and others who hold a genuine interest in water, our most important resource. The American Water Works Association unites the diverse water community to advance public health, safety, the economy, and the environment.

*/s/ Corinne V. Snow*
Corinne V. Snow

*Counsel for American Water Works Association*

# TABLE OF CONTENTS

**Page**

Certificate as to Parties, Rulings, and Related Cases ................................................. i

Rule 26.1 Corporate Disclosure Statement................................................................. iv

Glossary...................................................................................................................... xvi

Introduction..................................................................................................................1

Jurisdictional Statement ...............................................................................................2

Statement of the Issues.................................................................................................2

Statutes and Regulations ..............................................................................................3

Statement of the Case...................................................................................................3

      A.     The Delivery of Drinking Water.....................................................3

      B.     Lead.................................................................................................4

      C.     Legal Background ...........................................................................6

      D.     The Rulemaking............................................................................12

Summary of Argument ...............................................................................................14

Standing......................................................................................................................15

Standard of Review ....................................................................................................17

Argument....................................................................................................................18

      I.     EPA's Interpretation Is Not the Best Reading of the Statute..............18

      A.     The Plain Meaning of Control Does Not Equate to Access. ...................................................................................19

      B.     EPA Lacks Authority to Compel Public Water Systems to Replace Privately Owned Service Lines..............................25

C. EPA's Interpretation Unreasonably Departs from Decades of Prior Agency Policy. ................................29

1. EPA has never equated control with access and has instead associated it with ownership. ...........................29

2. EPA's defense of its novel interpretation is unpersuasive. ..............................................31

II. The Rule Is Not Feasible as Required by the Act. ............................35

A. EPA Failed to Adequately Take Costs Into Consideration in Assessing the Feasibility of the 2024 Rule. .........................36

B. Even Accepting EPA's Definition of Feasibility and Cost Analysis, the 10-Year Service Line Replacement Requirement Is Infeasible. .......................................45

C. EPA Failed to Meet its Burden of Adequately Justifying its Departure From the 2021 Rule's Replacement Program. ...............................................50

D. Other Aspects of the 2024 Rule Are Cumulatively Infeasible. ..............................................52

Conclusion ..............................................................................54

Certificate of Compliance ......................................................56

Certificate of Service ..............................................................57

# TABLE OF AUTHORITIES

**Cases:**

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
41 F.4th 586 (D.C. Cir. 2022) ..................................................................15

*Air All. Houston v. EPA*,
906 F.3d 1049 (D.C. Cir. 2018) ...............................................................33

*Almay, Inc. v. Califano*,
569 F.2d 674 (D.C. Cir. 1977) .................................................................39

*Auer v. Robbins*,
519 U.S. 452 (1997) ................................................................................32

*AWWA v. EPA*,
40 F.3d 1266 (D.C. Cir. 1994) .................................... 3, 7, 9, 23, 26, 29

*Bass v. Ledbetter*,
363 S.E.2d 760 (Ga. 1988) ................................................... 25, 26

*Bloomberg L.P. v. SEC*,
45 F.4th 462 (D.C. Cir. 2022) .................................................................46

*Bluewater Network v. EPA*,
370 F.3d 1 (D.C. Cir. 2004)......................................................................17

*City of Clarksville v. FERC*,
888 F.3d 477 (D.C. Cir. 2018) .................................................................18

*City of Portland v. EPA*,
507 F.3d 706 (D.C. Cir. 2007) ........................................... 35, 45, 48

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989) ................................................................................19

*Comm. for Effective Cellular Rules v. FCC*,
53 F.3d 1309 (D.C. Cir. 1995) .................................................................16

*Env't Def. Fund v. FERC*,
2 F.4th 953 (D.C. Cir. 2021) ...................................................................17

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ....................................................... 28, 33, 49-50, 51

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ...............................................................................28

*Greenbaum v. Islamic Republic of Iran*,
  67 F.4th 428 (D.C. Cir. 2023) .............................................................22

*HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass 'n*,
  594 U.S. 382 (2021) ...............................................................................19

*Imperial Irrigation Dist. v. EPA*,
  4 F.3d 774 (9th Cir. 1993) .....................................................................19

*In re Hoskins*,
  405 B.R. 576 (Bankr. N.D. W. Va. 2009) ...........................................21

*Ligon v. Redding*,
  188 S.W.2d 483 (Ky. 1945) ...................................................................21

*Lissack v. Comm 'r*,
  125 F.4th 245 (D.C. Cir. 2025) .............................................................30

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ........................................................................ 17, 31

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982) ........................................................................ 21, 23

*Lucero v. Holland*,
  902 F.3d 979 (9th Cir. 2018) ................................................................20

*MD/DC/DE Broads. Ass 'n v. FCC*,
  236 F.3d 13 (D.C. Cir. 2001) ................................................................34

*Me. Lobstermen's Ass 'n v. Nat'l Marine Fisheries Serv.*,
  70 F.4th 582 (D.C. Cir. 2023) .............................................................16

*Mingo Logan Coal Co. v. EPA*,
  829 F.3d 710 (D.C. Cir. 2016) ....................................................... 32, 50

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
595 U.S. 109 (2022) ....................................................28

*Northpoint Tech., Ltd. v. FCC*,
412 F.3d 145 (D.C. Cir. 2005) ....................................28

*Okla. Dep't of Env't Quality v. EPA*,
740 F.3d 185 (D.C. Cir. 2014) ....................................32

*Omni Cap. Int'l Ltd. v. Rudolf Wolff & Co.*,
484 U.S. 97 (1987) ....................................................27

*Pac. Gas & Elec. Co. v. FERC*,
113 F.4th 943 (D.C. Cir. 2024) ........................... 17, 18

*Pub. Citizen, Inc. v. FAA*,
988 F.2d 186 (D.C. Cir. 1993) ....................................46

*Russello v. United States*,
464 U.S. 16 (1983) ........................................... 19, 27

*Sierra Club v. U.S. Dep't of Transp.*,
125 F.4th 1170 (D.C. Cir. 2025) ................................54

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) ....................................................32

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560 (2012) ....................................................22

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) ....................................................20

*U.S. Sugar Corp. v. EPA*,
113 F.4th 984 (D.C. Cir. 2024) ..................................17

*United States v. Dorman*,
860 F.3d 675 (D.C. Cir. 2017) ....................................20

*United States v. Jenkins*,
90 F.3d 814 (3d Cir. 1996) ........................................20

*United States v. LePage*,
477 F.3d 485 (7th Cir. 2007) ...................................................20

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) ................................... 51, 54

*Utility Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ...................................................28

*West Virginia v. EPA*,
597 U.S. 697 (2022) ................................... 25, 28

**Statutes:**

5 U.S.C. § 706(2)(A) ................................... 16-17

42 U.S.C. § 300f(1)(A) ...................................25

42 U.S.C. § 300f(1)(C)(ii) ...................................6

42 U.S.C. § 300f(3) ...................................6

42 U.S.C. § 300f(4)(A) ................................... 1, 17, 18, 25

42 U.S.C. § 300g ................................... 15, 25

42 U.S.C. § 300g-1(b)(4)(D) ................................... 35, 36, 40, 45

42 U.S.C. § 300g-1(b)(7)(A) ................................... 6, 35, 44

42 U.S.C. § 300g-2 ...................................12

42 U.S.C. § 300g-3 ...................................25

42 U.S.C. § 300g-6 ...................................5, 26

42 U.S.C. § 300j-7(a) ...................................2

Safe Drinking Water Act Amendments of 1986,
Pub. L. No. 99-339, 100 Stat. 642 (1986) ...................................5

Ga. Code § 12-5-172(11) ...................................25

415 Ill. Comp. Stat. 5/17.12(v)(1)-(5) ...................................48

2021 N.J. Sess. Law Serv. 5343 (West)..................................................49

2023 R.I. Pub. Laws 23-334 ..............................................................49

**Regulations:**

40 C.F.R. § 141.80(a)(3) ...................................................................12

40 C.F.R. § 141.81(d)(1)(i) ...............................................................52

40 C.F.R. § 141.84(b)(5)....................................................................52

40 C.F.R. § 141.84(d)(1)....................................................................51

40 C.F.R. § 141.84(d)(2)....................................................................17

40 C.F.R. § 141.84(d)(3)....................................................................51

40 C.F.R. § 141.84(d)(4)....................................................................12

40 C.F.R. § 141.84(d)(5)(iii)..............................................................12

40 C.F.R. § 141.84(d)(5)(vi)(A) .................................................. 12, 51

40 C.F.R. § 141.84(h)(1)(iii)..............................................................52

40 C.F.R. § 141.85 .............................................................................52

40 C.F.R. § 141.85(j)(2)......................................................................52

Mich. Admin. Code r. 325.10604f(6)(B)............................................48

**Administrative Materials:**

56 Fed. Reg. 26,460 (June 7, 1991) .......... 3, 6, 7, 8, 9, 19, 23, 27, 29, 36, 37, 38, 49

60 Fed. Reg. 16,348 (Apr. 12, 1996) ..................................................29

65 Fed. Reg. 1,950 (Jan. 12, 2000) ..................................... 9, 30, 31, 32

72 Fed. Reg. 57,782 (Oct. 10, 2007).....................................................9

86 Fed. Reg. 4,198 (Jan. 15, 2021) ..................................... 7, 10, 11, 14, 50

86 Fed. Reg. 14,003 (Mar. 12, 2021)..................................................................11

86 Fed. Reg. 31,939 (June 16, 2021) ................................................................11

86 Fed. Reg. 71,574 (Dec. 17, 2021) ................................................................12

88 Fed. Reg. 84,878 (Dec. 6, 2023) ........................................................... 12, 50

89 Fed. Reg. 32,532 (Apr. 26, 2024) ................................................................41

89 Fed. Reg. 86,418 (Oct. 30, 2024)................... 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 22, 24, 30, 31, 32, 33, 35, 36, 40, 41, 43, 44, 45, 46, 47, 48, 50, 51, 52

**Other Authorities:**

132 Cong. Rec. 11669 (May 21, 1986)..............................................................26

*Black's Law Dictionary* (12th ed. 2024)..........................................................21

*Black's Law Dictionary* (6th ed. 1990)............................................................22

*Black's Law Dictionary* (rev. 4th ed. 1968)....................................................22

CDM Smith, *Final Report, Considerations When Costing Lead Service Line Identification and Replacement* (Nov. 2022), Attachment 1 to Association, Draft Comments, Lead and Copper Rulemaking Improvements Rulemaking (2022), EPA-HQ-OW-2022-0813-0031 ........................................39

Conf. Rep. No. 99-575 (1986) ...........................................................................26

EPA, *Economic Analysis for the Final Lead and Copper Rule Improvements* (2024), EPA-HQ-OW-2022-0801-2649................................................ 16, 40, 41

EPA, *Fact Sheet for Developing and Maintaining a Service Line Inventory* (June 2023) ........................................................................................................4

EPA, *How the Drinking Water State Revolving Fund Works* (last updated Aug. 20, 2025)................................................................................................43

EPA, *Infographic: How Does Your Water System Work* .........................................3

EPA, *Interagency Water Workforce Working Group Report to Congress* (2024) ................................................................................... 45, 47

EPA, Panel Report of the Small Business Advocacy Review Panel on EPA's Planned Proposed Rule Lead and Copper Rule Improvements (LCRI) National Primary Drinking Water Regulation (2023), EPA-HQ-OW-2022-0801-0045 ..................................................................................39

EPA, *Public Comment and Response Document for the Final Lead and Copper Rule Revisions* (2020), EPA-HQ-OW-2017-0300-1622 ...... 14, 27, 49, 50

EPA, *Public Comment and Response Document for the Final Lead and Copper Rule Revisions* (2024), EPA-HQ-OW-2022-0801-2645 ...... 24, 31, 38, 40

EPA, *Technical Support Document for the Final Lead and Copper Rule Improvements* (2024), EPA-HQ-OW-2022-0801-2646 ............................... 15, 47

EPA, *Water Infrastructure Sector Workforce* (last updated June 9, 2025) .............45

Exec. Order No. 13,990, 86 Fed. Reg. 7,037 (Jan. 20, 2021).....................................................................11

H.R. Rep. No. 93-1185 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6454 ..................37

Hill, Michael, *Port Authority Settlement Gives Newark $155M for Lead Service Lines Replacement*, NJ Spotlight News (Oct. 1, 2019) ...........................43

I EPA, *2006 Community Water System Survey* (2009)............................................36

Mot. of Association for Leave to Intervene on Behalf of Resp'ts, *Newburgh Clean Water Project v. EPA*, No. 21-1019, Doc. #1885193 (D.C. Cir. Feb. 12, 2021) ...............................................................................11

Office of Water, EPA, *Lead and Copper Revisions White Paper* (Oct. 2016) .........8

Order, *Newburgh Clean Water Project v. EPA*, No. 21-1019, Doc. #2094574 (D.C. Cir. Jan. 16, 2025) ......................................11

Pet. for Review, *Newburgh Clean Water Project v. EPA*, No. 21-1019, Doc. #1881638 (D.C. Cir. Jan. 15, 2021) ......................................11

*Random House Unabridged Dictionary* (2d ed. 1993).............................................22

S. Rep. No. 104-169 (1995) ..................................................................................3, 37

*Webster's New World Dictionary* (3d ed. 1988)........................................................22

White House, *Fact Sheet: The Biden-Harris Lead Pipe and Paint Action Plan* (Dec. 16, 2021) .................................................................................12

# GLOSSARY

| | |
|---|---|
| **Act** | Safe Drinking Water Act, 42 U.S.C. §§ 300f et seq. |
| **APA** | Administrative Procedure Act, 5 U.S.C. §§ 551 et seq. |
| **Association** | American Water Works Association |
| **EPA or the Agency** | U.S. Environmental Protection Agency |
| **Level** | Maximum Contaminant Level |
| **PFAS** | Per- and polyfluoroalkyl substances |
| **The 2024 Rule** | National Primary Drinking Water Regulations for Lead and Copper: Improvements (LCRI), 89 Fed. Reg. 86,418 (Oct. 30, 2024) |
| **The 2021 Rule** | National Primary Drinking Water Regulations: Lead and Copper Rule Revisions, 86 Fed. Reg. 4,198 (Jan. 15, 2021) |
| **The 1991 Rule** | Maximum Contaminant Level Goals and National Primary Drinking Water Regulations for Lead and Copper; Final Rule, 56 Fed. Reg. 26,460 (June 7, 1991) |

# INTRODUCTION

The Safe Drinking Water Act ("Act") authorizes the Environmental Protection Agency ("EPA" or the "Agency") to establish federal drinking water standards for public water systems. Congress defined a "public water system," as "a system for the provision to the public of water for human consumption," which serves a minimum number of people and "includes ... any collection, treatment, storage, and distribution facilities under control of the operator of such system and used primarily in connection with such system." 42 U.S.C. § 300f(4)(A).

In the Lead and Copper Improvements Rule ("2024 Rule"), EPA equated "control" with "access," such that the scope of a water system depends on the whims of third parties granting or withholding "access" over privately owned service lines. This novel interpretation unlawfully contravenes Congress's intent and sets a dangerous precedent for future regulations under the Act.

Petitioner American Water Works Association ("Association") has long supported EPA's efforts to develop national primary drinking water regulations for lead and copper[1] that protect public health. The 2024 Rule, however, is neither

---

[1] The 2024 Rule also regulates copper in drinking water "because the sources of lead and copper in drinking water are generally the same (i.e., corrosion from fixtures of pipes containing the metal), and because the treatment technology for elevated copper levels is also the primary treatment for lead (i.e., reducing corrosion in the distribution system)." 89 Fed. Reg. 86,418, 86,545 (Oct. 30, 2024), Joint Appendix ("JA") 128.

feasible nor cost-effective, as required by the Act, and creates significant risks for water system compliance and water affordability. This Court should therefore vacate and remand the 2024 Rule.

## JURISDICTIONAL STATEMENT

Association seeks review of EPA's final action, "National Primary Drinking Water Regulations for Lead and Copper: Improvements (LCRI)," 89 Fed. Reg. 86,418 (Oct. 30, 2024). Joint Appendix ("JA") 1-250. This Court has jurisdiction to review the challenged action. 42 U.S.C. § 300j-7(a). Association timely filed its petition on December 13, 2024—within 45 days of the 2024 Rule's publication in the Federal Register. *Id*.

## STATEMENT OF THE ISSUES

Whether EPA violated the Act and/or the APA by:

1. Requiring water systems to replace certain service lines that are owned by third parties and located on private property if those systems can "access" such lines; and

2. Promulgating regulations that are not feasible as required by the Act because, among other things, they require water systems to remove certain lines within a 10-year period and do not account for the limited fiscal, administrative, and technical capacities of water systems.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in a separate addendum.

## STATEMENT OF THE CASE

### A. The Delivery of Drinking Water

Most people in the United States obtain their drinking water from public water systems. *See* S. Rep. No. 104-169, at 5 (1995). These systems remove harmful contaminants from raw source water (*e.g.*, water from lakes, rivers, and reservoirs), pump the treated water to large, underground pipes called water mains, and eventually deliver the water to private property via smaller pipes called service lines. *See id.*; EPA, *Infographic: How Does Your Water System Work*, https://perma.cc/EFP2-5TMF (last updated June 13, 2025); *see also* 89 Fed. Reg. at 86,429, JA12.

Private property owners and public water systems typically own distinct portions of service lines depending on state or local law. *See* 56 Fed. Reg. 26,460, 26,503 (June 7, 1991), JA402. "[S]ome public water systems control and/or own connections up to the property line, others control and/or own the service line and other connections up to the building[,] ... and still others control and/or own the service connections only up to the curb." *Id.* Generally, though, water systems "own only that part of the service line that underlies public property." *AWWA v. EPA*, 40

3

F.3d 1266, 1274 (D.C. Cir. 1994) (citation omitted). The figure below exemplifies

the division of ownership between a water system and a customer:



EPA, *Fact Sheet for Developing and Maintaining a Service Line Inventory* (June

2023), https://perma.cc/6FMU-RZ96. For most contaminants regulated under the

Act, this does not present any compliance issues because systems treat the water

before it reaches service lines. But lead is different.

**B.     Lead**

Lead was historically used in a "wide variety of products found in and around

homes," including pipes and plumbing materials. 89 Fed. Reg. at 86,429, JA12.

Unlike other contaminants, which are often found in source waters, lead enters

drinking water "by the corrosive action of water in contact with plumbing materials

containing lead." *Id*. at 86,441, JA24. "The most common sources of lead in drinking

water are lead pipes, faucets, and fixtures," and service lines containing lead are "typically the most significant source of lead in water." *Id*. at 86,429, JA12. These pipes are more likely to be found in older cities and homes built before 1986, the year Congress banned lead-bearing plumbing materials in all new construction. *See* Safe Drinking Water Act Amendments of 1986, Pub. L. No. 99-339, § 109, 100 Stat. 642, 651 (1986); 42 U.S.C. § 300g-6. These service lines present problems if they "deteriorate or corrode, releasing lead particles into the drinking water." 89 Fed. Reg. at 86,419, JA2.

Lead service lines or lead-containing plumbing materials situated on private property means that "lead release can be unpredictable over time and across households, can originate from many sources owned by the water system and the customer, can vary based on the sample technique used, and can be affected by customer water use habits." *Id*. at 86,443, JA26 (citation omitted). In turn, levels of lead measured at the tap vary based on the amount of lead in any given site's plumbing, the age of the plumbing materials, the water's physical and chemical characteristics, how long water is in contact with material, and consumer water use practices. *Id*. As a result, individual households experience different levels of lead exposure, some of which water systems neither contributed to nor have the ability to control. *See id*. at 86,442, JA25.

### C. Legal Background

The Act authorizes EPA to regulate water systems in one of two ways. First, EPA may establish a Level, which is a maximally permissible level of a contaminant that a water system can deliver to any customer. 42 U.S.C. § 300f(3). Alternatively, EPA may establish a treatment technique if the Administrator finds that it is not "economically or technologically feasible" to determine the level of a particular contaminant in a water system. *Id.* § 300f(1)(C)(ii) . In such case, EPA selects treatment techniques that "would prevent known or anticipated adverse effects on the health of persons to the extent feasible." *Id.* § 300g-1(b)(7)(A).

In the original 1991 Rule, EPA determined that lead met the criteria for treatment techniques because the distinct nature of lead contamination made it infeasible to ascertain levels of lead at the tap and establish uniform numerical standards that could guide national application of the best available treatment for lead in drinking water. 89 Fed. Reg. at 86,441, JA24; *see* 56 Fed. Reg. at 26,473, JA391. EPA also made several observations that would guide its regulatory approach for lead in drinking water over the next several decades. First, given the prevalence of lead-bearing materials in privately owned plumbing, a "major contributor" of lead contamination in drinking water was "corrosion of materials <u>not owned or controlled</u> by the public water system." 56 Fed. Reg. at 26,476, JA393 (emphasis added). Thus, setting a Level would neither account for consumers' lead exposure nor "provide a

6

means to fully evaluate whether a system is properly implementing optimal corrosion control." *Id.* Second, the Act's definition of a public water system evidenced Congress's intent "to exclude from the responsibility of [a system] distribution facilities, such as customer's plumbing, which are not under control of the system." *Id.* Establishment of numerical standards by which a water system would measure compliance would impermissibly hold the system "liable for conditions that are beyond its control," and "water systems should not be held directly responsible for [such conditions] within private homes." *Id.* at 26,475-76, JA392-93. A treatment technique rule for lead, then, was "consistent with the plain language of the statute and with the reasonable approach of requiring systems to address only those problems over which they exercise sufficient control for remedial action." *Id.* at 26,476, JA393 (emphasis added). This Court upheld the treatment technique approach. *See AWWA*, 40 F.3d at 1270-71.

Over the following decades, water systems have made significant progress towards reducing lead exposure in drinking water and improving public health, particularly in children. 86 Fed. Reg. 4,198, 4,199 (Jan. 15, 2021), JA307; *see id.* at 4,199-200, JA307-08 (noting that the number of large water systems that exceeded the 1991 lead action level of 15 parts per billion has dropped by over 90 percent and

7

the median concentration of lead in children has dropped 95 percent).[2] Key to this success has been "corrosion control treatment," which represents various methods systems can use to prevent lead from entering drinking water. *See* 56 Fed. Reg. at 26,483-85, JA398-400. Corrosion control treatment "is the primary treatment technique on which the [1991 Rule] focuse[d]," Office of Water, EPA, *Lead and Copper Revisions White Paper* 10 (Oct. 2016), JA279, and it "continues to be a 'best technology, treatment technique[] or other means' for use by water systems," 89 Fed. Reg. at 86,498, JA279; *see also* 56 Fed. Reg. at 26,505, JA404; ("EPA believes that corrosion control will remain the primary method for the majority of water systems to reduce lead levels.").

The 1991 Rule also created a lead service line replacement program to complement corrosion control treatment.[3] *See* 56 Fed. Reg. at 26,505, JA404; *id.* at 26,503, JA402 (observing that lead service line replacement would also "be an effective means for reducing excessive lead exposure"). EPA was mindful, however, of the practical challenges of lead service line replacement. Surveys at the time indicated the presence of 10 million lead service connections nationwide and that 20

---

[2] "The [lead] action level is a concentration of lead ... in the water that determines, in some cases, whether a water system must" take certain actions. *Id.* at 4,207, JA314.

[3] EPA also created two other programs (for source water treatment and public education) to complement corrosion control.

percent of all water systems had some of these connections. *Id.* at 26,503, JA402.

Moreover, "ownership and/or control of lead service lines is often split between the public water system and the property owner," and replacing such lines necessarily "involves determining ... water system [obligations] where jurisdiction over the service line is split between the water system and the user." *Id.* at 26,503-04, JA402-03; *see also infra* at Section I.A.

The 1991 Rule's lead service line replacement program reflected these realities by requiring water systems to replace lines at a manageable seven percent annual rate, only after systems installed or improved cost-effective treatments such as corrosion control, only after such systems exceeded lead concentrations above 15 parts per billion, and only for those portions of the lines they owned.[4] *See id.* at 26,507-08, JA406-07. As EPA made clear, "water systems should only be responsible for removing that portion of the lead lines they control," and they should "have a reasonable degree of certainty" if they are, in fact, "contributing to elevated levels of lead at the tap" before EPA required them "to incur the costs of replacing the line." *Id.* at 26,507-08, JA406-07.

---

[4] As discussed *infra* at Section I.C.1, EPA promulgated a definition of "control" to clarify the responsibilities of public water systems to replace lead service lines at or near private property. *Id.* at 26,504, JA403. This Court vacated that definition on procedural grounds. *See AWWA*, 40 F.3d at 1275.

From 1991 to 2021, these components of the replacement program remained substantively intact while EPA examined ways to improve the 1991 Rule.[5] *See* 89 Fed. Reg. at 86,430-31, JA13-14. EPA "intended to address ... long-term issues" promulgating the 2021 Rule. The 2021 Rule significantly strengthened the prior rule by, *inter alia*, closing loopholes in the lead service line replacement program and requiring full replacement. *Id.* at 86,431, JA14; *see* 86 Fed. Reg. at 4,216, JA315.

The 2021 Rule also shifted from partial to full service line replacement. Full replacement is more effective at reducing lead in drinking water but "require[s] more time and resources per replacement than partial [replacement]." 86 Fed. Reg. at 4,216, JA315. Accordingly, EPA reduced the replacement rate from seven percent to three percent per year, which gave systems approximately 33 years to fully replace all service lines. *See id.* at 4,219, JA317; 89 Fed. Reg. at 86,456, JA39. EPA also added a greater pool of service lines covered by these replacement requirements, including "lead status unknown service lines" and "galvanized requiring replacement service lines,"[6] 86 Fed. Reg. at 4,218-19, JA316-17,[7] and required full

---

[5] As discussed further below, EPA promulgated two sets of minor and short-term revisions to the 1991 Rule. *See generally* 65 Fed. Reg. 1,950 (Jan. 12, 2000), JA271; 72 Fed. Reg. 57,782 (Oct. 10, 2007), JA276.

[6] A galvanized service line is "made of iron or steel that has been dipped in zinc to prevent corrosion and rusting." 40 C.F.R. § 141.2.

[7] The 2021 Rule also eliminated the ability for water systems to "test-out" of lead service line replacement obligations. That is, water systems could no longer count a

replacement only where (a) the customer consented to the replacement, and (b) the customer agreed to cover the cost of the replacement or the water system chose to cover the full cost, *see id.* at 4,292-94 (regulatory text making clear that water systems are not required to bear the cost of replacement), JA323-25; 89 Fed. Reg. at 86,449, JA32. Water systems remained in compliance if customers refused to participate in the replacement program or did not respond after two "good faith attempts" to contact them. 86 Fed. Reg. at 4,219, JA317.

Several groups of petitioners immediately challenged the 2021 Rule. *See* Pet. for Review, *Newburgh Clean Water Project v. EPA*, No. 21-1019, Doc. #1881638 (D.C. Cir. Jan. 15, 2021).[8] Association intervened in support of EPA because the 2021 Rule made significant improvements to existing regulations. *See* Mot. of Association for Leave to Intervene on Behalf of Resp'ts, *Newburgh Clean Water Project v. EPA*, No. 21-1019, Doc. #1885193 (D.C. Cir. Feb. 12, 2021). The Agency then announced it would review the 2021 Rule pursuant to an executive order issued by then-President Biden. *See* 86 Fed. Reg. 14,003 (Mar. 12, 2021), JA300; Exec. Order No. 13,990, 86 Fed. Reg. 7,037 (Jan. 20, 2021), JA326. EPA then delayed the

---

service line as replaced if a sample taken from the line measured below 15 parts per billion. 86 Fed. Reg. at 4,216, JA315.

[8] Those cases are currently held in abeyance pending the outcome of this litigation. Order, *Newburgh Clean Water Project v. EPA*, No. 21-1019, Doc. #2094574 (D.C. Cir. Jan. 16, 2025).

effective date and the compliance date of the 2021 Rule "[t]o allow the EPA to engage with stakeholders and review the [2021 Rule] before it took effect."[9] 89 Fed. Reg. at 86,431-32, JA14-15. In December 2021, then-President Biden announced a plan to "accelerate the replacement of lead pipes in the next decade." White House, *Fact Sheet: The Biden-Harris Lead Pipe and Paint Action Plan* (Dec. 16, 2021), https://perma.cc/32YG-3X2G. EPA "immediately" began to develop a new proposed rule aligned with that announcement. 86 Fed. Reg. 71,574, 71,578 (Dec. 17, 2021), JA305; 88 Fed. Reg. 84,878, 84,900 (Dec. 6, 2023) (proposed rule), JA254; 89 Fed. Reg. at 86,432, JA15.

### D. The Rulemaking

On December 6, 2023, EPA published the proposed Lead and Copper Rule Improvements. *See generally* 88 Fed. Reg. 84,878, JA251. EPA promulgated the 2024 Rule on October 30, 2024, and retained the "[k]ey provisions in the proposal." 89 Fed. Reg. at 86,432, JA15. Specifically, the 2024 Rule requires all water systems to proactively replace their lead and galvanized requiring replacement service lines

---

[9] In this context, the effective date is the date a rule is codified in the Code of Federal Regulations, whereas the compliance date is the date by which water systems must be in compliance with all applicable requirements. *See* 86 Fed. Reg. 31,939, 31,941 (June 16, 2021).

to which they have "access" by December 31, 2037,[10] unless a State with primary enforcement authority sets shorter deadlines or if systems use deferred deadlines. *See* 42 U.S.C. § 300g-2; 40 C.F.R. § 141.84(d)(5)(vi)(A). EPA introduced a novel definition of "control," mandating that where "a water system has access (*e.g.*, legal access, physical access) to conduct full service line replacement," the system must replace the whole service line—even the privately owned portion. 89 Fed. Reg. at 86,445, JA28. If a water system lacks access to conduct full service line replacement, it is "not required ... to replace the line," but it must still "document the reasons why the water system does not have access." *Id.* at 86,453, JA36. To satisfy that requirement, water systems must make four attempts to obtain property owner consent using two different methods. *Id.* And upon any change in ownership of a property, the "water system must offer full service line replacement" within six months and make the same effort to obtain that new owner's consent. *Id.* EPA concluded that the 2024 Rule, including this service line replacement program, was "feasible." *Id.* at 86,434-35, 86,445-46, JA17-18, 28-29.

Association extensively commented that many of these provisions violated the Act and contained many impractical requirements. *See generally* Comments of

_____

[10] December 31, 2037, marks 10 program years from the 2024 Rule's compliance date of November 1, 2027. *See* 40 C.F.R. §§ 141.80(a)(3), 141.84(d)(4), 141.84(d)(5)(iii).

Association on EPA's Proposed Lead and Copper Rule Improvements (Feb. 2, 2024) [hereinafter Association Comment], EPA-HQ-OW-2022-0801-2024, JA530. Relevant here, Association explained that equating "control" with "access" contravened EPA's statutory authority and would prove unworkable because water systems' compliance obligations would change each time a private property owner grants or revokes access over a privately owned portion of a service line. *Id.* at 29, 116, JA568, 655. The proposed rule, Association noted, would also sow confusion and needlessly burden systems with navigating state and local laws and tracking changes in private property ownership to determine when systems might have "access" to privately owned service lines. *Id.* at 117, JA656. Finally, Association explained that EPA had failed to demonstrate the feasibility of the 10-year lead service line replacement program, and that this program would be infeasible given the limited fiscal, administrative, and technical capacities of water systems. *Id.* at 17-19, 30, JA556-58, 569.

## SUMMARY OF ARGUMENT

**I.** EPA's novel interpretation equating the term "control" in Section 1401(4)(A) of the Act to mean mere "access" is not the best reading of the statute and represents an unreasoned departure from decades of prior policy.

**II.** EPA violated the Act and the APA in promulgating a rule that is not "feasible" for water systems to implement within the time provided. Just three years

after determining that giving systems 33 years to fully replace their affected service lines was "feasible," and not "too slow to protect public health," EPA did an about-face and demanded that systems complete the requirements in 10 years. EPA, *Public Comment and Response Document for the Final Lead and Copper Rule Revisions* at 188, 190 (2020) [hereinafter *EPA Response to Comments on the 2021 Rule*], EPA-HQ-OW-2022-0801-0179, JA293, 294; 86 Fed. Reg. at 4,219, JA317; *see* 89 Fed. Reg. at 86,456, JA39. By EPA's own assessment, almost 40 percent of the water systems will be unable to complete their replacement programs within EPA's mandated 10-year window based on their current replacement rates. *See* EPA, *Technical Support Document for the Final Lead and Copper Rule Improvements* at 2-4 (2024) [hereinafter *Technical Support Document*], EPA-HQ-OW-2022-0801-2646, JA1651-53. EPA's analysis also fails to adequately consider costs by underestimating the costs of compliance and overestimating the availability of outside financial assistance. The victims of EPA's flawed analysis will be the American public—forced to pay increased rates for drinking water without commensurate health benefits.

## STANDING

Association's standing is self-evident because its public water system members are "directly regulated by the rule and ha[ve] been injured by it." *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 592

(D.C. Cir. 2022). Association's public water system members are objects of the 2024 Rule and subject to its requirements. *See* 89 Fed. Reg. at 86,428, JA11; 42 U.S.C. § 300g (coverage of the Act); *see, e.g.*, Converse Decl. ¶¶ 4, 9-10, Standing Addendum ("SA")-14, 16-17; Rechtin Decl. ¶¶ 4, 9-10, SA-21, 23-24.

Association's members satisfy the requirements for Article III standing. *See Advocs. for Highway & Auto Safety*, 41 F.4th at 592-95. The 2024 Rule gives rise to "concrete, particularized pocketbook injur[ies]" for Association's members. *Me. Lobstermen's Ass 'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 592 (D.C. Cir. 2023); *see* 89 Fed. Reg. at 86,420, JA3 (estimating costs); EPA, *Economic Analysis for the Final Lead and Copper Rule Improvements* at 4-15 to 4-284 (2024) [hereinafter Economic Analysis], EPA-HQ-OW-2022-0801-2649, JA1742-2011 (Section 4.3, "Estimating Public Water System Costs"). The 2024 Rule will impose costs on Association's members, including through the service line replacement program and corrosion control requirements, and members are already incurring costs to comply with this rule. *See* 89 Fed. Reg. at 86,574-78, JA157-61; Converse Decl. ¶¶ 10-17, SA-16-19; Rechtin Decl. ¶¶ 10-17, SA-23-26. Members would not face some or all of these costs if the 2024 Rule is vacated in part or in full. *See* Converse Decl. ¶ 18, SA-19; Rechtin Decl. ¶ 18, SA-26.

Association's challenge is germane to its purpose, and there is no reason individual members must participate in it. *See Me. Lobstermen's Ass 'n*, 70 F.4th at

593; *Comm. for Effective Cellular Rules v. FCC*, 53 F.3d 1309, 1315 (D.C. Cir. 1995). By challenging the 2024 Rule, Association serves its organizational purposes of ensuring that drinking water regulations are feasible, cost-effective, and consistent with the Act. *See* Mehan Decl. ¶¶ 2-6, 26, SA-2-3, 11.

## STANDARD OF REVIEW

This Court holds unlawful and sets aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[T]he overarching question" is whether the agency's "decisionmaking was reasoned, principled, and based upon the record." *Env't Def. Fund v. FERC*, 2 F.4th 953, 967-68 (D.C. Cir. 2021) (citation modified); *see Bluewater Network v. EPA*, 370 F.3d 1, 22 (D.C. Cir. 2004) (deference to agency findings "only if [the agency] has adequately explained the basis" for it).

On questions of statutory interpretation, this Court "must apply what [it] regard[s] as the statute's 'best' reading." *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 991 (D.C. Cir. 2024) (per curiam) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)). This interpretive inquiry "begin[s] with the text" and focuses on "the ordinary meaning of [the statute's] key terms." *Pac. Gas & Elec. Co. v. FERC*, 113 F.4th 943, 948 (D.C. Cir. 2024) (citations omitted).

## ARGUMENT

**I.     EPA's Interpretation Is Not the Best Reading of the Statute.**

The Safe Drinking Water Act limits EPA's authority to regulate public water systems to lines that are "under control" of the system operator. 42 U.S.C. § 300f(4)(A). In the 2024 Rule, EPA declared for the first time that water systems have "control" over service lines if systems have "access (*e.g.*, legal access, physical access) to conduct full service line replacement." 40 C.F.R. § 141.84(d)(2).

The question here is whether EPA's reading is the "single, best meaning" of the statute. *Loper Bright Enters.*, 603 U.S. at 400. The answer is emphatically <u>no</u>. EPA's interpretation of "control" to mean "access" unlawfully sweeps into its regulatory purview any <u>privately</u> owned service line whenever a <u>public</u> water system operator is deemed to have "access" (however temporary) to that service line. Because EPA lacks authority under the Act to regulate privately owned service lines, it cannot require water systems to replace them. In addition, EPA's interpretation violates the APA because it departs from the Agency's prior interpretations of "control" without reasoned explanation and invites legally and practically absurd results. This Court should therefore vacate and remand the 2024 Rule so that EPA can promulgate a drinking water regulation that aligns with the best reading of the statute. *See Pac. Gas & Elec. Co.*, 113 F.4th at 949 n.3.

**A.  The Plain Meaning of Control Does Not Equate to Access.**

"In addressing a question of statutory interpretation," this Court "begin[s] with the text." *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018). The issue here turns on the meaning of Section 1401(4)(A), reproduced below:

> The term "public water system" means a system for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen service connections or regularly serves at least twenty-five individuals. Such term includes (i) any collection, treatment, storage, and distribution facilities under control of the operator of such system and used primarily in connection with such system, and (ii) any collection or pretreatment storage facilities not under such control which are used primarily in connection with such system.

42 U.S.C. § 300f(4)(A).

The final clause of Section 1404(4)(A) shows that Congress contemplated that systems should have responsibility over some facilities they do not control, but such facilities do not include private service lines. Instead, systems are responsible for "any collection or pretreatment storage facilities <u>not</u> under [operator] control which are used primarily in connection with such system." *Id.* Notably absent from this clause is any mention of privately owned service lines or plumbing, a choice this Court should presume was deliberate. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another ..., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).

The Act does not define "under control," and the statute's legislative history does not elucidate what Congress intended by the term. *See* 56 Fed. Reg. at 26,503-04, JA402-03. "Where Congress does not furnish a definition of its own," a court looks to "its ordinary or natural meaning." *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021) (citation omitted); accord *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024); *see also Imperial Irrigation Dist. v. EPA*, 4 F.3d 774, 776 (9th Cir. 1993). The ordinary meanings of "control" and "under control" belie EPA's interpretation.

First, common law has long recognized the difference between these two terms as a legal matter. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989) ("[W]here Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." (citation omitted)); *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 484 (2023) ("[Courts] generally presume that ... common-law terms bring the old soil with them" (citation modified)). In the criminal law context, this Court and its sister circuits have recognized that "[a]ccess is not synonymous with possession, nor with either dominion or control." *United States v. LePage*, 477 F.3d 485, 490 (7th Cir. 2007); *see also United States v. Dorman*, 860 F.3d 675, 682-83 (D.C. Cir. 2017) (determining that defendant was not "in a position to exercise dominion and control

20

over" drugs found "in common areas of the home beyond [defendant's] presence or control .... Too many other individuals had access to the home ...." (citation omitted)); *United States v. Jenkins*, 90 F.3d 814, 818 (3d Cir. 1996) ("We overturned [a] conviction for insufficient evidence of possession. The evidence showed that [the defendant] had access to or resided in the house and knew of the presence of the drugs, but did not show she had dominion and control them."); *Lucero v. Holland*, 902 F.3d 979, 993 (9th Cir. 2018) ("[A]ccess to an item, but with unspecified restrictions, is not the same as having the right to control it. For example, an employee may have access to another coworker's desk, but it does not logically follow that the employee gains the right to exercise control over the items on the desk" (citations omitted)).

> Property law likewise recognizes the distinction:

> A possessory interest in land exists in a person who has (a) a physical relation to the land of a kind which gives a certain degree of physical control over the land, and an intent so to exercise such control as to exclude other members of society in general from any present occupation of the land.

Restatement (First) of Property § 7 (A.L.I. 2024). By contrast, "access" without a possessory interest is merely a revocable license to enter land or undertake some act that would otherwise lack permission. *See, e.g.*, *License, Black's Law Dictionary* (12th ed. 2024) (defining "license" as "permission, usu[ally] revocable, to commit some act that would otherwise be unlawful; esp[ecially] an agreement ... that it is

21

lawful for the licensee to enter the licensor's land to do some act that would otherwise be illegal"); *In re Hoskins*, 405 B.R. 576, 581 (Bankr. N.D. W. Va. 2009); *Ligon v. Redding*, 188 S.W.2d 483, 488 (Ky. 1945) ("[T]he word 'control,' standing alone and unqualified, necessarily means, not partial but complete control."). And in cases of eminent domain, courts distinguish between when the government has temporarily accessed property and when it has asserted more permanent control. *See, e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 431 (1982) ("[B]ecause there had been an 'actual taking of possession and control,' the taking was as clear as if the Government held full title and ownership.").

To support its contrary reading, EPA points to two dictionary definitions of "control." 89 Fed. Reg. at 86,451, JA34. The thrust of EPA's reasoning is, "[i]f the water system can, as a factual matter, gain access over the service line to disconnect it ... and replace it with a new line, then the water system" must also control it because the system "is directing influence over the line," "exercises power or authority to manage it," and "subject[s] [the service line] to a restraining or controlling influence of the system." *Id.*

This Court may look to dictionaries to "determine the ordinary meaning of a legal term." *See Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428, 432 (D.C. Cir. 2023) (citing *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012)), cert. denied, 144 S. Ct. 568 (2024). But EPA's reasoning runs <u>counter</u> to multiple

dictionary definitions, published contemporaneously with Congress's passage of, and amendments to, the Act, which collectively demonstrate the significant difference between the terms. *Compare, Control, Black's Law Dictionary* (rev. 4th ed. 1968) ("To exercise restraining or directing influence over; regulate; restrain; dominate; curb; to hold from action; overpower; counteract; govern[.]"), *and Control, Webster's New World Dictionary* (3d ed. 1988) ("[T]o exercise authority over; direct; command."), *with Access, Random House Unabridged Dictionary* (2d ed. 1993) ("[T]he ability, right, or permission to approach, enter, speak with, or use."), and *Access*, *Black's Law Dictionary* (6th ed. 1990) ("[T]he right [in real property law] vested in the owner of land which adjoins a road ... to go and return from his own land to the highway without obstruction. 'Access' to property does not necessarily carry with it possession.").

EPA's definition not only defies common law and common understanding, it also creates absurd results. Ownership of service lines is often split between the system and the end user at various points. A system's ownership may extend up to the property line, building, or only the curb. *See* 56 Fed. Reg. at 26,503, JA402; *supra* at 3. But a system's control over service lines exists over only that part of the line that underlies public property. *See AWWA*, 40 F.3d at 1274 (citing 56 Fed. Reg. at 26,503, JA402). The notion that a system can "control" points beyond there if the system receives mere permission to replace privately owned portions of the line

defies what it means to control property as a legal matter. *See Loretto*, 458 U.S. at 435-36.

Practically speaking, equating "control" with "access" would expand or contract the scope of a water system's responsibilities (and with it, EPA's jurisdiction) like an accordion any time a property owner, tenant, or third party granted or subsequently withheld any kind of "access" to privately owned service lines. EPA recognizes as much by requiring systems to try to re-ascertain if they have "access" each time a property changes hands and falls under new ownership. And even without changes in ownership, a single property owner could grant access one moment, and deny it the next, only to then restore access at a later date. The scope of the system subject to EPA regulation and system operator responsibility cannot be ever shifting based on the whims of third parties. The Rule only allows systems 10 years to remove all lead lines. *See generally* 89 Fed. Reg. at 86,419, JA2. It defies logic to assume no changes in ownership over that period of time, and a system cannot plan for or know whether in year 10 there will suddenly be new owners who suddenly expand the scope of the water system by granting access to their private lines.

EPA makes no attempt to grapple with these challenges, shrugging its shoulders and explaining that its decision not to "delineate the prerequisites or elements of 'access' stems from "the wide variation of relevant state and local laws

and water tariff agreements as well as the potential for these to change over time." EPA, *Public Comment and Response Document for the Final Lead and Copper Rule Revisions* at 9-257 (2024) [hereinafter *EPA Response to Comments on the 2024 Rule*], EPA-HQ-OW-2022-0801-2645, JA988. But leaving it up to water systems to figure out this "functional, self-implementing," *id.* at 9-262, JA993, concept of access, on a case-by-case basis, is neither practicable nor workable, Association Comment at 117, JA656.

**B.     EPA Lacks Authority to Compel Public Water Systems to Replace Privately Owned Service Lines.**

Even if EPA's interpretation of control is textually plausible, its interpretation would give it unprecedented authority that reaches far beyond the words and intent of the statute. *See West Virginia v. EPA*, 597 U.S. 697, 721 (2022). "Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *Id.* at 723 (internal quotation marks and citation omitted). The Act regulates only public water systems by requiring them to comply with federal drinking water standards and enforcing those requirements through States with primary enforcement authority. *See* 42 U.S.C. §§ 300f(1)(A), 300g, 300g-3. Nowhere in the Act is there any language, expressly or implicitly, authorizing EPA to directly regulate service lines within private residences, business, or other entities in this way.

The only court to have reached this precise issue would agree. In *Bass v. Ledbetter*, the Georgia Supreme Court affirmed summary judgment of a mandamus action that sought to compel a water system to clean contaminated pipes on private property under Georgia's safe drinking water act. 363 S.E.2d 760, 760-61 (Ga. 1988). That law, similar to its federal counterpart, defines a "public water system" by reference to facilities "under the control" of the system. *Compare* Ga. Code § 12-5-172(11), *with* 42 U.S.C. § 300f(4)(A). The Georgia Supreme Court explained that "private lines running from the service connections of the distribution facilities into the homes ... are <u>not</u> within the control of the operator," and therefore, the state's regulatory authority was "limited to the public aspects of water delivery systems." *Bass*, 363 S.E.2d at 761 (emphasis added). That same reasoning applies here.[11]

Indeed, Congress built a framework that recognized that lead exists in both public water systems and in private lines and plumbing materials and did <u>not</u> mandate that individual households or water systems remove any service line or lead-bearing plumbing material. Instead, the statute prohibits <u>future</u> use of lead-bearing pipes or plumbing fixtures in any "residential or nonresidential facility providing water for human consumption." 42 U.S.C. § 300g-6. As the architect of

---

[11] This Court hinted at the same understanding in its review of the 1991 Rule, observing how lead enters a water system "through corrosion of service lines and plumbing materials containing lead ... that are privately owned and thus <u>beyond the EPA's regulatory reach</u> under the Act." *AWWA*, 40 F.3d at 1269 (emphasis added).

the ban made clear, it "[d]id not ask anyone to rip up old plumbing systems." 132 Cong. Rec. 11669 (May 21, 1986) (statement of Sen. Bradley). Nor was it "the intention of the conferees that EPA enforce the ban directly on builders and contractors," as "[t]he ban [wa]s to be enforced only through State and local building and plumbing codes." *Id.* at 11660 (statement of Sen. Durenberger); *see also* Conf. Rep. No. 99-575, at 195-96 (1986). Such a clear, disparate exclusion "argues forcefully" that Congress did not intend for EPA to have the authority to require water systems to remove lead on private property. *Omni Cap. Int'l Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 106 (1987); *see Russello*, 464 U.S. at 23 ("[I]t is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

EPA itself has never suggested that it could mandate service line replacement on private property. Instead, EPA has long recognized its "authority to hold public water systems responsible <u>only</u> for conditions under their 'control,'" 56 Fed. Reg. at 26,504, JA403 (emphasis added), but "much of the lead and copper-bearing plumbing material is privately owned and <u>outside the public water system's control</u>," *id.* at 26,471, JA389 (emphasis added); *see also EPA Response to Comments on the 2021 Rule* at 195-96, JA296-97 (noting "the shared responsibility" between water systems and customers and "not holding water systems responsible when customers are not willing or able to participate" in lead service line replacement). Instead,

27

EPA's long-standing approach to lead in chinking water consistently prioritized corrosion control treatment, a treatment technique that effectively reduces lead concentrations in pipes on private property without any encroachment on that property by public water systems. *See supra* at 8.

In short, the 30-year history of EPA's lead drinking water regulations is devoid of any decree by the Agency that water systems are responsible for replacing service lines they do not own. "This 'lack of historical precedent,' coupled with the breadth of authority that [EPA] now claims, is a 'telling indication' that the mandate extends beyond the agency's legitimate reach." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 119 (2022) (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010)); *accord West Virginia*, 597 U.S. at 722. EPA's interpretation of "control" in the 2024 Rule gives it "sweeping and consequential authority" to require water systems to replace millions of individual service lines that lie beneath private properties. *West Virginia*, 597 U.S. at 721 (citation omitted). In such case, "something more than a merely plausible textual basis for the agency action is necessary"—instead, EPA "must point to 'clear congressional authorization' for the power it claims." *Id.* at 723 (quoting *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Here, EPA cannot.

**C. EPA's Interpretation Unreasonably Departs from Decades of Prior Agency Policy.**

In addition to contravening the Act, the 2024 Rule contradicts the Agency's prior interpretation of "control," which dates back over two decades. That is a paradigmatic example of arbitrary action. *See Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 156 (D.C. Cir. 2005); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

**1. EPA has never equated control with access and has instead associated it with ownership.**

EPA attempted to define control several times before the 2024 Rule, but never did the Agency so broadly define control to equate it to access. Preambles to prior rulemaking documents demonstrate the Agency's view that control bore at least some similarities with ownership and that privately owned portions of service lines, at least within individual households, lie beyond the control of water systems. For example, in the 1991 Rule, EPA promulgated a definition of control to mean "authority to set standards for construction, repair, or maintenance of the line, authority of the system to replace, repair, or maintain the service line, or ownership of the line." 56 Fed. Reg. at 26,504, JA403. In so doing, EPA established a presumption that water systems control every service line up to the wall of the buildings they serve, rebuttable only with a demonstration that some legal authority limited the systems' control. *Id.*; *see also id.* at 26,475-76, JA392-93 ("EPA agrees

that water systems should not be held directly responsible for plumbing materials within private homes.").

This Court remanded and vacated EPA's 1991 definition solely on procedural grounds because the Agency failed to provide adequate notice to the public of this "novel definition." *AWWA*, 40 F.3d at 1275. Several years later and "[a]fter further consideration," EPA proposed a revised definition of "control" that would include the portion of the line the water system owns, as well as any additional portion that the system has the authority to replace, but not portions of service lines where systems have "standard setting authority or other forms of authority," as the 1991 Rule required. 60 Fed. Reg. 16,348, 16,356 (Apr. 12, 1996), JA2046. EPA expressed concern that the latter "could result in confusion and delay" because "different perceptions of the precise scope of the system's legal authority, and resolution of such disputes would have required the intervention of the State, a potentially time consuming process." *Id.* EPA also invited comment on equating control with ownership, believing that the narrower definition "would further simplify implementation of the rule, since the division in ownership between the system and the user should be clear to all parties." *Id.*

Responding to commenters that a definition equating control with ownership was both lawful and administratively practical, EPA finalized this definition in its minor revisions to the 1991 Rule. *See* 65 Fed. Reg. 1,950, 1,963 (Jan. 12, 2000),

JA272 ("EPA believes it is appropriate to equate 'control' with 'ownership' in order to eliminate potential legal confusion and delays in implementing the Rule."). Until the 2024 Rule, EPA did not diverge from this interpretation.

### 2. EPA's defense of its novel interpretation is unpersuasive.

Here, EPA attempts to justify its novel reading of the Act by presenting five arguments. Each lacks "persuasive value." *Lissack v. Comm'r*, 125 F.4th 245, 259 (D.C. Cir. 2025).

*First*, EPA claims that it can ascertain congressional intent because "the phrase 'under control of' instead of the more commonly used phrase 'owned by' suggested that Congress had a different concept in mind." 89 Fed. Reg. at 86,452, JA35. Initially, it is unclear what tool of statutory interpretation EPA wants this Court to apply. *See Loper Bright Enters.*, 603 U.S. at 400. EPA offers no citations or explanations for why Congress's purported choice to use a supposedly less common phrase means that Congress had "a different concept in mind" here. 89 Fed. Reg. at 86,452, JA35. In any event, EPA invites pure guesswork into how equating control with access is consistent with Congress's intent. Such nebulous reasoning warrants no consideration or deference. *See Loper Bright Enters.*, 603 U.S. at 402.

*Second*, EPA claims that it "has never concluded that [the Act] mandates an interpretation of 'control' to mean ownership exclusively." 89 Fed. Reg. at 86,452,

31

JA35. But that is wrong. In 2000, the Agency promulgated minor revisions to the 1991 Rule and stated in the final rulemaking preamble:

> EPA has eliminated the "control" terminology from the [1991] Rule. Today's action revises § 141.84(d) to require the water system to replace only the portion of the [lead service line] that it owns.

65 Fed. Reg. at 1,966, JA274 (emphasis added). EPA acknowledges here that its use of ownership as a proxy for control decades ago was "driven by implementation concerns for the [1991 Rule]." *EPA Response to Comments on the 2024 Rule* at 9-260, JA991. But instead of explaining why those concerns no longer exist, EPA baldly asserts that the use of ownership is "no longer consistent with" the Act because "full service line replacement is necessary to prevent known or anticipated adverse effects on the health of persons and the increased lead levels" associated with partial replacement. *Id.* This explanation does not reflect a "fair and considered judgment on the matter in question," *Auer v. Robbins*, 519 U.S. 452, 462 (1997), because it does not acknowledge the implementation problems EPA identified many years ago. As such, EPA's "plainly erroneous" interpretation of, and unexplained inconsistency with, its own regulations sanction no deference from this court. *Id.* at 461 (citation omitted); *see Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *Okla. Dep't of Env't Quality v. EPA*, 740 F.3d 185, 195 (D.C. Cir. 2014).

*Third*, EPA points to "many examples of" successful service line replacement programs, which demonstrate "that water systems can obtain access to conduct full

service line replacement without owning the line." 89 Fed. Reg. at 86,452, JA35.

Those examples do nothing to justify EPA's stark deviation from its prior interpretation of "control" or why the Agency is no longer concerned about the "unintended delays and other complications" inherent in its broad definition. 65 Fed. Reg. at 1,963, JA272; *see also id.* (expressing concern with the difficulties in working with homeowners, avoiding conflicts or lawsuits, and determining which legal authorities give water systems authority to enter private homes). Although EPA "need not demonstrate to a court's satisfaction that the reasons for its new [definition] are <u>better</u> than the reasons for the old one," it still must "provide a more detailed justification" when its factual findings depart from those that underlay its prior position. *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 718-19 (D.C. Cir. 2016) (emphasis in original) (quoting Fox, 556 U.S. at 515); *see also Air All. Houston v. EPA*, 906 F.3d 1049, 1066-69 (D.C. Cir. 2018) (per curiam) (concluding that an EPA rule was arbitrary where it deviated from previous Agency positions and failed to explain shifts in perceptions of factual findings). EPA has failed to do so here. *See also infra* Section II.C.

*Fourth*, EPA claims that "significant Federal funding sources ... can help increase water system access to conduct full service line replacement" because property owners "may be more likely" to replace their portion of the service line with subsidized costs. 89 Fed. Reg. at 86,453, JA36. But again, even if those

inferences are true, they still fail to acknowledge the Agency's long-standing concerns about delays and uncertainty. *See supra* Section I.C.1; *see also infra* Section II.A (discussing external public funding and explaining why it is not significant). And they simply bear no relevance to the legal issue here—whether the "best reading" of the statute equates control with access.

*Fifth*, by requiring systems to make new attempts to gain access with each change in property ownership in the 2024 Rule, *see supra* Section I.A, EPA has implicitly recognized that the best reading of the statute should equate control with ownership. Many properties could change occupancy (when leased) multiple times without changing ownership, and while a subsequent tenant may be able to give a system operator "access" to the property, we would not say, as a matter of common sense and plain meaning, that the new tenant or the system "controls" the lines as a result.

* * *

The single, best reading of Section 1401(4)(A) equates control with water system ownership—not access. Moreover, EPA's justification for this novel interpretation violates the APA because it is contrary to the language of the Act, the purpose of the overall statutory scheme, and the Agency's precedent. The 10-year service line replacement program is the product of a policy objective from the previous Presidential administration and <u>not</u> any change in circumstances, *see supra*

at 11-12, and EPA rested on an unreasoned and unlawful interpretation to justify it. Given that the replacement program is the bedrock reason upon which EPA promulgated the 2024 Rule, the entire Rule should be vacated. *See MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 23 (D.C. Cir. 2001) ("In these circumstances, it is clear that severing all references to [a portion of a rule] would severely distort the [agency's] program and produce a rule strikingly different from any the [agency] has ever considered or promulgated .... Accordingly ... the entire rule must be vacated.").

## II. The Rule Is Not Feasible as Required by the Act.

When promulgating treatment techniques, including the 2024 Rule, EPA must "identify those treatment techniques which, in the [EPA's] judgment, would prevent known or anticipated adverse effects on the health of persons to the extent feasible." 42 U.S.C. § 300g-1(b)(7)(A). Feasible, in turn, is defined as "feasible with the use of the best technology, treatment techniques and other means which the Administrator finds, after examination for efficacy under field conditions and not solely under laboratory conditions, are available (taking cost into consideration)." *Id.* § 300g-1(b)(4)(D). This Court has stated that the term "feasible" means that something is "technically possible and affordable." *City of Portland v. EPA*, 507 F.3d 706, 712 (D.C. Cir. 2007); *see also* 89 Fed. Reg. at 86,433, JA16 (highlighting the "three primary components" in EPA's treatment technique feasibility analysis, including "effectiveness," "affordability," and "technical[] possib[ility]").

Here, EPA took too narrow of a view of "feasibility," did not take certain costs into consideration, and failed to demonstrate that the 2024 Rule will be "technically possible" or "affordable" for water systems. *City of Portland*, 507 F.3d at 712. Accordingly, EPA violated the Act and the APA, and the 2024 Rule should be vacated in full and remanded to the Agency. Even accepting EPA's narrow definition of feasibility, this Rule is not feasible given the lack of an available, reliable workforce to remove service lines nationwide on the proscribed 10-year timeline. The examples EPA cites to support its claims of feasibility are in response to specific, localized crises where intensive resources were brought to bear on the problem. They do not demonstrate that all systems can comply with this timeline simultaneously when competing for limited resources and juggling competing regulatory demands.

### A. EPA Failed to Adequately Take Costs Into Consideration in Assessing the Feasibility of the 2024 Rule.

EPA failed to "tak[e] [certain] cost[s] into consideration" when promulgating the 2024 Rule. 42 U.S.C. § 300g-1(b)(4)(D). EPA's feasibility analysis is therefore invalid.

*First*, EPA failed to appropriately consider the costs the 2024 Rule will impose on small and rural water systems. While EPA defines "affordability" in terms of what large water systems can reasonably afford, *see* 89 Fed. Reg. at 86,433-34, JA16-17, it is within the Agency's discretion to assess potential compliance costs

across all regulated systems, *see* 56 Fed. Reg. at 26,483, JA398 ("EPA also gives additional consideration to the total national costs to comply with the regulation."). Nothing in the Act's definition of "feasible" precludes such considerations. *See generally* 42 U.S.C. § 300g-1(b)(4)(D). Because approximately 91 percent of water systems regulated under the 2024 Rule are small systems, it was arbitrary for EPA not to consider the costs of the 2024 Rule for such systems when analyzing its affordability. *See* Association Comment at 24, JA563; *see also* I EPA, *2006 Community Water System Survey* 10 (2009), https://perma.cc/7SWQ-PU8J ("[T]he vast majority of water systems are relatively small[.]").

As EPA has previously acknowledged, "there is no indication that Congress envisioned establishment of [Levels] that would result in <u>widespread noncompliance</u> among water systems because of contamination caused by <u>conditions beyond their control</u>." 56 Fed. Reg. at 26,476 (emphasis added), JA393. The same logic applies to treatment techniques: EPA's regulations should not result in widespread noncompliance, such as for small, rural, public, or quasi-public water systems, for reasons outside of systems' control. Otherwise, the rule is infeasible. *See* Association Comment at 98, JA637. Indeed, Congress has explained that it did not "inten[d] to cause any area to be deprived of any existing drinking water supply services," H.R. Rep. No. 93-1185 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6454, 6471, such as through exorbitantly costly regulations under the Act, *see also* S. Rep. No. 104-169,

at 12-13 (describing provision in prior version of Act, which received "critical comment" and "impos[ed] burdens on consumers and the taxpayers ... with no rational relationship to the public benefits that might be realized").

EPA acknowledged as much when it declined to promulgate a Level for lead. 56 Fed. Reg. at 26,476, JA393 ("EPA does not believe that establishing stringent [Levels] that most systems might not be able to meet would be consistent with the statutory requirement that a[] [Level] be 'feasible.'"). Yet EPA promulgated the 2024 Rule without adequate consideration of its affordability for such systems, allowing for possible "widespread noncompliance" for those systems that will be unable to meet the service line replacement and other aspects of the 2024 Rule. *Id.*; *see* Association Comment at 24, 98, JA563, 637; *see also* EPA Response to Comments on the 2024 Rule at 1-576, JA705 (comment from Washington Association of Sewer & Water Districts stating, "[f]unding for ... replacements will always be an issue. The financial pressures for meeting these requirements at the same time as working to meet other regulatory requirements are high, particularly on smaller utilities. Without ongoing federal funding, customers will experience rising utility rates that will be unaffordable to some ...."); *see also id.* at 1-36, JA697 (comment from Nebraska Department of Environment and Energy stating, "[t]he implementation of these requirements will place a tremendous burden on both the public water systems, and the States. Small systems, in particular, will lack the

resources to implement all of the facets of this complex regulation"); *id.* at 1-524, JA703 ("There is also not enough funding available to replace all lead lines and this requirement could force [systems] to go into unaffordable debt to remain in compliance."). As EPA has recognized, "[h]aving large numbers of systems out of compliance with the [Act] due potentially to problems outside their control would cause substantial confusion among the public and the water supply industry." 56 Fed. Reg. at 26,477, JA394. EPA's failure to holistically assess the 2024 Rule's costs opens the door to that very result, *see generally* Association Comment at 109-10, JA648-49, and it was arbitrary and capricious for EPA to issue the 2024 Rule when it will create widespread noncompliance within the regulated community, *see generally Almay, Inc. v. Califano*, 569 F.2d 674, 682-83 (D.C. Cir. 1977) (finding a Food and Drug Administration action arbitrary and capricious and explaining that, "imposition of the present regulation, over the ... objections of those who must comply, in the face of indications that compliance would be unworkable ... cannot contribute to public acceptance of the federal regulatory scheme").

*Second*, EPA significantly underestimated the costs water systems will face in complying with the 2024 Rule. EPA failed to adequately account for the cost estimate report Association submitted to EPA, which estimated the cost per service line replacement under the 2024 Rule, including the cost of private-side replacement, to range from "$7,600 to $37,800 with an average cost of $12,500." Association

Comment at 129-30, JA668-69 (citing CDM Smith, *Final Report, Considerations When Costing Lead Service Line Identification and Replacement* 4-12 (Nov. 2022), Attachment 1 to Association, Draft Comments, Lead and Copper Rulemaking Improvements Rulemaking (2022), EPA-HQ-OW-2022-0813-0031, JA414 (Federalism Comments)).[12] Instead, EPA estimated costs substantially lower, with a mean cost of $6,930 for full service line replacement. *See Economic Analysis* at 4-10 to 4-11, JA1740-41 (Exhibit 4-5). Likewise, EPA assessed the 2024 Rule's costs over a 35-year period, *see* 89 Fed. Reg. at 86,568, JA151, despite the fact that most costs will accrue over the 10 years in which water systems are conducting replacement, *see* Association Comment at 82, 98, JA621, 637. At bottom, EPA underestimated the 2024 Rule's costs by potentially billions of dollars. *See generally* 89 Fed. Reg. at 86,420, 86,568, JA3, 151 (estimating "the quantifiable annual costs of the rule [to] be $1.47 to $1.95 billion in 2022 dollars," which, "over a 35-year period of analysis," translates to approximately $51.45 to $68.25 billion in costs); *EPA Response to Comments on the 2024 Rule* at 1-524 to 1-525, JA703-04 (comment from U.S. Conference of Mayors, National League of Cities, and National

---

[12] See also EPA, Panel Report of the Small Business Advocacy Review Panel on EPA's Planned Proposed Rule Lead and Copper Rule Improvements (LCRI) National Primary Drinking Water Regulation 28 (2023), EPA-HQ-OW-2022-0801-0045, JA266 (small entity representative "estimat[ing] that full [lead service line replacement] costs more than $12,000 per line").

Association of Counties, highlighting "the projected replacement cost of $90 to $100 billion"). By failing to accurately account for the true costs of the 2024 Rule, including certain high costs associated with service line replacement, *see* Association Comment at 129-32, JA668-71, EPA failed to "tak[e] [such] cost[s] into consideration," in violation of the Act, 42 U.S.C. § 300g-1(b)(4)(D). EPA likewise failed to adequately consider the cumulative costs of concurrently complying with other recently promulgated regulations under the Act in the Agency's feasibility analysis for the 2024 Rule.[13]

Even by EPA's (under)estimates, the 2024 Rule will impose historically high costs on water systems, *see Economic Analysis* at 4-2 (Exhibit 4-1), JA1738 (estimating total annual public water system costs for the 2024 Rule to be $2.291 billion to $2.948 billion), and the impacts of these costs will fall directly on American households, which are already dealing with increasing water affordability issues, *see* Association Comment at 6-9, JA545-48 (collecting studies). This is so

---

[13] Water systems are simultaneously contending with EPA's recent PFAS drinking water standard, which was contemporaneously promulgated with the 2024 Rule and is one of the most expensive rules the Agency has ever promulgated under the Act. *See* 89 Fed. Reg. 32,532 (Apr. 26, 2024). This regulation will impose national annualized costs of approximately $2.45 billion on many water systems already struggling with the 2024 Rule. *See* Opening Brief of Pet'rs at 54, *AWWA v. EPA*, No. 24-1188 (consolidated with Nos. 24-1191, 24-1192) (D.C. Cir. Oct. 7, 2024); 89 Fed. Reg. at 86,569, JA152; *see also* Association Comment at 98, JA637 ("'[F]easibility' cannot be viewed in a vacuum.").

because water systems rely on direct revenue from ratepayers, which is typically derived from increased customer charges and water rates, to pay for infrastructure improvements. *See id.* at 6, JA545.

*Third*, EPA drastically overestimates the extent to which these costs can be offset by outside financial assistance.[14] *See generally id.* at iii, JA538. There are limitations on the types of funding available to water systems to help offset these impacts and pay for infrastructure improvements. For instance, with limited exceptions (*e.g.*, preparing service line inventories), federal funding cannot be used for operational expenses. *See id.* at 6-9, JA545-48. In addition, most federal and state funding comes in the form of loans that water systems must repay, and are repaid with funds obtained from customer charges or water rates. *See id.* While these funding sources can be useful to reduce household burdens, their impacts are marginal and limited to the subset of systems that are capable of accessing these funds. *See id.*

---

[14] "While EPA avers that it "did not rely upon external funding" in assessing the 2024 Rule's affordability, 89 Fed. Reg. at 86,448, JA31, the preamble for the 2024 Rule indicates that the Agency's feasibility analysis was informed by the availability of such funding, *see, e.g.*, *id.* at 86,460, JA43 (noting "there is significant funding available to support service line replacement," and highlighting EPA's "expect[ation] that the additional funding from [the Bipartisan Infrastructure Law] will increase the affordability of the achieved replacement rates").

More generally, federal and state infrastructure funding assistance will be insufficient to support water system compliance with the 2024 Rule's treatment techniques, including service line replacement. *See id.* at 1, JA540. For instance, congressional appropriations will be necessary to facilitate nationwide service line replacement, but the availability of such funding is uncertain year to year. *See id.* at 5, JA544. Likewise, systems will require subsidized infrastructure funding from sources like the Drinking Water State Revolving Loan Fund program, but this Fund has become increasingly oversubscribed over time.[15] *See id.* at 31, JA570. EPA also overestimates water systems' abilities to timely receive such funding while simultaneously competing with all other systems across the country. *See id.* at iii-iv, 1, 109-10, JA538-39, 540, 648-49. EPA relied on data from a number of non-representative "exemplar[]" water systems to support the feasibility of service line replacement. These systems had access to financial support and public attention that will be unavailable to most systems under the 2024 Rule, as the majority of these "exemplar[]" systems were experiencing crises for which they received significant levels of external financial and technical assistance. *Id.* at 18-19, 30, JA557-58, 569;

---

[15] The Drinking Water State Revolving Loan Fund "is a financial assistance program to help water systems and states to achieve the health protection objectives of the [Act]." EPA, *How the Drinking Water State Revolving Fund Works* (last updated Aug. 20, 2025), https://perma.cc/5ZQ3-C8EJ. Through 2019, state drinking water state revolving loan funds have provided over $41 billion to water systems, underscoring their importance to the water sector. *See id.*

*see infra* Section II.C; *see, e.g.*, Michael Hill, *Port Authority Settlement Gives Newark $155M for Lead Service Lines Replacement*, NJ Spotlight News (Oct. 1, 2019), https://perma.cc/8DNS-WDC8; *see also* 89 Fed. Reg. at 86,460, JA43 (acknowledging "some of the identified systems received varying amounts of financial assistance to support service line replacement," though disclaiming EPA's consideration of such funding). In contrast, the typical water system regulated under the 2024 Rule will be left on its own to compete with all other systems nationwide for funding and technical expertise. *See* Association Comment at 109-10, JA648-49. While Association shares EPA's goal of fully removing all lead service lines, this objective is not achievable based on the federal funding that will be available throughout the 2024 Rule's replacement program's duration. *See id.* at i, iii-iv, 5-6, JA536, 538-39, 544-45.

At bottom, EPA is imposing requirements through the 2024 Rule that rely on funding that will be neither readily available nor accessible to water systems. The upside of the Act's mandate for EPA to "identify" treatment techniques that "would prevent known or anticipated adverse effects on the health of persons to the extent feasible," 42 U.S.C. § 300g-1(b)(7)(A), is that EPA must ensure that its rules account for resource constraints facing water systems—put differently, EPA cannot promulgate "infeasible" regulations, *see, e.g.*, 89 Fed. Reg. at 86,446, 86,455, JA29, 38. However, EPA has crafted an infeasible rule by imposing requirements that rely

on funding sources that are insufficient to support water systems in complying with the 2024 Rule in the mandated timeframe. *See generally* Association Comment at 1, JA540.

**B.   Even Accepting EPA's Definition of Feasibility and Cost Analysis, the 10-Year Service Line Replacement Requirement Is Infeasible.**

Even if this Court accepts EPA's narrow definition of feasibility and concludes EPA adequately "t[ook] cost into consideration" when assessing the feasibility of the 2024 Rule's 10-year service line replacement requirement, EPA failed to demonstrate that this requirement will be "feasible" for water systems. 42 U.S.C. § 300g-1(b)(4)(D). EPA did not show that it is "technically possible" or "affordable" for water systems to replace all service lines within the 10 years allotted under the 2024 Rule.[16] *City of Portland*, 507 F.3d at 712.

The water sector faces a persistent shortage of the type of skilled labor necessary to properly perform service line replacement under the 2024 Rule. *See* Association Comment at 45-48, JA584-87; *see also* 89 Fed. Reg. at 86,434, JA17 (explaining EPA considers "the national availability of necessary ... labor[] and specialized expertise" in evaluating technical possibility). EPA has itself acknowledged that "water utilities face challenges in recruiting, training, and

---

[16] That the 2024 Rule would require water systems to replace services lines outside of their control, in violation of the Act, reinforces the infeasibility of this requirement. *See supra* Section I.

retaining employees," and that "[t]hese challenges are exacerbated" by the fact that "roughly one-third of the water sector workforce [is] eligible to retire in the next 10 years." EPA, *Water Infrastructure Sector Workforce* (last updated June 9, 2025) [hereinafter *Workforce Webpage*] (emphasis added), https://perma.cc/FC49-QNQY; *see also* EPA, *Interagency Water Workforce Working Group Report to Congress* 1 (2024) [hereinafter *Interagency Report*], https://perma.cc/SW2B-WVWE ("The water workforce is also losing experienced workers to employment opportunities outside the sector. At present, there is limited staff to replace these workers.").

These problems are amplified by the "growing need to train and employ water protection specialists with specialized technical skills," who will be increasingly necessary to conduct service line replacement while contending with advancing technologies. *Workforce Webpage*. While EPA highlights a comment from the Laborers' International Union of North America and other information in support of its "assumption" that the labor market can adjust in time, *see* 89 Fed. Reg. at 86,469, JA52, the Agency failed to sufficiently explain whether this assumption, and the support EPA cites, would bridge the gap between what is necessary under the 2024 Rule and the intensifying labor challenges facing the water sector that EPA has elsewhere acknowledged.[17] *See Bloomberg L.P. v. SEC*, 45 F.4th 462, 476 (D.C. Cir.

_____

[17] To the extent EPA relies on past performance of service line replacement in limited jurisdictions to demonstrate the sufficiency of labor, *see* 89 Fed. Reg. at 86,468-69, JA51-52, the water systems operating in those jurisdictions were not simultaneously

2022) ("[T]he requirement that agency action not be arbitrary or capricious includes a requirement that the agency <u>adequately</u> explain its result[.]" (emphasis added) (quoting *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993))); *see also Interagency Report* at 12 ("[T]he recent focus on identifying and replacing lead service lines <u>compounds</u> the need for additional workers." (emphasis added)).

EPA's technical support document for the 2024 Rule reveals further flaws in the Agency's feasibility analysis. EPA evaluated 48 water systems' service line replacement programs in the 2024 Rule's feasibility analysis. *See Technical Support Document* 2-4, JA1651-53. Of these 48 systems, EPA projected that 18 would take longer than 10 years to complete their service line replacement programs, based on their measured replacement rates. *See id.* Put differently, while EPA concluded that the 10-year service line replacement requirement is feasible, *see* 89 Fed. Reg. at 86,467, JA50, the Agency's own data projected that approximately <u>40 percent</u> of these surveyed water systems would be unable to complete their replacement

---

competing to procure contractor support amidst a nationwide race to replace service lines, *see* Association Comment at 47, JA586. Past performance by these systems, in vastly different circumstances to those created under the 2024 Rule, is insufficient evidence of future feasibility under the 2024 Rule as constructed.

programs within EPA's mandated 10-year window based on their actual replacement rates.[18] *See Technical Support Document* at 2-4, JA1651-53.

Moreover, even the "successful" water systems EPA identified performed service line replacement in optimal conditions that are unrepresentative of what the majority of systems will face under the 2024 Rule. Unlike water systems that will be simultaneously conducting service line replacement and competing with all other systems nationwide for the same financial, labor, materials, and other resources under the 2024 Rule's 10-year requirement, the systems EPA considered did not have to deal with such challenges, and were often given significant financial support unavailable to most systems. *See* Association Comment at 18-19, 30, 47, 109-10, JA557-58, 569, 586, 648-49.

EPA highlights service line replacement laws in Illinois, Michigan, New Jersey, and Rhode Island as evidence for the 2024 Rule's 10-year replacement program's feasibility, but these state programs do not prove that the 2024 Rule's replacement program can be accomplished on a national scale. *See* 89 Fed. Reg. at 86,457, JA40. As EPA acknowledges, only New Jersey's and Rhode Island's programs actually impose 10-year service line replacement requirements. *See id.* In

---

[18] EPA marked "N/A" for three of these water systems' estimated years to complete service line replacement. *See Technical Support Document* 3-4, JA1652-53. Excluding these systems, the calculation would be: (18/45) x 100 = 40 percent.

contrast, Michigan created a 20-year replacement requirement for water systems not subject to other replacement requirements, *see* Mich. Admin. Code r. 325.10604f(6)(B), while Illinois imposes varying "replacement rates and timelines" on "community water suppl[ies]," with completion timelines ranging from "up to 15 years" to "up to 50 years," *see* 415 Ill. Comp. Stat. 5/17.12(v)(1)-(5). Far from proving that it is "technically possible," *City of Portland*, 507 F.3d at 712, to impose "full service line replacement by [the 2024 Rule's] set deadline," 89 Fed. Reg. at 86,457, JA40, half of EPA's selected States set <u>much longer</u> deadlines for their own programs than what EPA claims is feasible under the 2024 Rule.[19] That these States established such varying approaches to service line replacement reflects what EPA has already recognized: States know better than EPA about the capabilities of water systems within their own boundaries. *See EPA Response to Comments on the 2021 Rule* at 357, JA299 (acknowledging "states have a better understanding about the number of [lead service line replacement] individual systems can manage, and states may also have varying ... priorities which are reflected in their prescribed goal ...

---

[19] While EPA offers New Jersey's and Rhode Island's programs as evidence for the feasibility of the 2024 Rule's 10-year service line replacement program, the state bills establishing these programs were passed in 2021 and 2023, respectively. *See* 2021 N.J. Sess. Law Serv. 5343 (West); 2023 R.I. Pub. Laws 23-334. Because neither of these programs are even halfway through their expected durations, and their ultimate success is unclear, they are inadequate proof of the technical possibility of the 2024 Rule's replacement program.

rates"); 56 Fed. Reg. at 26,508, JA407 ("States will be in the best position to assess the factual circumstances of each individual system to determine the schedule which the system can feasibly meet."). And under the Act, States are always free to impose more stringent standards and removal timelines than EPA's standards.

**C.  EPA Failed to Meet its Burden of Adequately Justifying its Departure From the 2021 Rule's Replacement Program.**

Where a "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must "provide a more detailed justification than what would [have] suffice[d] for a new policy created on a blank slate." *Fox*, 556 U.S. at 515; *see also Mingo Logan Coal Co.*, 829 F.3d at 718-19. Such is the case here, where the 2024 Rule's 10-year replacement program stands in sharp contrast to the 2021 Rule, which established a "minimum mandatory full [lead service line replacement] rate of three percent after a lead action level exceedance," and gave systems approximately 33 years to fully replace their affected service lines. 86 Fed. Reg. at 4,219, JA317; *see* 89 Fed. Reg. at 86,456, JA39. As EPA explained, this three percent replacement rate was "feasible," *EPA Response to Comments on the 2021 Rule* at 190, JA294, and <u>not</u> "too slow to protect public health," *id.* at 188, JA293. Indeed, EPA found that the 2021 Rule's "provisions," including its service line replacement program, were the "<u>most appropriate</u> for a national rule, based on the EPA analyses as well as comments on the proposed rule." *Id.* at 160, JA292 (emphasis added).

Less than three years after promulgating that regulation, EPA abandoned this paradigm and proposed an aggressive 10-year replacement timeline, *see* 88 Fed. Reg. at 84,882, JA253, despite its endorsements of the 2021 Rule's service line replacement program as feasible and appropriate for public health, *see EPA Response to Comments on the 2021 Rule* at 160, 190, JA292, 294. While EPA cites "new evidence available after the promulgation of the 2021" Rule in support of its 10-year replacement deadline, much of the "evidence" it highlights, including individual water systems' "voluntary" service line replacement programs and the efforts of Illinois, Michigan, New Jersey, and Rhode Island, *see* 89 Fed. Reg. at 86,457, JA40, fails to support its decision to depart from the 2021 Rule, *see supra* Section II.B. Agencies are "generally free to change positions" if they proffer good reasons to support new policies, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1284 (D.C. Cir. 2019) (citing *Fox*, 556 U.S. at 515), but "[t]his flexibility has limits," *id.* (emphasis added). In light of the deficiencies in the evidence on which it relied, EPA pushed past the "limits" of its "flexibility" when it failed to "offer 'a reasoned explanation ... for disregarding facts and circumstances that underlay'" the 2021 Rule. *Id.* (quoting *Fox*, 556 U.S. at 515-16).[20]

---

[20] While it was appropriate for EPA to include a deferred deadline provision for service line replacement in the 2024 Rule, *see* Association Comment at 38, JA577, this provision does not salvage the feasibility of the replacement requirement, *contra* 89 Fed. Reg. at 86,446, JA29. Under this provision, water systems "may defer" their replacements past the 10-year deadline if, in the process of "replacing 10 percent of

**D.     Other Aspects of the 2024 Rule Are Cumulatively Infeasible.**

In addition to the service line replacement program, other elements of the 2024 Rule will be cumulatively infeasible for systems. For instance, water systems will need to find and fund crews to conduct validation studies of non-lead service lines, including through visual inspections of service lines at "a minimum of two points." 40 C.F.R. § 141.84(b)(5). This requirement will exacerbate the challenges water systems will face as they compete nationwide to procure the necessary labor to accomplish service line replacement. *See* Association Comment at 40, JA579; *Workforce Webpage* (highlighting the "roughly one-third" of the water workforce eligible for near-term retirement). Similarly, the 2024 Rule requires water systems to distribute water filters and replacement cartridges to consumers in different circumstances, *see, e.g.*, 40 C.F.R. § 141.84(h)(1)(iii); *id.* § 141.85(j)(2) , which will

---

the total number of known lead and galvanized requiring replacement service lines in a system's replacement pool," the system would be replacing "an annual number of service line[s] ... that exceeds 39 per 1,000 service connections." 40 C.F.R. § 141.84(d)(5)(vi)(A). Because EPA's feasibility determination for service line replacement relies on the Agency's statutorily-invalid definition of "control," *see* 89 Fed. Reg. at 86,467, JA50, and this provision delays, but does not affect, water systems' mandate to replace all lines within their "control," *see* 40 C.F.R. § 141.84(d)(1), it does not alter the overall feasibility of the replacement requirement, *see generally* supra Section I. This provision also does not change the fact that, under the 2024 Rule, water systems will often be unsure as to whether they have fully completed their replacement requirements because private property ownership, and consent for service line replacement, can change at any point during the replacement period. *See generally* 40 C.F.R. § 141.84(d)(3); *see also supra* Section I.A.

compound the costs and materials challenges associated with service line replacement, *see* Association Comment at 80, JA619. Likewise, EPA's revision of the lead action level from 15 parts per billion to 10 parts per billion, *see* 89 Fed. Reg. at 86,420, JA3, will invariably lead to more water systems exceeding this level and triggering public education and corrosion control-related requirements, *see, e.g.*, 40 C.F.R. § 141.81(d)(1)(i) (describing actions "[l]arge or medium water systems with lead service lines that exceed the lead action level must" take with regard to re-optimizing optimal corrosion control treatment); *id.* § 141.85 (noting "public education materials" distribution requirements applicable to "water system[s] that exceed[] the lead action level"). This blunt technique will not be selective for the water systems most at risk of lead corrosion issues and will saddle systems with misplaced burdens. *See* Association Comment at 61, JA600.

Collectively, these elements of the 2024 Rule underscore how EPA has imposed a suite of requirements on water systems that will prove cumulatively infeasible. *See id.* at 10, JA549. While Association supports implementing strong protections for water consumers and the elimination of lead in water systems, the 2024 Rule will force systems, absent additional financial support, to defer critical water infrastructure improvements. *See id.* at i, JA536. Implementing measures like service line replacement should not come at the cost of delaying critical investments in water infrastructure.

\* \* \*

Since 1991, water systems around the country have successfully implemented federal drinking water regulations to reduce the prevalence of lead in our drinking water. The additional work that remains, however, must align with the technical, administrative, and fiscal limitations of water systems. EPA did not consider such limitations. As a result, EPA did not satisfy its obligations under the Act and the APA in determining that the 2024 Rule will be feasible because the Agency failed to take certain costs into consideration, relied on inadequate evidence to support its affordability analysis, and imposed a regulation that will saddle systems with historically high costs and myriad logistical challenges. For these reasons, the 2024 Rule is not feasible, and it should accordingly be vacated in full and remanded to EPA. *See Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1186 (D.C. Cir. 2025) ("Remand with vacatur is the ordinary remedy for unlawful agency action" (citing *United Steel*, 925 F.3d at 1287)).[21]

## CONCLUSION

For the foregoing reasons, the Court should grant the petition for review, vacate the 2024 Rule, and remand to EPA.

---

[21] If this Court determines that the 2024 Rule is feasible but that the Agency's reading of "control" is not the best reading of the Act, *see supra* Section I, then partial vacatur of that portion of the Rule is warranted.

Date: April 17, 2026

Respectfully submitted,

*/s/ Corinne V. Snow*

Corinne V. Snow
Hannah Flesch
Vinson & Elkins LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Phone: (202) 639-6622
Fax: (917) 879-8998
Email: csnow@velaw.com
Email: hflesch@velaw.com

*Counsel for Petitioner American Water Works Association*

**CERTIFICATE OF COMPLIANCE**

1. This Opening Brief of Petitioner American Water Works Association complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). It contains 12,919 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

2. This Opening Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Date: April 17, 2026

*/s/ Corinne V. Snow*
Corinne V. Snow
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Phone: (202) 639-6622
Email: csnow@velaw.com

*Counsel for Petitioner American Water Works Association*

**CERTIFICATE OF SERVICE**

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that, on April 17, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

Date: April 17, 2026

/s/ Corinne V. Snow
Corinne V. Snow
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Phone: (202) 639-6622
Email: csnow@velaw.com

*Counsel for Petitioner American Water Works Association*